UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, Plaintiff, | ) | Case 1:15-cr-00178 |
| v. | ) | Alexandria, Virginia<br>January 27, 2016<br>3:17 p.m. |
| MARK S. DRESNER, Defendant. | ) | Pages 1 - 80 |

TRANSCRIPT OF PAUL WILKINSON'S TESTIMONY

BEFORE THE HONORABLE ANTHONY J. TRENGA

UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

FOR THE PLAINTIFF:

KOSTA S. STOJILKOVIC, ESQUIRE
N. NATHAN DIMOCK, ESQUIRE
MICHAEL T. O'NEILL, ESQUIRE
OFFICE OF THE UNITED STATES ATTORNEY
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3700

FOR THE DEFENDANT:

STEVEN T. WEBSTER, ESQUIRE
AARON S. BOOK, ESQUIRE
WEBSTER BOOK, LLP
300 North Washington Street, Suite 404
Alexandria, Virginia 22314
(888) 987-9991

THE DEFENDANT, MARK S. DRESNER, IN PERSON

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

**I N D E X**



| WITNESS | EXAMINATION | PAGE |
| --- | --- | --- |
| Paul F. Wilkinson | Direct | 3 |
| | Cross | 47 |
| | Redirect | 77 |

PAUL F. WILKINSON, PLAINTIFF'S WITNESS, AFFIRMED

DIRECT EXAMINATION

BY MR. DIMOCK:

Q Good afternoon, Mr. Wilkinson.

A Good afternoon.

Q Could you please state and spell your full name for the record.

A It's Paul Francis Wilkinson, P-A-U-L, F-R-A-N-C-I-S, W-I-L-K-I-N-S-O-N.

Q And, Mr. Wilkinson, where are you from?

A I'm from the San Francisco Bay Area. I was born in San Francisco. I grew up on the peninsula, and I currently reside in Los Gatos in the mountains.

Q And could you describe generally, Mr. Wilkinson, your educational background.

A I started out pretty early in high school in the electronics sector and stayed with that until three years of college. I didn't get a formal degree, but I had about seven years of electronic courses and engineering courses.

Q And could you just generally describe your work history.

A Mainly in the consumer electronics business and mobile electronics. I worked on creating a mobile -- high-end mobile security system. Now I'm more akin to

home automation, home control systems, audio and video systems for customer residences.

Q Do you own your own company?

A Yes.

Q Okay. Is this the only company that you've ever owned?

A No.

Q Could you explain that.

A This is -- my current company I started after I left Ultimate Control in 2006. In that time period -- I started Nature's Peak in 2004 while I was employed at Ultimate Control, and then I left Ultimate Control to work on Nature's Peak while also working in the consumer electronics business to pay the mortgage and put the food on the plate.

Q Could you explain how it is that Nature's Peak came about.

A Nature's Peak was created after a lot of interest from family and friends to see the product move forward. So I had a dip and a spread that we made in the kitchen for many years. When I invited company over, family and friends, they really liked it. It was a great dip, for instance, for artichokes and could be used as a sandwich spread and many other applications. So I was egged on, I guess, by my family and friends.

They said, Hey, you have to put this on the market because it's a great product.

And so that was our first step, getting out to the market and determining that there is a market. And after that determination, raising capital from an angel investor that loved the product and wanted to see it move forward. He was part of the early momentum that encouraged us to bring it to market.

Q And who is that angel investor you just described?

A That's Dick Coughlin, Richard Coughlin.

Q And how did you know Mr. Coughlin?

A He was part of my Indian Princesses group up in the mountains, a father-daughter group.

Q And do you know approximately how much he invested in Nature's Peak?

A Over $600,000.

Q Did you invest your own money in Nature's Peak as well?

A Yes.

Q About how much over the years?

A Over $300,000.

Q So prior to 2007, what was the primary funding mechanism for Nature's Peak?

A Angel investment and sweat equity.

Q Around late 2006, early 2007, did you encounter a

need for additional funding?
A Yes, we did. We always had the need as we grew, but the main reason why we needed it is if we were going to grow to be a national company, we needed to get funds secured for production and for receivables, financing. So we were in need of a million or two in cash and about a million in credit for receivables financing.
Q And during that time period, did any opportunities come up that you decided to explore?
A Yes, many opportunities came up. We pursued, as far as I know, all the opportunities that were -- that came up as far as referrals go, yes.
Q At any point, did the idea of the company going public come to your attention?
A Yes, in 19 -- in 2008 that was presented after we -- 2008-2009 time period after we exhausted a lot of individual potential investors. Keep in mind that was a time period where the economy was going south. And so raising money for a start-up venture wasn't high on everybody's, you know, investment list.
Q What do you remember about how it is that going public came to your attention as an option?
A It was through our business consultant, Robert Oppenheimer, who was also on our board. He had some

associates in New York that he met through another company that he was working with out there, and they also pointed us -- those people in New York pointed us to other potential investors that we went and met with that were equity investor types, two or three. Two I recall for sure. It may have been a third one, but that didn't pan out. But they referred me to them, and we met with them. We gave them our business plan. That started in 2006.

Q Let me ask you a couple of follow-up questions. You mentioned on your board. Who was on the board of your company?

A Dick, Richard Coughlin, and Robert Oppenheimer.

Q And did you have any history with public companies or any expertise with public companies during that time period?

A Zero.

Q And you mentioned Mr. Oppenheimer. How is it that you came to know Mr. Oppenheimer?

A I met Mr. Oppenheimer in a business course called Entrepreneurial Edge, and we've known each other for many years. Before I started Nature's Peak, he worked with us in the consumer electronics business I was in.

Q What was his role with regard to that?

A A business consultant.

Q Okay. And then you mentioned Robert Oppenheimer and some people in New York. Did you come to know who those people in New York were?
A Yes. It was Todd Spehler and then Frank Zangara and Mark Dresner, and then later there was a couple -- there was an attorney involved, George Cornell. And there was another attorney, but he wasn't in New York, Michael Hair. He was in Arizona.
Q Okay. What do you recall, if anything, about Mr. Oppenheimer's role in terms of the company going public?
A He worked with Todd and Mark and Frank -- the New York team, I call it -- in preparing what we needed to do, the documents that we needed in order to make the merger with EVRN work.
Q What was your understanding of the mechanics of that process?
A I had little understanding of it then, and I still have little understanding of it now. So I was focused on the production and marketing side of the company, which was pretty overwhelming considering I also had to earn money. Because the company wasn't making enough money to pay me a salary. So I had to make that to pay my mortgage and put food on my plate.
Q Did you have any understanding in terms of how

going public would help Nature's Peak?

A Yes, some understanding. That it would be a vehicle to raise money and have potential that our stock -- our privately held stock would be eventually turned into publicly traded stock that we could potentially sell if we wanted to.

Q And when you say we, who are you referring to?

A The board. We made the decision to move forward with the merger, and those are some of the benefits that were explained to us.

Q Okay. What was your understanding of the mechanism as to how this process of going public would ultimately lead to the capital that you needed coming in?

A That's part of the mechanism that I didn't understand.

Q And then I think you testified that you did ultimately decide to go public. Is that correct?

A Correct. We did the merger, which made us public.

Q What do you remember about that, about the merger you mentioned? I think you also mentioned Everock previously.

A There was just a lot of documentation that needed to be done before and after. So that was prepared. I did some of the review on it. Most of it I didn't

quite understand, again, the mechanics of the stock and the stock split and the stock being issued. But I was aware of it because documents were given to me to sign.
Q Okay. And what was your understanding of how Everock fits into this?
A Everock was previously a company in the mining business, I was told. So they no longer had any operations. And so they were a nonoperational company, but they were traded publicly. And so merging our company with that company would give us the public status.
Q Okay. Did you know at the time whether or not Everock had any shareholders existing?
A Yes. How many I'm not sure, 1,000, 2,000. I'm not sure.
Q Okay. Did you have any understanding as to what would happen with those shareholders once the merger took place?
A That they would just continue to be shareholders in Everock.
Q Okay. And did you ultimately wind up meeting some of the people in New York that you mentioned?
A Yes, at the Fancy Food show.
Q What's the Fancy Food show?
A The Fancy Food show is the largest trade show in

the industry. If you're kind of anybody in the food business without being a commodity type of food, being a specialty food, you would be at the Fancy Food show. That was held in San Francisco half the year, and then the other half of the year it would be in New York and sometimes held in LA.
Q Who do you recall meeting at the New York show?
A I recall meeting Todd --
THE COURT: Excuse me. Who is Todd?
THE WITNESS: Oh, I'm sorry. Mr. Spehler.
THE COURT: Spehler?
THE WITNESS: Yeah, Mr. Spehler.
A -- and Mr. Zangara and Mr. Dresner, I believe.
Q And so you indicated that the board then eventually made a decision to move forward with this proposal going public; is that correct?
A That's correct.
Q Once that decision was made, who conveyed that decision to the people in New York that you've described?
A Repeat the question.
Q Once that decision was made, who conveyed that to the individuals in New York that had brought this to the company's attention?
A That would have been Robert, Mr. Oppenheimer.

Q Did you have an understanding at the time in terms of where the capital would come from to cover the cost of going public?
A That the New York team would cover most of the cost, but I do remember checks going out of the company for some attorney's fees.
Q Okay. I know you mentioned also attorneys earlier. How were these attorneys chosen to work on this particular transaction?
A George and -- George Cornell and Michael Hair were chosen, I believe, by Todd as one of the New York guys that made that decision. It wasn't our team.
Q Okay. And was the expectation that you or Nature's Peak would be putting up money in order to facilitate this process?
A Well, no, because we didn't have the money to put up to facilitate this process. That was very clear. The amount of money that went out for some attorney's fees was as much as we could do at the time because we were trying to work our capital in the production and then getting paid from the distributors and putting that money back into production. It's sort of a leapfrog way of getting the company going.
Q What was your understanding in terms of -- well, first off, let me ask you this: Do you know whether or

not Everock had a CEO?
A Charles Moeller was the CEO.
Q What was your understanding as to what would occur with Mr. Moeller once this merger took place?
A Well, at first he was going to be on the board for six months or a year. And then after so many months, he resigned.
Q Do you know why he resigned?
A I don't remember.
Q Okay. What do you recall about the next steps once the decision was made to go forward in terms of the merger?
A More paperwork. Once the decision was made, there was a lot of paperwork that was generated to meet specific guidelines of being a public company, guidelines of the pink sheets, which I think is the same as the OTC pink sheets. And there was a lot of disclosures and documents that we had to fill out at that time.
Q How would you describe your understanding of those documents and disclosures and what was going on during that time period?
A Well, I didn't know any different. So it was whatever needed to be done needed to be done. I don't know if that answers your question but...

Q Okay. Was there any discussion about how Nature's Peak would ultimately find investors by going through this process once the merger was complete?
A This is the cloudy part. A mechanism of which somehow we had publicly traded stock would enable us to raise the necessary capital for us to have for our production run and credit line. The mechanism still to this date I'm unclear of.
Q Okay. You mentioned that there were a lot of documents and agreements and materials that -- paperwork, I think, that was going around at the time. Do you know who was preparing those materials or who was involved in preparing them?
A The New York team -- as far as I can remember, the New York team would prepare the documents. And then Robert would review them, and then I would eventually be given them for review and a signature.
Q Okay. During this process, did you -- I know you mentioned the two attorneys that had been recommended. Did you have any other counsel representing you or Nature's Peak's interest through this process?
A We did -- well, not when we merged into Everock. Then it became the other attorneys. But prior to that, we did have representation.
Q And that was when you were as a private company?

A That was when we were a California corporation, correct.

Q What happened after the company became public? What do you recall?

A Well, there was more documentation that was required. We had to file quarterly reports, annual statements. The financials had to be kept up and reviewed, and then at that time we did -- we started doing press releases.

Q Okay. I'd like to show you some documents now with the assistance of the court security officer. We'll start with what's been previously marked as Government Exhibit 24-01.

THE COURT: All right. Is there any objection to this document?

MR. WEBSTER: I'm sorry, Your Honor. I'm just catching up.

THE COURT: All right.

A Okay.

Q If you can, just hold on a moment while defense counsel gets a copy.

A No problem.

MR. WEBSTER: No, Your Honor, there's no objection.

THE COURT: All right. Without objection,

Exhibit 24-01 is admitted.

MR. DIMOCK: Thank you, Your Honor. We would ask to publish as well.

THE COURT: Yes.

THE COURT REPORTER: I'm sorry. Is it 24-1 or 24-01?

MR. DIMOCK: It's 24-01. That's how the numbering is on the sticker.

THE COURT SECURITY OFFICER: Counselor, it's marked 24-1. There's no zero.

MR. DIMOCK: Oh, I must have an older --

THE COURT SECURITY OFFICER: No problem.

BY MR. DIMOCK:

Q Mr. Wilkinson, starting on the first page of this e-mail, do you recognize this?

A Yes.

Q Okay. And who is this e-mail from?

A It's from me.

Q And what's the date on it?

A The date is December 14, 2006.

Q And do you know who this is being sent to?

A It was sent to Mr. Spehler.

Q And let me just clarify: The tms@infusioncapital.net, is that Mr. Spehler's e-mail address?

A That's correct.
Q Then who else is on this e-mail?
A Robert Oppenheimer.
Q Okay. Does it have an attachment?
A Yes.
Q If you would, go to the next page of the exhibit. What's this document entitled?
A Nature's Peak, Proposed Term Sheet, Series A Preferred Stock.
Q What's your understanding of what this related to in late 2006?
A Well, as I mentioned earlier, there was a couple of individuals that Mr. Spehler referred us to for potential funding. We were asked how much we needed and how much we were willing to sell and at what price. So this would have been a term sheet, and this is how we raised capital from the angel investors and other investors where we sold preferred shares.
Q Okay. And if we go to the second page of the document, do you see on the lower section where it says by Equisition Capital II, LLC?
A Yes.
Q What name is listed there?
A That's Mark Dresner.
Q And that's not signed, correct?

A That's not signed.
Q Okay. What's your understanding as to why Mr. Dresner's name was listed on this document?
A To the best of my knowledge, Todd requested that.
Q Okay.
A Mr. Spehler.
Q Do you know if any funding actually came in connection with this document?
A No.
Q Okay. And just to be clear, this was prior to the time that Nature's Peak actually merged with Everock?
A Correct.
Q Okay. Thank you.
I'd like to show you another document. This one would be marked as Exhibit 24-2.
THE COURT: Any objection to this document?
MR. WEBSTER: No objection, Your Honor.
THE COURT: Without objection, Exhibit 24-2 is admitted.
MR. DIMOCK: Thank you, Your Honor.
BY MR. DIMOCK:
Q Mr. Wilkinson, do you recognize this?
A Yes.
Q Okay. In the subject line, it says updated and then two letters, SS, for your review. Could you

explain what SS means?
A That's my abbreviation for a spreadsheet.
Q Okay. And what generally is this e-mail string relating to?
A This would be -- well, this was one of many e-mails that went back and forth when Todd and Mark were helping us with the business plan. So Mark was, as far as I understood, a business consultant for Todd, and he had a lot of expertise in this area. He reviewed the business plans and marketing plans and gave us a lot of good input.
Q Okay. And do you know -- in the top of the page on the first page, it suggests that there's a call that's going to take place. Do you know if a conference call with Mark did take place or not, if you recall?
A It probably did. There were many conference calls that took place. I can't say 100 percent whether that particular one did, but it probably did.
Q Okay. That will be all for that document.
The next one I'd like to have you look at is marked as 24-3. If you can, take a look at that document, Mr. Wilkinson. Do you recognize that document?
A Yes, I recognize the document.

Q Is this an e-mail that you sent?
A Yes.
Q And does it go to a mark@dresner.com?
A And to Todd Spehler.
Q And does this relate to the Nature's Peak merger?
A Yes.
MR. DIMOCK: Your Honor, we would ask to admit Government Exhibit 24-3.
THE COURT: Any objection?
MR. WEBSTER: Your Honor, there appear to be a number of comments in the draft of this disclosure statement that come from Robert Oppenheimer. So to that extent, we would object to that as hearsay.
MR. DIMOCK: Your Honor, we would not offer those comments for the truth of the matter asserted.
THE COURT: All right. I'm going to admit Exhibit 24-3. The Court will reserve on the admissibility of the comments.
MR. DIMOCK: Thank you, Your Honor.
BY MR. DIMOCK:
Q Mr. Wilkinson, what's your understanding -- excuse me. Just a moment while I find my place here.
What's your understanding of what this e-mail and the attached draft document were related to?
A Well, this was part of the information, the

disclosure statement that we needed to have in order to perform the merger.
Q Okay. If we go to the second page of the exhibit, it would be the first page of the attachment. Do you see that?
A Yes.
Q And if we go to the middle of the page, do you see where it says Investor Relations Contact for the Issuer?
A Yes.
Q Who is listed there?
A That's Mark Dresner's name and address in New York.
Q What's your understanding as to why Mr. Dresner was listed under investor relations contact on this draft?
A I'm not sure. Todd could have asked him to be on that.
Q Okay.
A But that's speculation.
Q Okay. So you don't understand at this point?
A No, I don't understand why he was on there. I am speculating that it was agreed by the New York team that he would be on there.
Q If we could go to the third-to-the-last page of

the document, it would be either the 14th page of the exhibit, or for anyone who is following the Bates number, it's ending in 706154.

A Got it.

Q Okay. And do you see in the middle of the page under Item D?

A Yes.

Q What does that say?

A That says, "Promoters: This does not apply to the company."

Q What's your understanding of what a promoter is?

A I don't know what a promoter is.

Q Okay.

A And it said this does not apply to the company. So it wouldn't have been something I would have needed to know.

Q Okay. All right. Thank you.

The next document I'd like you to look at is what's been previously marked as Government Exhibit 24-4. Do you have that, Mr. Wilkinson?

A Yes.

Q Just a few basic questions: Do you recognize this document?

A Yes.

Q Is this an e-mail string between you, Mr. Spehler,

Mr. Dresner, and Mr. Oppenheimer?
A And my accountant.
Q Okay. And does this relate to Nature's Peak?
A Yes.
MR. DIMOCK: Okay. Your Honor, we would move 24-4 into evidence.
THE COURT: Any objection?
MR. WEBSTER: No, Your Honor.
THE COURT: Without objection, Exhibit 24-4 is admitted.
MR. DIMOCK: Thank you, Your Honor.
BY MR. DIMOCK:
Q So, Mr. Wilkinson, to the best your recollection, what is this particular e-mail discussing?
A Well, there was, again, a lot of information we needed to give for this merger and afterwards, and part of that was financials. So my accountant, Mr. McDermott, would send me draft copies of the financials, and then I sent that on to Mark and Todd to make sure that the format that it was in was acceptable for what we needed for whichever document this needed to go on, whatever disclosure document it needed to be attached to.
Q Okay. And this is now early 2008, correct?
A February 2008, correct.

Q Okay. All right. The next document -- no more questions on that document.

I'd like to turn to what's been previously marked as Government Exhibit 3-5.

A Okay.

Q I'll just wait a moment for defense counsel and the Court to also access that.

Okay. Mr. Wilkinson, do you recognize this document?

A Yes.

Q Okay. Is that your company Nature's Peak's letterhead?

A Yes.

Q Does it have your name listed at the bottom of it?

A Yes.

Q And does this also relate to the financing and merger that you've been testifying about?

A Yes.

MR. DIMOCK: Your Honor, at this point, we'd move Government Exhibit 3-5 into evidence.

THE COURT: Any objection?

MR. WEBSTER: No, Your Honor.

THE COURT: Without objection, Government's 3-5 is admitted.

BY MR. DIMOCK:

Q Mr. Wilkinson, what's your understanding of what this document represents? What's going on in this document?
A Well, since my lack of understanding of the mechanism, I think this was an issuance of shares and the stock merger. And so shares went to a Mr. Moeller, who was the acting CEO of Everock.
Q Okay. Do you understand why Mr. Moeller was receiving shares at that time?
A As part of the merger. I don't understand the -- why this amount or -- just I was told that was what we needed to do.
Q Okay. And this letter is -- what's the date on this letter?
A March 2010.
Q Okay. And do you see in the first paragraph or sentence where it talks about removal of restrictions and restrictive legends?
A Yes.
Q Do you have any understanding of what all of that means?
A Not really.
Q Okay. And lastly, does your signature appear on this document?
A Yes. It looks like my electronic signature.

Q Okay. Could you explain that. What do you mean by your electronic signature?

A Well, Mr. Oppenheimer had -- and which he worked on editing a lot of these documents. For convenience sake, so he didn't have to send me something that I'd have to sign and back to him, he had my electronic signature on file. So he would call me and say, Can I use this, your signature, and I would say yes.

Q Okay.

A That was a convenience thing.

Q Okay. That will be it on that particular document.

The next one I'd like you to look at is what's been previously marked as Government Exhibit 3-7.

A Okay. This is a similar document.

Q Okay. And just a couple of preliminary questions: Is that Nature's Peak's letterhead?

A Yes.

Q And does your signature appear on it?

A My electronic signature.

Q Okay. And does this also relate, as best you understand, to the merger that took place?

A Absolutely.

MR. DIMOCK: Your Honor, we would move Government Exhibit 3-7.

THE COURT: Any objection?

MR. WEBSTER: No, Your Honor, no objection.

THE COURT: Without objection, Exhibit 3-7 is admitted.

MR. DIMOCK: Thank you, Your Honor.

BY MR. DIMOCK:

Q Do you have an understanding as to what this particular document is related to?

A It looks like a follow-up on the last one.

Q Do you understand where it talks about removal of restrictions and restrictive legends in this letter? Do you have any understanding as to what all that means?

A No. That's the same as the last one. I am not exactly sure what that means.

Q All right. Thank you, Mr. Wilkinson.

MR. DIMOCK: The next document I'd like to have the witness review is what's been previously marked as Government Exhibit 24-5.

BY MR. DIMOCK:

Q If you could, look that over, Mr. Wilkinson.

A Well, this was an e-mail from Mark to myself and Mr. Oppenheimer with Mr. Spehler CC'd.

Q And does this also relate to Nature's Peak?

A Yes, it does.

MR. DIMOCK: Your Honor, we move in Government Exhibit 24-5.

THE COURT: Any objection?

MR. WEBSTER: No, Your Honor.

THE COURT: Without objection, Exhibit 24-5 is admitted.

BY MR. DIMOCK:

Q All right. If you could, Mr. Wilkinson, could you read that first sentence.

A "This will confirm that I'll conduct a phone interview with Paul tomorrow at 7/14/2010 at 12:30PM Eastern Time (9:30AM Pacific)."

Q Okay. What, if anything, do you recall about a phone interview that was going to take place in July 2010?

A This was for an interview that was done with Mark that a PowerPoint -- it was for some PowerPoint presentation for PR.

Q Okay. If you look down at the middle of the page, do you see where it says, I will need authorization?

A Yes.

Q Okay. Would you read that and the sentence that follows it.

A "I will need authorization from you (via a Nature's Peak email address) to link our press releases

to the EVRN ticker/quote page.

"Please send TWO emails: one for CEOinsiderTV.com and another for Spectrum Research Group."

Q Okay. What did you understand at the time about what this requirement was for?

A I don't know what the requirement was for. As authorization to use the PR piece, I'm assuming.

Q Okay. Are you familiar with Spectrum Research Group?

A No. But CEOinsiderTV, after watching the video, the PowerPoint or whatever you call it, that was the -- where it was going, where the PR was going to.

Q Okay. And the next document I'd like to move to is what's been previously marked as Government Exhibit 24-6. What generally is this document, Mr. Wilkinson, when you're done looking it over?

A This is just a note from Mark getting prepped for the interview.

Q Okay. So this relates to the other e-mail that you just testified about?

A Yes, it does.

MR. DIMOCK: Your Honor, we would move Government Exhibit 24-6.

THE COURT: Any objection?

MR. WEBSTER: No, Your Honor.

THE COURT: Without objection, Exhibit 24-6 will be admitted.

MR. DIMOCK: Thank you, Your Honor.

THE COURT: Thank you, Mr. Dimock.

We'll take our afternoon recess at this time. We'll stand in recess until 4:15.

(Recess from 3:58 p.m. until 4:15 p.m.)

THE COURT: Mr. Dimock.

MR. DIMOCK: Thank you, Your Honor.

THE COURT: Mr. Wilkinson, you remain under oath.

THE WITNESS: Thank you.

BY MR. DIMOCK:

Q So, Mr. Wilkinson, just before we took the break, you had just -- we had just admitted Government Exhibit 24-6, and I think that you had testified this was an e-mail relating to the call you were setting up for this interview. Do you remember that?

A Yes.

Q Okay. Do you know whether this interview -- do you recall whether it actually took place?

A Yes, it did take place.

Q Okay. How did it take place?

A I was in my office, and Mark called in from New York, I presume.

Q Okay. And what do you recall about the mechanics of it in terms of the questions and the answers?
A There was company history involved, where we were at, where we were going. We had a script that got worked on by Mark and the New York team and Robert and myself and a couple of other people in the company that helped us with marketing.
Q Okay. And whose idea was it to do this interview?
A It was one of the New York guys.
Q Okay. And when you say you had a script, could you just expand on that. What do you mean by that?
A Well, the answers -- so I wasn't going to stutter when he asked the questions, we wrote them down so I can be faster responding. Also, it flowed better.
Q Okay. In preparing for your testimony today, have you reviewed a video of an interview with you by Mark Dresner?
A Yes.
Q Is that the video discussed in these particular e-mails?
A Yes.
MR. DIMOCK: Your Honor, we'd like to play that video and move it into evidence. It's marked as Exhibit 19-2.
THE COURT: Any objection?

MR. WEBSTER: No, Your Honor.

THE COURT: Without objection, Government Exhibit 19-2 is admitted.

MR. DIMOCK: Okay. What I'm going to try to do, Your Honor, is put my hand up to pause at a couple of points to ask a couple of questions.

THE COURT: How long is this interview?

MR. DIMOCK: It's about nine minutes in total.

THE COURT: All right.

MR. DIMOCK: Thank you, Your Honor.

(A video is played.)

BY MR. DIMOCK:

Q Okay. I'm going to just pause there for a moment. You just made a comment. First off, that's your voice, correct?

A Correct.

Q You made a comment about meeting the current OTC or something to that effect. What does that mean?

A I'm not exactly sure.

Q Do you know where that particular language came from?

A That would have come from Mark or Todd.

Q Okay. And I'll ask you the same question as it relates to the second bullet on your screen, which is

the slides that go along with it. Do you see that?
A The earned current information?
Q Uh-huh.
A Designated for high level of financial reporting transparency.
Q Yeah. What's your understanding of what the significance is of that, if any?
A That was part of the reporting process we did and disclosures and financial reporting.
Q Did you create these slides that go along with this?
A No.
MR. DIMOCK: Okay.
(A video is played.)
BY MR. DIMOCK:
Q I just want to pause there for a moment and ask you a couple of questions. Prior to this slide, when you were talking, you talked about the fact that you had received a lot of orders. You were starting to get orders for your product in. Do you remember that?
A Yes.
Q Then on this slide, you talked about the fact that you were now in the Whole Foods Market?
A Correct.
Q Did you at that point have the ability to meet all

of the orders you were hoping to get? Would capital be required for that?
A At that point, we produced enough product to fill the first wave of orders, but we needed more production capital if the growth was going to keep -- if we were going to keep up with the growth.
Q And at that time, what was your expectation as to where that production capital would come from?
A Well, at that time, through the process of the merger, we were going to be able to raise the necessary capital, a million to two million, and get our credit line established and meet our business plan goals.
Q Okay.
(A video is played.)
BY MR. DIMOCK:
Q Mr. Wilkinson, shortly before the end of the slide show and the recording, there was a point where you made a comment about reporting to shareholders, and there was also a bullet point that said the goal of rewarding shareholders. Do you remember that?
A Yes, I do.
Q First off, were those your words? Was that something you wrote?
A Most of this was scripted, but I did have input into it. I didn't write that particular part.

Q And what was your understanding as to what that part related to in terms of rewarding shareholders?

A Well, shareholders that we've had since the beginning, the -- what we started the company with, the initial investors, people, the sweat equity. The thought has always been we build the company up, and it become a certain size, and everybody will see their investment back and hopefully make money. That was the objective.

It would also benefit anybody else who came along, and then with this new merger, anybody a part of that that owned stock in Everock would also benefit.

Q Now, this is around middle of July 2010, correct, based on the e-mails that you've reviewed?

A Correct.

Q Around that time period, do you know if any shares in the company had been sold at that point?

A Well, that part is cloudy. So I read e-mails about Charles Moeller and other shares being distributed. But I wasn't sure how much, and I don't recall at what time.

Q Okay. Do you recall whether by that time the company had received any capital or funding in connection with this merger?

A It did receive some capital as far as I can

recall, $100,000 to $200,000.
Q Okay.
A It wasn't enough to keep us -- keep the production runs going.
Q So in terms of meeting those orders that you were talking about in the video, was it sufficient to meet those orders that you had coming in?
A Initially, and then we had to let the distributors know we couldn't produce any more product.
Q Okay. And the money that did come in, what was your understanding of what the source was of that money or what it represented?
A Well, again, I'm not sure of the mechanism. It came in through Robert, I believe, as a loan to the company.
Q Okay. I want to show you just a couple of other documents.
MR. DIMOCK: They're three more exhibits, Your Honor, just for the Court's edification. The first one is going to be marked as Government Exhibit 25-01 -- it's actually 25-1. Your Honor, actually, the three documents that we're going to be going over with this witness are 25-1, 25-2, 25-3. I've conferred with defense counsel. We've stipulated over these, and I think these will come in without

objection. I'll let defense counsel confirm that.

THE COURT: Any objection?

MR. WEBSTER: No, Your Honor.

THE COURT: All right. Without objection, Exhibits 25-1, 2, 3, and 4 are admitted.

MR. DIMOCK: Actually, Your Honor, just 1, 2, and 3.

THE COURT: 25-1, 2, and 3 are admitted.

MR. DIMOCK: Thank you, Your Honor.

BY MR. DIMOCK:

Q So do you have 25-1 in front of you?

A Yes.

Q Okay. Do you generally recognize this document?

A One of the many disclosure documents that we had to fill out to keep proper status, corporate status, pink sheet, OTC.

Q Okay. What's the title of this particular one on the first page?

A Issuer's Initial Disclosure Obligations.

Q Okay. And if you could, turn to the 19th page of the document. If you notice in the corners, it will say page blank of 21. So it would be the one that's marked 19 of 21.

A I'm here.

Q Okay. Do you recognize the signature in the

middle of the page?
A Yes, that's my electronic signature.
Q Okay. And then if we could -- if you could, basically, just thumb through this document. Can you tell me whether or not Mr. Dresner's name appears anywhere in this?
A No, it doesn't appear so. I hope it's not a test and it's hidden somewhere in here.
Q No. We're not here to trick any witnesses.
Do you recall earlier before the break you testified about a document? It was Exhibit 24-3. It was an e-mail, and it had a draft sort of disclosure statement attached to it. Do you remember that document?
A Yes, with my comments and Robert's and Mark's comments on there, yes.
Q Do you remember that it had Mr. Dresner's name listed as an investor relations contact?
A Yes.
Q Do you have any understanding as to why the document that ultimately got filed no longer listed Mr. Dresner as a contact?
A No. It was something that the New York team probably said doesn't need to be on there or something.
Q Okay. So you don't know?

A I don't know, no.
Q Okay. If you could, finally, look at page 13 of the document. It's 13 of 21.
A Yes.
Q And do you see Item B in the middle of the page?
A Yes.
Q What does that say?
A It's the same, promoters. Which I'm not sure what a promoter is. But it didn't apply, so I didn't need to know.
Q Okay. That will be it on that document.
If we could now go, please, to 25-2.
A It's another disclosure statement.
Q What do you recall, if anything, about this particular document?
A Just another one of the many.
Q Okay. If you look at page 9 of the document at the bottom of the page --
A Yes.
Q -- do you recognize the signature?
A That's my signature, my electronic signature.
Q Your electronic. Okay. And if you could, then please go to page 3 of the document.
A Yes.
Q Do you see under Item 1 where it says, For

investor relations please contact?

A Yeah. That was Robert Oppenheimer's Core Business ONE. That was his address or was his address in San Francisco.

Q Okay. Do you have any understanding as to why by the time this document was filed it now listed Mr. Oppenheimer for investor relations?

A No.

Q Could you also look at page 7 of the document, and I would direct your attention to Item 8 at the bottom of the page.

A Okay.

Q Okay. And can you read just the second-to-last sentence -- or actually, the last two sentences.

A "However, the company does anticipate a sale of some equity securities within the first two quarters of its 2009/2010 fiscal year in order to fulfill its objectives in securing additional capital. The Company anticipates the issuance of securities for equity will be restricted."

Q Do you understand what that provision means?

A Part of the merger.

Q Okay. And do you understand what the part about whether shares are restricted or not means?

A I am fuzzy in that area.

Q Okay. Then the last document I'd like to look at with you, Mr. Wilkinson, is Government Exhibit 25-3.
A Okay.
Q What is this document?
A The same thing but it's annual.
Q Okay. So it says Annual Update Disclosure Statement - 30 June 2009? Is that the title?
A Correct.
Q Okay. Could you go to page 25, please.
A Yes.
Q And do you recognize the signature in the middle of the page?
A Yes, my electronic signature.
Q Okay. And then if you could go, please, back to page 20.
A Issuance History?
Q Uh-huh.
A Okay.
Q And do you see under Item E, as in echo --
A Yes.
Q -- towards the bottom of the page? Could you read that paragraph, please.
A "Aug 2008 (effective date) the Company issued 300,000,000 restricted shares to Mr. Charles Moeller, who was President of the Company at that time, in

exchange for prior services valued at $30,000.00. Subsequently Mr. Moeller effectively returned 270,000,000 of these shares to the Company in connection with the acquisition of Nature's Peak a California corporation."

Q Okay. What's your understanding or what was your understanding at the time of what this provision was about, particularly the second sentence?

A Again, I'm not quite clear on the mechanism, but this was part of the -- what we had to do for the merger.

Q Okay. When you say it was part of what we had to do, what do you mean by that? How did you know what had to be done?

A Well, I didn't know. It was what was instructed to me to do. So...

Q Okay. That will be it for the documents, Mr Wilkinson, but I do have a few more questions to ask you before we finish up with your direct.

A Okay.

Q First off, let me ask you this: When you were a private company, when Nature's Peak was private, did Nature's Peak issue press releases?

A No, there wasn't any press releases.

Q Okay. When you became a public company, were

press releases issued by the company?
A Yes.
Q And why is that?
A Part of what I was requested to do.
Q Okay. What was your understanding about why press releases were needed?
A It was needed for PR purposes, and I thought this was normal process when you become a public company. If you have news, you release press releases in my lack of knowledge of public companies' responsibilities.
Q Okay. Did you draft any press releases for the company?
A No.
Q Okay. What about in terms of deciding when press releases would go out? Did you make those decisions?
A No.
Q Do you know who made those decisions?
A It was the New York team.
Q And when you say the New York team, who do you mean?
A Well, I wasn't sure whether it was Mark or Todd, part of the team. It was Mark, Todd, and Frank. I'm not sure which one of them made that decision.
Q Okay. What about the drafting of the press releases? Do you know who was drafting them?

A I believe mostly Mark, and then Mark would give them to Robert for editing purposes. And then I would look over it for accuracy purposes. Robert would look over it for editing and accuracy purposes.

Q Okay. Did you ever have to make any edits to them?

A I did. They weren't major edits, but I wanted to make sure that anything that was said about the companies and what we were doing, any of the marketing was 100 percent accurate.

Q Okay. What was your -- during the time period when the merger takes place and for, say, a year or so after the merger, as it relates to the company's operations, what was your primary focus?

A I was always focused in the operations part of it, the production side, marketing side, running the business. I was a small business. You wore many hats, and I wore many of them.

Q Okay. Let me ask you this: Other than the press releases that you said that you would have looked at that were for the company, are you aware of whether any other companies were putting out press releases on Nature's Peak's behalf?

A No.

Q At some point, did the company stop releasing

press releases?
A Yes.
Q Why was that?
A That was after there was some issues with the New York team, and Mr. Oppenheimer came back from a meeting with Spehler and said that he had --
MR. WEBSTER: Objection, hearsay.
THE COURT: I'll let it in subject to you connecting up with an adequate foundation.
MR. DIMOCK: Sure, Your Honor. It relates to why they decided to stop.
THE COURT: All right. I understand. I'll reserve on it.
BY MR. DIMOCK:
Q Okay. You can continue.
A He said he discovered some things and they weren't proper and for us to break off of any communications or dealings with the team in New York.
MR. WEBSTER: I move to strike that answer, Your Honor. At this point, clearly, that's hearsay.
THE COURT: All right. I'm going to continue to reserve on it.
Go ahead.
BY MR. DIMOCK:
Q As a result of what you were told, what did you

next do as it related to this process of raising capital through the merger?
A We were in limbo, I remember. We couldn't do anything. I sought counsel, and we couldn't do a thing.
Q Okay. And ultimately, where does Nature's Peak stand now?
A The same place, in limbo and can't do a thing. The original investors can't do a thing because we were told that.
Q Does Nature's Peak still have any debts?
A It had debts at the time, and it would still have debts.
Q And are you responsible for any of those debts?
A Not personally.
Q Okay. And has it been difficult for you to testify about any of this?
A Well, it just brings back a lot of -- seven years of my life into this and several hundred thousand dollars which I'm still paying off. So it's been a real struggle, a real struggle watching that video for the third time. And it just hits me every time. So the whole process -- you know, we had something that was really going, and we thought this involvement, this business involvement that we were going to do was going

to leapfrog the company into being something that was a very uniquely positioned company in the natural food market.

MR. DIMOCK: No further questions, Your Honor.

THE COURT: All right. Thank you.

Mr. Webster.

MR. WEBSTER: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. WEBSTER:

Q Mr. Wilkinson, you have repeatedly referred in the course of your testimony to the New York team, correct?

A Correct.

Q And in the New York team, you are including Mark Dresner, correct?

A Correct.

Q But back on January 12, 2015, when you met with the FBI, you described in a similar fashion the discussions between Mr. Oppenheimer and the New York folks. I'll put that in quotes. And you define the New York folks as Charles Moeller, Frank Zangara, and Todd Spehler, correct?

A Correct.

Q At that point, you didn't include Mark Dresner as one of the New York folks or the New York team,

correct?
A Correct. I actually forgot. I knew who it was. I just forgot the name.
Q You didn't say that there was some other person whose name you had forgotten?
A I may have said that, yes.
Q You may have said that to the FBI and they didn't write it down?
MR. DIMOCK: Objection, Your Honor. The witness wouldn't have knowledge of what was written down.
THE COURT: Rephrase the question.
MR. WEBSTER: Sorry. I didn't mean to interrupt, Your Honor.
BY MR. WEBSTER:
Q Did you say it or didn't you? Did you say there was another person whose name you couldn't remember?
A I don't recall.
Q You did refer to the New York folks as Spehler, Zangara, and Moeller, right?
A Correct.
Q Not Dresner?
A If I said that at the time. I didn't recall his name at the time.
Q So since meeting further with the government or

the FBI, you have now revised your view of the New York team or the New York folks to include Mark Dresner?

A It was actually immediately after that interview. Which I'm surprised it didn't get written down because I thought it was at the tail end of that interview where I did remember his name. I told my attorney that.

Q I'm sorry. You had an attorney at these interviews?

A Yes.

Q Who was your attorney?

A Buck Farmer.

Q And where is Mr. Farmer from?

A San Francisco.

Q Did you have another gentleman as an attorney?

A Andy Pontious.

Q Where is he from?

A San Francisco.

Q Did these same firms represent you in connection with the reverse merger into Everock?

A No. No.

Q What law firms represented you when you -- I'm talking about Nature's Peak, Incorporated.

A George Cornell and Michael Hair.

Q Okay. So they were the lawyers for Nature's Peak,

Incorporated?
A Correct.
Q And you relied on them for legal advice with respect to, for example, the merger agreement transaction detail that you all signed?
A Correct.
Q Did you sign a merger agreement?
A I assume so.
Q Do you remember whether or not you signed a merger agreement?
A Well, my signature was electronic. So my signature was put on it, yes. So I don't remember physically signing it.
Q Are you suggesting to the Court by your references to this electronic signature that somebody else has been utilizing your signature on securities filings, for example?
A No, I'm not suggesting that. I just didn't physically sign it, but I was asked by Mr. Oppenheimer. When I needed to sign a document, he asked me.
Q And you would look at the document and say, Yes, I approve your using my electronic signature?
A Yes.
Q So you're not suggesting some unauthorized use or some forgery of security filings?

A Not suggesting.
Q Were all of the securities filings post merger with Everock signed by you?
A Myself and Robert.
Q Yes.
A Yeah.
Q Did you personally sign all of the securities --
A Well, again, I personally writing, no, but agreeing to have Robert put my signature on it, yes.
Q Did you review the securities filings prior to them being filed?
A A lot of the security filings, as well as the disclosures, was out of my wheelhouse. So I depended on the team, which included Robert and Mark and Todd, to -- that they knew what they were doing. So I signed it. I'm not -- that's not my trade.
Q Could you take a look at, please, 25-1 which is admitted in evidence. I believe counsel for the government looked with you at the signature on page 19.
A Yes.
Q Okay. And you either signed that or you authorized someone to place your electronic signature on this document?
A Yes.
Q Did you read this document before you signed it or

authorized someone to sign it on your behalf?
A Probably not the whole thing.
Q Would you look right above here, right above your signature where it says you certify that, "1. I have reviewed the Information and Disclosure statement, Exhibits, and all notes thereto."
Were you making that affirmation and representation to the market, to the capital markets on or about June 3, 2009?
A I read so many of these documents, and a lot of this -- a lot of stuff I didn't quite understand fully. So this was several documents. I reviewed this. I commented on it. Did I read and understand every word? I didn't understand every word. I may have read it, but I didn't understand everything. So I relied on other people to tell me that this was accurate and what we needed to do.
Q Let's just focus on this one part of the document that you clearly must've read because your signature is right underneath these representations, okay?
Number 2 --
MR. DIMOCK: I'm going to object to that characterization. I don't know if that was a question or a statement.
THE COURT: All right. Overruled.

Go ahead. Ask your question.

BY MR. WEBSTER:

Q "2. Based on my knowledge, this disclosure statement does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made. In light of the circumstances under which such statements were made, such are not misleading" -- I think that's a typo -- "with respect to the period covered by this disclosure statement."

Were you making that representation by affixing your signature to this document on or about June 3, 2009?

A As far as I recall, yes.

Q And so what you're telling the market for your stock is that everything in this disclosure statement is true and they can rely on it, right?

A To the best of my knowledge of what I understood.

Q And also, you're, in Number 3, saying that the financial statements and other financial information included or incorporated by reference in this disclosure statement fairly represent -- I think that should say fairly present, but it says fairly represent in all material respects the financial condition, results of operations and cash flows of the issuer as

of and for the periods presented in this disclosure statement."

You were making that representation to the capital markets and people who wanted to purchase the securities of Everock, Inc., correct?

A Yes, absolutely.

Q And that one you seem to have more familiarity with. Is that because you reviewed very carefully the financial statements of --

A My accountant would send me the financial. I understood those more than the other portions of the stocks and mechanisms and all of that. So that one -- and I've been working with this accountant for a long, long time. So my confidence level is that -- although, I'm not a CPA -- that that was accurate.

Q Who is the accountant?

A Bill McDermott.

Q Bill McDermott. And how long had you been working with him at this time frame? Let's say in 2009.

A Over a decade.

Q And was that just in relation to Nature's Peak or some other business operations?

A No, other business.

Q Was he a certified public accountant?

A Correct.

Q Did he have experience in auditing the financial statements of public companies to your knowledge?
A I don't recall.
Q Well, he certainly produced the financial statements that are made part of some of these security filings, right?
A Yes, I would assume that he did.
Q Have you since discovered that any of the financial information in those financial statements was untrue or misleading in any way?
A Not to my knowledge.
Q Has Mr. McDermott, for example, ever suggested to you that he may have made a mistake or mistakes with respect to the financial statements on which purchasers of Everock securities would be relying?
A No. No.
Q And so you have confidence that those financial statements are, in fact, accurate, correct?
A Yes.
Q The fourth representation that you made here is that the information is complete and presented fairly in all material respects.
Do you stand by that representation that you signed?
A With the knowledge that I had at the time, yes.

Q Yes. And likewise, if we could, go to 25-2 and 25-3 which you reviewed with the government. Do you have, sir, 25-2 in front of you?
A I do.
Q On page 9, would you look at that, please, which has your signature or your electronic signature.
A Yes.
Q Again, it has these very similar representations made by you to potential purchasers of the securities of Everock, Incorporated, correct?
A Correct.
Q And you stand by those representations today?
A Again, as far as I understood.
Q Attached to this filing two pages back from your signature are the Nature's Peak financial statements as of the quarter ending March 31, 2009. Do you see those?
A Behind it?
Q Yes, sir, two pages behind where your signature is affirming the accuracy of this filing.
A Yes.
Q Okay. Were these prepared by Mr. McDermott?
A Correct.
Q Do you have any doubt, as you sit here today, that anything in these financial statements which you were

submitting for purposes of potential purchasers of Everock securities, do you have any doubt that these financial statements are accurate?
A To the best of my knowledge, they're accurate.
Q So nobody has suggested to you that these financial statements are inaccurate in any material respect, correct?
A Correct.
Q And if you could, look at Exhibit 25-3, please, on page 25.
A Go ahead.
Q Yes. That's your signature or your electronic signature, correct?
A Correct.
Q And you authorized this signature to be put on here in some manner, correct?
A Yes.
Q And you're making the same representations as you made for the previous two filings that we looked at with respect to the accuracy of this filing, correct?
A Correct.
Q And this one is the annual update disclosure statement, dated June 30 -- or as of June 30, 2009, correct?
A Correct.

Q Do you stand by these representations of everything in this securities filing?
A To the best of my knowledge.
Q And if you'd flip one page back this time to the financial statements, do you see those?
A Yes.
Q Were these prepared by Mr. McDermott?
A Yes, they were.
Q Do you have any doubt that these financial statements that were presented to potential purchasers of Everock securities were and are accurate?
A I have no doubt that they were. If Bill prepared them, Mr. McDermott, they were accurate.
Q Would you also look at Exhibits 25-4 through 25-7. With respect to Exhibit 25-4, could you look at page 9, please.
A It's my electronic signature.
Q Yes. The signature dated November 16, 2009?
A (Nods head up and down.)
Q You made all of the similar representations that we just talked about with respect to this securities filing, correct?
A Correct.
Q And you're not aware of any inaccuracies in this one, right?

A To the best of my knowledge.
Q This one also contains financial statements as of September 30, 2009. You have full confidence that those financial statements that were presented to the equity markets were accurate when they were made and they are accurate as of today, right?
A Yes.
MR. DIMOCK: I'm going to object, Your Honor, on a foundational basis. Counsel several times now has characterized these as having been presented to investors in Everock and the financial markets, but I don't think we've clarified whether the witness is aware of whether that was --
THE COURT: I'll let you explore that on redirect.
MR. DIMOCK: Okay.
BY MR. WEBSTER:
Q Do you know how a public company has to report information to people who might purchase its securities?
A No.
Q Even though you were the president of a publicly reporting company that sold securities to the general public, you're not aware of what disclosures are required to be made, sir?

A I know disclosures need to be made. What all the disclosures need to be made, I relied on my team for that. That wasn't in my wheelhouse, and yes, I was president and CEO.

Q But when you signed this document that makes these representations, the buck stops with you, right?

A Yes.

Q And when you reviewed press releases for their accuracy, the buck stops with you, right?

A Yes.

Q Because when you reviewed those press releases for accuracy and then sent them out knowing that investors may rely on them, you wanted to make sure they were correct, right?

MR. DIMOCK: Objection. I think his testimony was that he wasn't sure how they were sent out. Also, objection to investors relying upon.

THE COURT: All right. Overruled. I'll allow you to clarify that if necessary.

MR. WEBSTER: Thank you, Your Honor. I'll just try to clarify that.

BY MR. WEBSTER:

Q Your testimony was that you reviewed the Nature's Peak press releases during the time it was a public company for accuracy, correct?

A For the accuracy of the statements that I was a part of. Let me clarify that. If there was a portion in those press releases that had to do with a particular event, a marketing event, a distributor, something that I could comment on for accuracy, I did.
Q But if there were other things in the press releases, you wouldn't review them other than what you've just described?
A If there's other things I didn't understand, I would count on my team to understand them. It would be nice to know everything on the planet, but that's just not the case. I had to focus on the business.
Q You told the FBI that your role in regards to the Nature's Peak press releases was to review them for accuracy, correct?
A Correct, what I could review for accuracy. That's correct.
Q You also told them the press releases were sent to PR Newswire for dissemination, correct?
A I don't recall, but they were sent to PR Newswire, I believe, or another agency that sent them out.
Q As of --
A I didn't send them out myself.
Q I'm not suggesting that you sent them out yourself, sir. I think it was suggested that you

didn't know how these were disseminated, but you told the FBI they were disseminated by the PR Newswire, correct?
A I learned that, yes.
Q When did you learn that?
A That's a good question.
Q Thank you.
A I think I recalled -- I'm not sure if I recalled it at that meeting because I didn't -- I didn't recall the exact company name because there were several companies involved in this. I wasn't sure which PR company it was.
Q But you did know, sir, what a press release was, correct? When you reviewed a draft press release, regardless of whether you knew factually how it was going to be distributed, you knew what a press release was, right?
A In general, yes.
Q What is your understanding in general of what a press release is?
A A press release would give the public information of what a company -- an event in a company that has transpired primarily for giving news to not only stockholders but to the public in general about the -- how do I put it -- the wins that we had, like the

signing up of Whole Foods, the -- when we got distributors on board, when we got certain reps on board.

So when I reviewed those press releases, it was because some event happened, as far as I remember, and we wanted to let the public know about it. That's part of this process of merging with this company to become a public company and the responsibilities, I guess, of a public company from that point on.

Q And those are all the types of things that you would have reviewed in these press releases for accuracy, correct?

A The types of things would have been the accuracy of the events that had taken place.

Q Such as events that took place like the distribution of your product by Whole Foods in the Mid-Atlantic region?

A That's exactly right.

Q And the assistance of your partners, such as Avenue Gourmet and the other company -- I'm sorry -- whose name I can't remember?

A The Source One Marketing.

Q Source One Marketing. Thank you.

A Okay. And the other distributors -- KeHE was a big one. As we got our product out and as we were

being accepted into the large distributors, that was considered news. At least that was what I was told. That's newsworthy.

Q Did you believe it was newsworthy even --

A It was a big event for me, yes --

Q Understood.

A -- and everybody else in the company because that's what we strove for is to get into the market. You don't get in the stores without getting in the distributors. So when we signed up a distributor, it was a big deal.

Q And so, for example, when you mentioned those types of things in the interview that you and Mr. Dresner recorded together, those were truthful, correct?

A Those are all positive things and, yes, truthful.

Q And counsel for the government referred to one line that said that Nature's Peak or Everock, if you will, had a goal of rewarding shareholders. Was that true?

A Well, that would have been true from the initial shareholders that we took on to the company.

Q Did you have a goal after the company went public through this reverse merger of rewarding shareholders through building a successful company?

A Absolutely.
Q Did you have an opportunity to review the PowerPoint slides that were used in that interview?
A Yes, recently.
Q I'm talking about back then, back when you did the interview.
A I believe I saw it on a PowerPoint. I'm not sure if I saw it in the video or not.
Q In any format, sir?
A Yes.
Q So you reviewed it for accuracy?
A Yes.
Q And it was accurate?
A And it was accurate.
Q The company history was accurate, correct?
A Correct.
Q The financial statements at that time were accurate, right?
A Yeah. I have no reason to believe at any time any financial statements of the company would be not accurate, a blanket statement.
Q You refer to it as the best dip. I suppose that's somewhat of an opinion as opposed to a verifiable fact, right?
A Yeah. I used to -- in trade shows, we'd say it

was the best dip on the planet, but I revised that for this and said it was the best dip on the market.

Q I see. You were being cautious?

A Yeah, less cocky.

Q Okay. The best tasting sandwich spread on the market, I think that's what you said.

A Yes.

Q And you believe that?

A Even today.

Q And you believe that today?

A Absolutely, 100 percent.

Q And it was gluten free; wasn't it?

A Yeah.

Q Sugar free?

A Yep.

Q Kosher?

A Yep.

Q No MSG?

A Yep.

Q Long shelf life?

A Yes.

Q No preservatives?

A Correct.

Q There was a statement in there, I believe, by Mr. Dresner that most food products actually fail in

the marketplace. Did you believe that statement to be true?
A Most start-up companies fail in the marketplace. So that would ring true in any market.
Q You didn't have any problem with putting that in the video or the PowerPoint, right?
A It's a fact.
Q Very well.
Did you believe at that time that your company was building momentum?
A Absolutely.
Q Your relationships with Source One were legitimate, correct?
A Absolutely.
Q And the company or its representatives did, in fact, attend the Fancy Food show in New York, right?
A Correct.
Q And was this --
A Multiple times.
Q Multiple times. How many times?
A Three, maybe four years, and more out in San Francisco.
Q I beg your pardon. I was under the impression it was just in New York. They had it in San Francisco as well?

A Correct.
Q So on both coasts you were attending the Fancy Food show?
A The Fancy Food show was two times a year, the bigger shows, and that was in -- Javits, I believe, is the convention center in New York and then the Moscone Center in San Francisco, correct.
Q And did you meet Mr. Dresner at the New York Fancy Food show?
A Yes.
Q Did he come there and taste your product and say hello?
A Yes, along with Todd Spehler.
Q And was there a buzz around your product at the Fancy Food show?
A Yes.
Q That was accurate?
A All of that is accurate.
Q That was not puffery?
A No. It was -- actually, we had a -- and the same with KeHE. We had a very busy booth. So that wasn't -- all of the statements are accurate.
Q KeHE, who is that? That's K-E-H-E?
A K-E-H-E. They are one of the largest natural food distributors in the U.S.

Q Did they have some kind of food show?
A Yes.
Q Where is that located?
A Dallas.
Q So you traveled to Dallas?
A Correct.
Q Was there buzz around that?
A Enormous.
Q The road map that you presented in the interview seemed to center around three items, sales, fiscal responsibility, and product development, correct?
A The road map --
Q On the interview that you did and part of the PowerPoint slide --
A Okay.
Q -- it said it was a road map for the company. Do you remember that part?
A Yes. I mean, that was stuff that Mark or Todd wrote.
Q And that you stated in the interview, correct?
A Correct.
Q You reviewed, again, what was wrote before you said it?
A Correct, and I said it.
Q So you affirmed that those things were accurate?

A Correct.
Q And you knew this was an attempt to create some sort of buzz for your product, right?
A PR generally is like marketing. Whether you're doing a brochure, an advertisement, or whatever, this was a buzz for the product and the company.
Q And as part of the interactions with Mr. Dresner, he reviewed sales plans, marketing plans, and gave you a lot of good input, correct?
A That's absolutely correct.
Q The investor relations contact who's listed on all of your securities filings, was that the investor relations contact for Everock?
A Well, I guess it was initially Mark but then became Robert. So I'm not sure at what time period that transitioned to, and I'm really fuzzy on why it transitioned.
Q I'm just talking about when you were a public company. When you were a public company, you did not identify Mark Dresner as a contact for investor relations, correct?
A Again, I'm not clear on the exact timing of that. If in the filings -- if he wasn't in there in the filings after we were public, then that would be correct.

Q What was your understanding of what the contact was for investor relations?
A Man, I'm fuzzy on that. I don't know. I don't want to speculate.
Q Did you ever go back to the merger agreement and see if the merger agreement was honored?
A No.
Q You are certainly dissatisfied that you didn't get more money, correct?
A Well, yes.
Q And so did you ever go back to the merger agreement and see if anybody violated or breached it in any way?
A I'm not sure if the merger agreement spelled out the dollars that were -- you know, that they were looking to put into the company, they meaning the New York folk team.
Q Well, the New York folks does not include Mr. Dresner, but the New York team now does. So who are you referring to?
A Dresner and Spehler and --
Q I see. Mr. Dresner made promises to you about how much you could get from a reverse merger with a public shell?
A It was -- the three of them did, correct.

Q Okay. Specifically, what did Mr. Dresner say regarding the financing? You just said Mr. Dresner made representations to you about how much money you could receive from a reverse merger with a publicly reporting shell company, and I would like you to identify specifically what he said and the exact date when he said it.
A I don't recall the exact date, and I'm not sure which of the three were representing this. I do believe that Todd and Frank had more of the dollars representation of why to do this merger than Mark did.
Q And Mark focused on things like sales and marketing?
A Correct.
Q And you understand, sir, that Mr. Dresner is here on trial --
A Correct.
Q -- for some very serious offenses?
A Correct.
Q And so when you say things like Mr. Dresner made representations to you about how much money you could get out of this reverse merger, you understand that you need to be much more careful, correct?
A Correct.
Q Prior to any contact with Mr. Spehler or

Mr. Zangara or the New York folks, you had sought multiple other sources of financing, correct?

A Correct.

Q What are the sources of financing that you sought before you were contacted or before Mr. Oppenheimer contacted the New York folks on your behalf?

A They would have been friends, family. There were some people in the business that -- reps that referred us to people, distributors, local distributors.

Q Let's start with them. How would that raise you money? How would that raise you money?

A They would see the product, and because they were in the industry, that the owner of the distributor or store chain could see the investment opportunity there.

Q So did you make pitches --

A Correct.

Q -- to investors?

A Correct.

Q What materials did you bring with you when you would make pitches to these potential investors?

A The product.

Q The product?

A Yeah.

Q And how about --

A The product, a brochure.

Q Any financials?
A And the -- if there was interest in the company, we would provide anything, the financials. And if we had our business plan done at that time or revised at the time, it would have been our business plan.
Q And how many folks did you pitch prior to having contact with the New York folks?
A Maybe two or three dozen.
Q Out of the two or three dozen, how many did you provide financial statements to?
A Maybe half of that. The financials were in our business plan. So anybody who got a business plan got the current financials.
Q What were the proposed structures of the investments or financing?
A We had two shares of stock, preferred and common, and we had a value on the preferred stock. That was a mechanism we used as a private company, and that I understand much better than the merger and what happened afterwards.
Q When you say you had a value on the preferred shares, did you mean that somebody did a valuation of the company?
A We did an evaluation on the company. The accountant looked at it. We had several people look at

it. And you can come up with a company value using many different methods.
Q Sure, like discounted cash flow, for example. Did you use that?
A No.
Q Comparable sales, did you use that?
A Our track history and our sales *pro forma*, where we were going to be, at what time, and what year, we used that to evaluate the company. Certainly, the company didn't have the assets and the cash in the bank or whatever to have -- it's like this company is worth X because it has all of these assets. So we were a start-up company, and we had the potential there. So the business plan would state how much money -- revenue we would be bringing in year after -- you know, a five-year projection, and that's what we based the price of the stock on.
Q I see. And these various proposals that you made to two or three dozen investors, some of which included your business plan and, therefore, your financial statements, you understood the proposed structure of those potential transactions?
A For the most part, yes.
Q Were there parts of it that you didn't understand?
A I can't recall at this time if there were parts I

didn't understand.
Q Did you form Nature's Peak, Incorporated, yourself?
A Yes -- no. I had the help of Robert to form the corporation.
Q Robert Oppenheimer?
A Correct, the initially privately held corporation. He did most of the paperwork.
Q Articles of Incorporation?
A Correct.
Q The bylaws?
A The bylaws, all of that.
Q Who helped you with the issuance of stock to your shareholders?
A It would be our attorney at the time.
Q Did your attorney produce an offering memorandum or something called a private placement memorandum or a prospectus?
A I recall those documents.
Q Did you review those?
A I would have reviewed those.
Q You understood that those were necessary in connection with the offering or sale of securities?
MR. DIMOCK: Your Honor, I'm going to object at this point on relevance. We are kind of going down

this road of his private company.

THE COURT: I will let you ask this question, but I think you need to move on.

BY MR. WEBSTER:

Q You understood all of those concepts?

A Yes. It was in -- you know, it goes back a ways. So what you mentioned sounds familiar.

Q But you had to make certain disclosures to potential investors?

A Absolutely. Whatever we did my attorney reviewed at the time.

Q And you reviewed to make sure it was 100 percent accurate just like those press releases, right?

A I reviewed the press releases, and they were accurate for what I knew of the press releases.

MR. WEBSTER: That's all I have.

THE COURT: Any redirect?

MR. DIMOCK: Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. DIMOCK:

Q Counsel asked you some questions about Mr. Dresner and your being interviewed by law enforcement. Do you remember that?

A Yes.

Q In terms of when you remembered Mr. Dresner's name

in relationship to when you were interviewed, how soon was that?

A It was right after the -- it was right at the end of the interview, and I'm not sure whether that became part of the interview or I told my attorney afterwards. Because they mentioned his name. I couldn't put the face to the name, and I couldn't do that. But afterwards I connected the dots. I was like, Okay, Mark helped with the PR.

Q At that time, how long had it been since the last time you had heard the name Mark Dresner?

A Years.

Q You were asked some questions about the attorneys that were involved in the merger. Do you remember that?

A Uh-huh.

Q And you were also asked about attorneys that you had separate from the merger that did other things for you. Do you remember that as well?

A Yes.

Q Were those the same attorneys?

A No. Those were different attorneys. Attorneys we had for the merger were -- I believe it was Todd. It could have been Frank. They suggested these attorneys.

Q And I just want to clarify. You were asked about

the New York folks versus the New York something or other. But when you talk about the people in New York, who are you talking about?

A I'm talking about Todd and Frank initially and then Mark and then Charles and then George -- let me get the last names. Sorry. So it would be Spehler and Zangara first, and then Mark came on as a consultant. Then Charles Moeller was the person -- the CEO of Everock, and George Cornell was the attorney. And then after George, the attorney was Michael Hair. He wasn't from New York. He was from Arizona, but he was referred by Spehler or Zangara. I don't think Mark had anything to do with that.

Q You were also asked about your electronic signature. Do you remember that?

A Yes.

Q Are you able to say with 100 percent certainty that every time your electronic signature was used you were given the document to review in advance and asked to approve it?

A Well, not with 100 percent certainty, but it was a protocol that Robert and I followed.

Q And are there parts of these documents that you've looked at today that you still to this day just don't fully understand?

MR. WEBSTER: Objection, leading.

THE COURT: I'll let him answer.

Go ahead.

A Yes.

Q Lastly, did you have to rely on other people in any way in terms of those materials?

MR. WEBSTER: Same objection.

THE COURT: Overruled.

BY MR. DIMOCK:

Q You may answer.

A Yes.

MR. DIMOCK: Nothing further, Your Honor.

THE COURT: All right. Thank you.

May this witness be excused?

MR. DIMOCK: Yes. From our perspective, yes.

THE COURT: May the witness be excused?

MR. WEBSTER: Yes, Your Honor.

THE COURT: Mr. Wilkinson, you're excused. Please do not discuss your testimony outside of the courtroom. You're free to go.

(The witness stands aside.)

----------------------------------

Time: 5:30 p.m.

I certify that the foregoing is a true and accurate transcription of my stenographic notes.

/s/

Rhonda F. Montgomery, CCR, RPR