UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case 1:15-cr-00178 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Alexandria, Virginia |
| | ) | January 28, 2016 |
| MARK S. DRESNER, | ) | 12:44 p.m. |
| | ) | |
| Defendant. | ) | |
| | ) | Pages 1 - 116 |

TRANSCRIPT OF FRANK ZANGARA'S TESTIMONY

BEFORE THE HONORABLE ANTHONY J. TRENGA

UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

FOR THE PLAINTIFF:

KOSTA S. STOJILKOVIC, ESQUIRE
N. NATHAN DIMOCK, ESQUIRE
MICHAEL T. O'NEILL, ESQUIRE
OFFICE OF THE UNITED STATES ATTORNEY
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3700

FOR THE DEFENDANT:

STEVEN T. WEBSTER, ESQUIRE
AARON S. BOOK, ESQUIRE
WEBSTER BOOK, LLP
300 North Washington Street, Suite 404
Alexandria, Virginia 22314
(888) 987-9991

THE DEFENDANT, MARK S. DRESNER, IN PERSON

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

**I N D E X**



| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| Frank Zangara | Direct | 3 |
| | Cross | 94 |
| | Redirect | 111 |

FRANK ZANGARA, PLAINTIFF'S WITNESS, AFFIRMED

DIRECT EXAMINATION

BY MR. STOJILKOVIC:

Q Please state and spell your name for the record.
A Frank Zangara, F-R-A-N-K, Z-A-N-G-A-R-A.
Q Mr. Zangara, did you plead guilty in this case?
A I did.
Q What crime did you plead guilty to?
A Conspiracy to commit wire fraud.
Q Under your plea agreement, did you agree to cooperate with the government in this case?
A Yes.
Q Are you testifying today pursuant to that cooperation agreement?
A Yes.
Q What benefit, if any, do you hope to get as a result of your cooperation?
A I'm hoping that through my cooperation I will get a letter stating I cooperated in my sentencing.
Q What's your understanding of what you're required to do as a cooperator?
A Tell the truth.
Q What's your understanding of what could happen if you don't testify truthfully today?

A I can be charged with additional charges.
Q What's your understanding of what effect, if any, that could have on your plea agreement with the government?
A I would imagine that -- I believe it would be null and voided.
Q Mr. Zangara, you indicated you pled guilty to wire fraud conspiracy. Generally speaking, what did that conspiracy relate to?
A The Everock/Nature's Peak's transaction.
Q Who did you conspire with?
A The other defendants in this case.
Q Well --
A Robert Oppenheimer, Todd Spehler, Mark Dresner, Charles Moeller, and Joe Manfredonia.
Q And to be clear, are all of those people charged as defendants as of this day?
A No.
Q Do you recognize any of those coconspirators in the courtroom today?
A Yes.
Q Who do you recognize?
A Mark Dresner.
Q Can you please identify him by where he's sitting and what he's wearing.

A He's sitting to your right in the middle of the other two gentlemen in a gray suit with a green tie and a white shirt.

MR. STOJILKOVIC: Your Honor, I'll ask the record reflect the identification of Mr. Dresner.

THE COURT: The record will so reflect.

BY MR. STOJILKOVIC:

Q In brief, Mr. Zangara, how would you describe your role in the Everock conspiracy?

A My part in the transaction was to receive shares and sell them and remit moneys to the other parties.

Q How would you describe Mr. Dresner's role?

A Mark was part of the marketing side of the transaction. He also had shares that he sold and remitted dollars to the other parties.

Q How would you describe Mr. Moeller's role?

A Mr. Moeller was instrumental in helping with cleaning up the vehicle that we used to reverse merge Nature's Peak into the public entity.

Q You mentioned also, I believe, Joseph Manfredonia among your coconspirators. Is that spelled M-A-N-F-R-E-D-O-N-I-A?

A Yes.

Q How did Mr. Manfredonia figure into the scheme?

A Joe Manfredonia provided the public with a traded

vehicle that we later cleaned up and used to reverse merge Nature's Peak's into.
Q I believe you also mentioned Todd Spehler. How did he figure into this scheme?
A Todd Spehler introduced me to Robert Oppenheimer who, in essence, brought Nature's Peak, the company, to the transaction for it to be reverse merged into Everock.
Q And with respect to Robert Oppenheimer, what was your understanding of -- what was his link to Nature's Peak?
A He was an employee or acted on behalf of the company. He was the go-between between the company and ourselves.
Q Aside from these individuals that you have described, were any other categories of people involved in the Everock scheme?
A Such as promoters that we hired, yes.
Q Was that a category of people?
A Yes.
Q Did any individuals associated with something called Moneyline Brokers play a role in this scheme?
A Yes.
Q Mr. Zangara, did you have an equally close relationship with all of these coconspirators you've

identified?
A No.
Q Who would you say were your closest associates in the conspiracy?
A Mark Dresner and Todd Spehler.
Q Approximately when did you first meet Mark Dresner?
A In the early 2000's.
Q How did you come to meet?
A I was introduced to him by Todd Spehler, who had known him from other business relations.
Q Did you do any business with Mr. Dresner prior to the Everock scheme?
A Yes.
Q Just generally speaking, what kinds of business did you do prior to Everock?
A We had financed a number of private companies where Mark was employed to oversee the technical aspect or run portions of their businesses.
Q Any of these business dealings prior to Everock, did any of them involve stock?
A Public or private?
Q Either.
A Private stock, yes, there would have been stockholders in those companies that were privately

held. I don't -- prior to Everock, there were no public companies that we were involved with together.
Q Did you continue to do business after the Everock deal?
A Yes.
Q Did that business after the Everock deal involve stocks?
A Yes.
Q Did it involve any public stocks?
A Yes.
Q Did it involve any penny stocks?
A Yes.
Q Aside from Everock, how many other penny stock related -- or how many other penny stocks did you and Mr. Dresner work on?
A Approximately ten.
Q Generally speaking, was your role consistent in these different penny stock deals from deal to deal?
A Including the Everock transaction?
Q Let me just --

MR. WEBSTER: Your Honor, I'm going to object. If they're suggesting that these are somehow indicative of Mr. Dresner's involvement in some other securities violations, we've not been given any appropriate notice under 404.

THE COURT: What's the purpose of this testimony?

MR. STOJILKOVIC: I simply want to establish the ongoing relationship. The government is not going to delve into whether these other deals were inappropriate in any way.

THE COURT: All right. I'll let you briefly pursue it, but move on.

BY MR. STOJILKOVIC:

Q Just generally speaking, was your role consistent from deal to deal, or did it change substantially?

A It changed substantially. Because the Everock deal unto itself was something we took from its inception through to the end, and the other ones were primarily surface related.

Q Understood.

Let's talk about the Everock deal in more detail. In addition to the Everock name, you mentioned Nature's Peak, I believe. What was Nature's Peak?

A Nature's Peak was the entity, the company that we reverse merged into Everock. Everock was the publicly traded vehicle that we used to, in essence, go public.

Q Who, if anyone, first brought Nature's Peak to your attention?

A Todd Spehler.

Q Once you had learned about Nature's Peak, did you attempt to identify a publicly traded company to merge with Nature's Peak?
A Yes.
Q Who, if anyone, identified that publicly traded company for you?
A Joe Manfredonia.
Q And what was the name of the public company?
A Everock.
Q To your understanding, what was Joe Manfredonia's link to Everock?
A I believe he was the control person that had control of that publicly traded entity.
Q And what, if anything, was done with Everock prior to the merger?
A We reversed -- we performed a reverse merger. We cleaned it up in the sense that all of the state filings were brought up to speed, any of the filings that needed to be brought up to date. You know, we made it capable of handling a reverse merger.
Q To your knowledge, who was involved in cleaning up Everock prior to the reverse merger?
A Robert Oppenheimer; Michael Hair, the attorney; Charles Moeller; and myself.
Q At this time, to your knowledge, was Mark Dresner

aware of the Everock acquisition and plan?

MR. WEBSTER: Objection, foundation, and he cannot testify to Mr. Dresner's state of mind.

THE COURT: Sustained.

BY MR. STOJILKOVIC:

Q At this time, did you have any conversations with Mr. Dresner about Everock?

A I'm sure that I did.

Q Okay. At the time that the shell was being cleaned up, did you share information with Mr. Dresner about your intent for the Everock deal?

A I'm sure that I did.

Q Was Nature's Peak ultimately reverse merged into Everock?

A Yes.

Q Can you explain in your own understanding just briefly how that reverse merger was supposed to work?

A The private company receives enough shares so that it becomes the majority holder in the control position in that transaction. So the company that's being acquired becomes the majority shareholder whereas it now becomes the control party in that transaction.

Q So in theory, at the end of all of this, was Nature's Peak going to be in control of Everock?

A Correct.

Q Mr. Zangara, once this reverse merger happened, do you know whether all of Everock's stock could be traded right away?

A No.

MR. WEBSTER: Objection, that calls for a legal opinion.

THE COURT: Why don't you lay a foundation if you're going to get into this.

MR. STOJILKOVIC: All right.

THE COURT: Let me just ask a question: Who acquired the Nature's Peak's shares? Everock?

THE WITNESS: No. It was Everock that was the publicly traded vehicle, and it was Nature's Peak that received the majority of the Everock shares whereby giving them control of Everock. That's the nature of the reverse merger.

THE COURT: What happened to the Nature's Peak shares? Were they surrendered to Everock?

THE WITNESS: Yes. Everock then -- Nature's Peak now has control of the treasury and all shares that are not, you know, issued in that standing.

THE COURT: Right.

MR. STOJILKOVIC: The Court's indulgence, Your Honor.

BY MR. STOJILKOVIC:

Q Mr. Zangara, are you familiar with the term "504 offering"?
A Yes.
Q To your knowledge, was there a 504 offering on the Everock deal?
A Yes.
Q To your own understanding, what is a 504 offering?
MR. WEBSTER: I'm going to object, Your Honor.
THE COURT: I understand he's not a lawyer, but I'll let him answer.
BY MR. STOJILKOVIC:
Q Please go ahead.
A A 504 offering is an offering under Rule 504 where certain individuals that live in the State of Texas -- and, I believe, it was Delaware as well and maybe Minneapolis or Minnesota -- were able to purchase restricted shares up to a certain amount and hold them for investment, and then they would become free trading shares.
Q Do you know who decided to do a 504 offering on Everock?
A Myself, Spehler, Oppenheimer.
Q Why did you do that 504 offering?
A One, for the money to pay for the expenses of the

reverse merger, and two, to create free trading shares.
Q With the assistance of the court security officer, I'd like you to take a look at Government Exhibit 22-1 which is in evidence.
MR. STOJILKOVIC: I'd ask that we put it up, please.
A That was 22-1?
Q Yes, sir. Do you recognize that e-mail, sir?
A I do.
Q Who is it from?
A From Frank Zangara, my e-mail address, fjz7654@msn.com.
Q And who was it to?
A Chuck Moeller.
Q Sir, what are you asking Mr. Moeller to do in this e-mail?
A I'm asking him to fax and -- sign and fax back to me a document so that the certificate for the 504 could be issued and the rest of the shares can be taken out of his name.
Q Why did you need Mr. Moeller to sign the document?
A Mr. Moeller was the interim CEO of Nature's Peak while we were cleaning it up.
Q I'm sorry. Of Nature's Peak or Everock?
A Everock. I'm sorry.

Q In truth, Mr. Zangara, did Mr. Moeller actually control Everock?

A No.

Q Who, if anyone, told him what to do as the, quote, unquote, control person of Everock?

A I did.

Q Let's take a look at, in the same binder there, Government Exhibit 22-7 which is also in evidence.

MR. STOJILKOVIC: Put that up, please.

Thank you.

BY MR. STOJILKOVIC:

Q Do you recognize this e-mail, sir?

A I do.

Q Who is it from?

A Frank Zangara, fjz7654@msn.com, my personal e-mail.

Q And who is it to?

A Chuck Moeller.

Q Sir, I'd like to turn to the attached documents, which are the subsequent pages of this exhibit. What are these attachments just generally speaking?

A Stock certificates.

Q For what stock?

A Everock, Incorporated.

Q Okay. Let's take a look at the first one. That's

page ending Bates Number 578. Who is this certificate made out to?

A Charles Moeller.

Q And in what amount of shares?

A 300,000,000.

Q Now, let's turn to the next page, Bates ending 579. Who is this one made out to?

A Daniel J. Pedone.

Q And in what amount?

A 20,000,000.

Q Do you know who Daniel Pedone is?

A Yes.

Q Who is he?

A Daniel Pedone was a client of mine when I was a retail stockbroker and a friend who resides in Victoria, Texas.

Q Do you know whether Mr. Pedone paid for these shares?

A Yes.

Q To your knowledge, what did he pay?

A The exact amount I don't recall, but this was --

Q Who did he pay?

A He paid Everock, and that was pursuant to the 504 offering.

Q What understanding, if any, did you have with

Mr. Pedone about what would happen to these shares in the future?
A I had a verbal agreement with him to purchase those shares back from him.
Q Why did you have that agreement?
A So that I could control free trading shares of the Everock deal.
Q And if you recall, was the agreement to purchase it back at the same price he paid or a different price?
A At a higher price while he retained some of the shares.
Q Why did you want to do this?
A So I could sell them at a later date at a higher price.
Q Did you, in fact, carry forward with this agreement to purchase shares back from Mr. Pedone?
A Yes.
Q Let's turn back to the prior certificate, the 300,000,000. To your understanding, what was supposed to happen with these 300,000,000 shares after the reverse merger?
A So 270,000,000 of them were supposed to be issued to the Nature's Peak control people.
Q And what about the remainder 30,000,000?
A They were supposed to be retained by Chuck Moeller

for his services.
Q Now, I want to focus in on that 270,000,000 shares that you said was supposed to go back to Nature's Peak. Did any of those shares actually end up in your control?
A Yes.
Q To your knowledge, did any of those shares end up in Mr. Dresner's control?
A Yes.
Q How do you know that?
A Because those were the only shares that were issued from the company, and we were both issued shares.
Q How do you know that Mr. Dresner was issued shares?
A Because he maintained an account at Moneyline, and we sold shares in the deal collectively and then used the money to pay out other people.
Q Do you know what happened to the 30,000,000 that was supposed to remain with Mr. Moeller?
A They also came into my control.

MR. STOJILKOVIC: We can put that document down, sir.

BY MR. STOJILKOVIC:
Q Are you familiar with the OTC Markets Group?

A Yes.
Q Just briefly, what is that?
A The OTC Markets Group is where pink sheets report pink sheet stocks and Bloomberg stocks report their filings and financials and goings-ons.
Q Do you know whether Everock made any filings to the OTC Markets Group?
A Yes.
Q Do you know who was responsible for putting together those materials to be filed for Everock?
A Yes.
Q Who?
A The attorney put the materials together and then filed them on behalf of the company where Charles would have signed off on them.
Q All right. Do you know who signed off on them after the merger?
A Robert Oppenheimer.
Q Sir, are you generally familiar with the contents of these files?
A Yes.

MR. STOJILKOVIC: Now, Your Honor and Counsel, I'm going to turn to the 25 series and starting with 25-1 which is in evidence.

THE COURT: All right. Mr. Stojilkovic, this

is a good time for us to break.

MR. STOJILKOVIC: As good as any, Your Honor.

THE COURT: We'll take our luncheon recess. We'll stand in recess and resume at 2:00.

Mr. Zangara, do not discuss your testimony during the recess.

THE WITNESS: Yes, Your Honor.

THE COURT: All right. The Court will stand in recess.

(Recess from 1:05 p.m. until 2:02 p.m.)

THE COURT: Mr. Stojilkovic.

MR. STOJILKOVIC: Your Honor, just one matter I wanted to bring to the Court's attention relating to our schedule. We have Mr. Zangara, who I anticipate is going to go a while longer. We have two witnesses after that left in our list, Rachael Bingham, who is a financial analyst with the FBI, and Agent Fung, who is the FBI special agent.

Ms. Bingham is currently home sick with the flu, which she was tested positive for yesterday, has a fever. What we discussed with defense counsel, if it would be acceptable to the Court, would be to proceed today with Mr. Zangara, put on Ms. Fung. But if we finish before the conclusion of time today with Ms. Fung, we would ask that we be allowed to put on

Ms. Bingham Monday morning. The alternative is we can have her here. She's sick. You know, I do want to make clear that if the Court tells us no, I do think we can have her here by the end of the day.

THE COURT: Let's see where we are at --

MR. STOJILKOVIC: She lives about an hour and a half out.

THE COURT: Mr. Webster, do you want to put anything on the record about this?

MR. WEBSTER: Your Honor, from our perspective, we think the government is making good time today with its case. I would anticipate that our sole witness would be Mr. Dresner. If we had their witness on Monday and Mr. Dresner on Monday subject to rebuttal, if there is any, that should be the case.

THE COURT: All right. I think we can proceed that way.

MR. STOJILKOVIC: Thank you, Your Honor. That's all we have.

THE COURT: All right. Ready to proceed with Mr. Zangara?

MR. STOJILKOVIC: Yes, sir.

THE COURT: All right. Mr. Zangara will come forward.

Mr. Zangara, you remain under oath.

THE WITNESS: Yes, Your Honor.

BY MR. STOJILKOVIC:

Q Mr. Zangara, when we broke, we had just begun discussing OTC Markets Group filings for Everock. I want to have you take a look at what's been admitted as Government Exhibit 25-1.

A Okay.

Q Do you recognize that document, sir?

A I do.

Q Sir, let me just walk you through some of the information and ask you some questions about this. First of all, do you see there on the top of the page that this is a disclosure that relates to Nature's Peak, originally known as Everock?

A Yes.

Q If I could ask you to turn to page 7 of the document which ends in Bates 278, please.

A Yes.

Q First of all, in field bold 1, does it indicate there the ticker for this company?

A It does.

Q What is that?

A EVRN, Edward, Victor, Robert, Nancy.

Q Let's look at bold number 3 and the information that's contained therein. First of all, do you see

there under 3(i) period end date?
A Say that again.
Q Okay. I'm directing your attention to Item Number 3 --
A Okay.
Q -- titled, The number of shares or total amount of the securities outstanding for each class of securities authorized.
A Yes.
Q Now I'd just like to walk you through some of these items that are listed here, the first being period end date. Do you see that?
A Yes.
Q All right. So what's the end date for this period that's described here?
THE COURT: Which exhibit are we on?
MR. STOJILKOVIC: Your Honor, we are on 25-1. I am on page 7 of 21 which also has a Bates number, and it ends in 278.
THE COURT: All right. I have it. Thank you.
BY MR. STOJILKOVIC:
Q Sorry, Mr. Zangara. Just to clarify, what's the period end date that's reported here?
A December 31, 2008.

Q Okay. And below that, do you see some information for number of shares authorized?
A I do.
Q What understanding, if any, do you have with what shares authorized means?
A The total amount of shares that exist in that company.
Q To your understanding, are all of those shares actually out there, or is this kind of the ceiling to which shares can be issued?
A Those are the ceilings for which the shares can be issued.
Q Below that do you see number of shares outstanding?
A I do.
Q What does that to your understanding mean?
A The total amount of shares that have been issued.
Q Okay. And what was that number as of December 31, 2008?
A 320,083,087 shares.
Q Now, sir, the portion of that, which is 320,000,000, does that correspond to the shares we saw in the two certificates before the break?
A Yes.
Q Okay. Do you know what that remainder of

approximately 83,000 shares, why that's there?
A Because 83,087 shares are the remainder of the shares that were left over from the Everock reverse split.
Q Were those shares in Everock prior to the split?
A Say that again.
Q How did those shares come to be left over? Do you know?
A Those were the shares that were issued and outstanding in the Everock Corporation prior -- after the reverse split as part of the cleanup of that shell.
Q Okay. If I could turn your attention now to page 10 of the document which ends in Bates 281, do you see there, sir, over the course of pages 10 and 11 a listing of officers and directors?
A I do.
Q What names are identified over the course of those two pages?
A Paul Wilkinson, president and CEO; Richard Coughlin, treasurer, director; Robert Oppenheimer, secretary, director; Chuck Moeller, director.
Q Mr. Zangara, in truth, were these the only people who made substantial decisions about the issuance and sale of Everock stock?
A No.

Q Turning your attention to the bottom of page 12 and the top of page 13, sir, do you see a listing there of beneficial owners?
A I do.
Q What does it say there with respect to Paul Wilkinson? What was his share of beneficial ownership?
A It was 55 percent or 180,000,000 shares.
Q Okay. Going on to the next page, what does it say for Mr. Richard Coughlin?
A It's 27 percent or 90,000,086 shares.
Q Okay. Now, if we combine the shares indicated here for Mr. Wilkinson and for Mr. Coughlin, do we get the approximately 270,000,000 that you testified were going to go back to Nature's Peak?
A You get the exact amount of 270,000,000.
Q Now, sir, do you personally know whether these shares actually went to Paul Wilkinson and Richard Coughlin?
A They were supposed to. That was my understanding.
Q Do you know? Do you, yourself, know whether they, in fact, made it there?
A No. No.
Q Please also -- continuing on page 13, sir, do you see item 3(b)?
A I do.

Q What does that indicate?
A Promoters-does not apply.
Q In truth, Mr. Zangara, were promoters hired on the Everock deal?
A Yes.
Q Who arranged for that?
A Myself.
Q To your knowledge, did Mr. Dresner perform any promotional activity?
A Yes.
Q Did individuals besides Mr. Dresner also do promotional activity?
A Yes.
Q I want to take a minute to clarify that. What was your understanding of what promoters other than Mr. Dresner were doing on the Everock deal?
A These were people who had a following, such as people who can disseminate the publicly traded information over a following of double opted in the e-mail or would do postings on the Internet to bring attention to the underlying security.
Q And how did these -- why did these people do that?
A Because they were paid to do that, to disseminate the information.
Q Okay. And what was the mechanism, the basic

mechanism for those payments?
A Most of them were paid in shares of stock.
Q Okay. Were any of these individuals -- did any of these promoters have accounts in Moneyline?
A Yes.
Q And to your knowledge, did they obtain shares of stock at Moneyline?
A Yes.
Q Did some of them obtain shares of stock from your Moneyline account to theirs?
A Yes.
Q If you could, flip over, sir, to Government Exhibit 25-3 which is also in evidence.
A Okay.
Q Are you familiar with this filing?
A Yes.
Q And just directing your attention to the top, what time period does this filing relate to?
A June 30, 2009.
Q All right. And does this also pertain to Nature's Peak, aka Everock?
A It does.
Q Let's turn to page 6 of 25. It also features a Bates number ending in 319. I want to draw your attention to Item 7 on page 6. Do you see there, sir,

where it says that in 2008 the company issued 30,000,000 restricted shares to Mr. Moeller -- I'm sorry -- 300,000,000?
A Yes.
Q All right. And do you see continuing on that it says subsequently Mr. Moeller effectively returned 270,000,000 shares to the company?
A Yes.
Q Sir, my question for you is did any of those 270,000,000 shares end up in your control?
A Yes.
Q Did you purchase these -- did you pay up front to obtain these shares?
A No.
Q Then how did they come to be in your control?
A From issuances from Robert Oppenheimer who, in essence, controlled those shares at Nature's Peak.
Q Okay. Do you know why Mr. Oppenheimer issued shares to you?
A Yes.
Q Why?
A So that I could promote them and sell them.
Q Did you have a direct line of communication with Mr. Oppenheimer?
A I did.

Q Did you personally ask him to issue those shares?
A I had been in discussions with him where that was discussed, but there were also other people who were in that line who would have arranged to have shares issued to me.
Q Anyone in particular?
A Mr. Spehler.
Q Now, once you obtained some of these 270,000,000 shares, were those shares eventually sold?
A Yes.
Q Did you share the proceeds of those sales with anyone?
A Yes.
Q Did you ultimately share some proceeds with Mr. Oppenheimer and Mr. Spehler?
A Yes.
Q Did you send any proceeds of your Everock stock sales to Mr. Dresner?
A Yes.
Q Now, sir, let me also ask you: To your knowledge, did any of these 270,000,000 shares that were supposed to go back to the company, did any of those shares come into Mr. Dresner's control?
A Yes.
Q How do you know that?

A Because he also had an account at Moneyline.
Q How do you know Everock shares went into it?
A Because we sold shares in concert at different times.
Q Do you know whether Mr. Dresner purchased these shares in the market?
A No.
Q How did he get them, if you know?
A The same way that I received them.
Q Do you know whether -- well, I believe you testified that you and he sold shares in concert through Moneyline.
A Correct.
Q Did you have any discussions with him about distribution of the proceeds of those sales?
A Yes.
Q To your knowledge, did Mr. Dresner also distribute proceeds of Everock shares to other members of the conspiracy?
A Yes.
Q Could you, please, turn to page 11 of the document ending in Bates 324.
A Okay.
Q And looking over the course of pages 11 and 12, who at this time were identified as the officers and

directors of Everock/Nature's Peak?
A Paul Wilkinson as the president, CEO, director; Richard Coughlin as treasurer, director; Robert Oppenheimer as secretary, director; and that's it.
Q Do you have any understanding why Mr. Moeller no longer appears on this list as of the date of this document, end of June 2009?
A As per the agreement that we had, Chuck or Charles was supposed to only be present during the cleaning up of the Everock shell, give the shares back, retain 30,000,000, and then he would resign, which is what appears to have happened.
Q To your understanding, what was the benefit, if any, of having Mr. Moeller resign?
A It would have -- it would have made his 30,000,000 shares eligible to be freed up.
Q Finally, sir, on this document, if I could ask you to turn to page 16 and look at Item 2 about two-thirds of the way down, Item 2 on promoters, what does it say?
A None-not applicable. The company does not retain a promoter.
Q Was this a true statement as of the filing of this disclosure?
A No.
Q You can put that document down.

Sir, you've referenced Moneyline a few times in your testimony. How did Moneyline first come to your attention?

A Moneyline was introduced to me by Joe Manfredonia.

Q I believe you mentioned that you ended up using Moneyline for the Everock deal.

A Yes.

Q Did you open an account at Moneyline?

A Yes.

Q To your knowledge, did any other coconspirators on the Everock deal have Moneyline accounts?

A Yes.

Q Which ones?

A Mark Dresner and Charles Moeller.

Q Just to clarify, you indicated that Mr. Manfredonia had introduced you to Moneyline. Do you know whether he had used them?

A I think he already had an account there.

Q To your understanding, what were the benefits, if any, of using Moneyline?

A It enabled us to move shares fully from one account to another.

Q What was your understanding of how Moneyline would sell shares and get proceeds back to customers such as yourself?

A We would give them an order. They would sell the shares. They would either wire or we would have a check issued as a customer.
Q When you were turning stock over to Moneyline in your accounts, do you know whether that stock was ultimately deposited in your name or in some other name?
A The shares were issued at Moneyline's request in the names of the accounts that they maintained for my -- for our benefit, my benefit.
Q Do you recall some of those account names?
A Bastille Advisors, Vanilla Sky. There's another one that just eludes me at the moment.
Q That's all right.
Sir, how did Moneyline get stocks, such as the Everock stock that you controlled, into the name of something like Bastille Advisors? How would that happen?
A They would instruct us or myself as to what name they wanted it issued in. We would -- I would tell Robert Oppenheimer, who would then put instructions into the transfer agent. The certificate and/or electronic deposit would be arranged with that name designation on it, and the transfer would take place.
Q Is that something you would have to do in order to

have the shares parked with Moneyline, to have them transfer in the name of one of their entities?
A Yes.
Q Now, even though these shares were now in the name of Bastille Advisors, to your understanding, whose shares were these?
A Mine.
Q And I believe you testified that you were also aware that Mr. Dresner had Everock stock with Moneyline.
A Yes.
Q To your knowledge, would Mr. Dresner have had to go through the same process, that is, putting the shares in something like Bastille Advisors' name in order to use Moneyline?
A Yes.
Q Did you have any discussions with Mr. Dresner about how many shares you would sell and how many shares he would sell of Everock?
A Yes.
Q Did you discuss this topic once or on multiple occasions?
A Multiple occasions.
Q Why did you have those discussions?
A In order to keep a fair and orderly market so that

we didn't destroy the project that we were working on, one. And two, so that this way neither of us exceeded the 10 percent rule, and we didn't become a control person.

Q Just in your own understanding, when you say you were trying not to exceed the 10 percent rule, what is that?

A If an individual owns more than 10 percent of a nonreporting publicly traded company, it could be viewed as a control person whereby rendering his shares nonsalable by virtue of the fact that he's an insider. He would be ruled as subject to Rule 144(k) I think it is.

Q Was it your intent that your own Moneyline account was never going to have more than 10 percent of the shares?

A Correct.

MR. WEBSTER: Objection, leading.

THE COURT: Overruled.

BY MR. STOJILKOVIC:

Q And was it your understanding that that was the same goal for Mr. Dresner's account as well?

A Yes.

Q Why did you not want yourself and Mr. Dresner to be identified as control persons of Everock?

A It would have restricted our ability to sell shares freely in the open market.

Q Did you have any discussions with Mr. Dresner about distribution of proceeds from the Everock stock sales?

A Yes.

Q And when you had these discussions, did they concern just your Everock stock or just his Everock stock or kind of the pool of Everock stock?

A The pool of Everock stock.

Q Are you familiar with the term "tranche"?

A Yes.

Q What does it mean to you?

A Let's say that we have 100,000,000 shares of stock. We take it in 20,000 to 20,000,000 shares of tranches pieces. So whether you want to call it a block or a tranche, they're interchangeable.

Q Did the Everock conspiracy involve a single tranche of --

MR. WEBSTER: Your Honor, I'm going to object at this point. The government has repeatedly used the terms "conspiracy" and "conspirators," which are legal conclusions. That's for the Court to decide.

THE COURT: I'm going to sustain the objection. I don't think you need to frame it in those

terms.

MR. STOJILKOVIC: Understood, Your Honor.

BY MR. STOJILKOVIC:

Q Mr. Zangara, the selling of Everock stock, did it occur in a single tranche or in multiple tranches?

A Multiple.

Q Why?

A Because, again, if, in fact -- if any one individual had more than 10 percent -- which the 270,000,000 shares would have represented greater than 10 percent of the issued and outstanding -- we would not have been able to sell the shares, and they would have been, in essence, subject to another rule.

Q Was there any other reason why you didn't attempt to sell all of these shares at one time?

A Well, it would have imploded the market. There's no way that we could have sold all the shares at once.

Q Do you know, sir, whether Nature's Peak-Everock issued press releases?

A Yes.

Q To your understanding, who put those releases together?

A Robert Oppenheimer would put them together in connection with Todd Spehler, and then they would come down through. Mark would look at them and edit them,

you know, grammatically. So that this way they were prepared to go out into the public market.

Q Did you personally know in advance when Everock/Nature's Peak was about to put out a press release?

A Yes.

Q How did you know that?

A Because it would be discussed among all of the parties.

Q And to your knowledge, did Mr. Dresner have a role in at least reviewing those releases in some fashion?

A Yes.

Q So then to your knowledge he would have known they're coming?

A Yes.

Q Who decided on the timing of when these press releases would be issued?

A It was a joint decision. I mean, based upon the actual activity happening at the company, whatever was in the best interest of all of those involved so that we had shares deposited and promoters lined up so as to maximize that we could get the most out of each release.

Q So you said it was a joint decision. To your recollection, who was part of the that decision

process?
A Oppenheimer, Spehler, and myself.
Q Now, can you, please, explain -- you started making reference to timing and shares. What was your understanding of the relationship, if any, between the timing of the press releases and where the shares were at Moneyline?
A We would deposit shares at Moneyline, make sure they were free and clear. We would line up promotion. So that this way when the press release did come out, it was going to be disseminated, and this way it would go out to as many potential investors as possible so that we could, in essence, sell the shares that we had on deposit.
Q And when in this process would you involve the other promoters? I'm talking here not about Mr. Dresner but the people -- you had mentioned the other promoters you brought into the deal.
A They would be engaged beforehand. You'd have to have them aligned or have their shares cleared their account. Then they would be ready to perform their duties once the releases came out in the public markets.
Q Okay. Now, if you wanted some of your shares in your Moneyline account to be sold, what kind of

contact, if any, would you have to have with Moneyline?
A Either call, text, or they had an electronic system that you could put orders in that I didn't use, but it was available.
Q Did that contact have to come from you as the client?
A Yes.
Q So hypothetically speaking, somebody else couldn't go and tell Moneyline to sell your shares?
A No.
Q And to your understanding, is that how these Moneyline accounts worked?
A Yes.
Q So if there was a concerted sale going on among different Moneyline accounts, to your understanding, could that instruction come from one person, or would it have to have come in some fashion from all of the account holders?
A Both. It could have come from one person, or I could have given somebody the authority to trade on my behalf.
Q I see. But some contact would've had to happen with every client?
A Yes.
Q Did you call Moneyline ahead of these tranches or

blocks of selling?
A Yes.
Q Why?
A To arrange sales of stock so that this way it was a percentage of the market as opposed to just go and liquidate every share that's in the account because you can, which would hurt the markets.
Q Now, let me ask you about these tranches. When these tranches occurred, would there be a lot of selling during a compacted period of time or only a little bit of selling?
A It would be a percentage of whatever the buying that was generated. So if there was a lot of buying, it would be a lot of selling. If there wasn't a lot of buying, there wasn't a lot of selling.
Q Who is your main contact at Moneyline?
A Anna Hiskey.
Q Okay. Was she your initial contact at Moneyline?
A No.
Q Who was your initial contact?
A Robin, and I don't remember her last name.
Q Okay. Was there anyone other than Anna and Robin that you recall?
A No. I may have spoken to the odd person there but nobody's name who I recollect.

Q Sir, now we're going to look at -- well, just one document, 22-13. It's already in evidence. I think you're going to need a different -- your binder may have it.

Sir, do you recognize the e-mail account at the top of this page?

A I do.

Q What is it?

A It's my corporate e-mail account.

Q And who are you e-mailing there in the top e-mail in this chain?

A Chuck Moeller.

Q Okay. And looking down the chain, are you forwarding to Mr. Moeller something that Mr. Dresner had e-mailed to you?

A Yes.

Q Okay. I want to direct you to the very bottom e-mail in this chain. That e-mail, sir, do you see it appears to be from Robin R., customer service, to mark@dresner.com? Do you see that?

A Yes, I do.

Q Do you recognize the mark@dresner.com address?

A I do.

Q Whose is it?

A Mark Dresner's.

Q Okay. And what is the date on that bottom e-mail, sir?
A August 10, 2009.
Q And do you see there it says in the body of the e-mail, "Hello Mark, have a brokerage that will accept DWAC's physical certs in pinks as long as they are not skull and crossbones," and then it has some information about an account number, name, and the like.
Sir, what is your understanding of having a brokerage that accepts DWAC physical certs?
A DWAC is an electronic transfer of shares.
Q Okay. And just for the clarity of the record, do you have any understanding of what skull and crossbones is?
A Skull and crossbones is a designation under OTC markets when companies that trade on the pink sheets and/or bullet points are not current with their information and disclosures.
Q To your knowledge, was Everock a skull-and-crossbones stock?
A No.
Q Do you know, sir, why Mr. Dresner forwarded you this e-mail?
A So I would have the information.
Q Okay. Were you also dealing with Moneyline at the

same time?
A Yes.
Q Was it commonplace for you and Mr. Dresner to exchange information like this about Moneyline?
MR. WEBSTER: Objection, leading.
THE COURT: Overruled.
BY MR. STOJILKOVIC:
Q You may answer the question.
A Yes.
Q Now, sir, could you look at the attachment to this e-mail, just the remaining pages of the exhibit. Are you familiar with this document, this type of document?
A I am.
Q What do you understand it to be?
A Upon the deposit of securities at a brokerage firm, this is a questionnaire asking how you got the shares, where -- you know, what the lineage is and background of those shares.
Q And to your knowledge, when you were dealing with shares that were going through Moneyline, who would submit this completed document to the brokerage?
A Moneyline. They would ask us to fill it out. We would submit it to them, and they would then submit it to wherever they were depositing the shares.
Q Sir, I'll ask you now to take a look at another

document that's already in evidence, which is Government Exhibit 27-10. I just want to focus you in on a very specific part of this document.
A One second.
Q Yes, sir, of course.
A Okay.
Q Can you turn to the last page of the document. It ends in Bates 441.
A It ends in Bates --
Q Bates 441. It also says page 9 of 9.
A Yes.
Q Okay. Can I ask you just to focus on that information in blue there in the box. You can also see it on your screen if it's a little easier to read. I'm going to ask you some questions about the individuals and entities listed there. Sir, I believe you indicated you're familiar with Charles Moeller.
A Yes.
Q Do you recognize Downshire Capital?
A No.
Q I presume you recognize your own name.
A Yes.
Q Do you know Garden State Resources?
A No.
Q Do you recognize Gibraltar Global Securities?

A Yes.
Q Do you recognize Glenwood Marketing?
A Yes.
Q Infusion Capital Management?
A Yes.
Q Laurie Mazzarella?
A Yes.
Q Matthieu Charbonneau?
A No.
Q Oceanic Consulting, LLC?
A Yes.
Q Steven Naremore?
A No.
Q The BHI Group, Inc.?
A Yes.
Q Bastille Advisors, Inc.?
A Yes.
Q Sandias Azucaradas?
A Yes.
Q Vanilla Sky S.A.?
A Yep.
Q AKAT Global, LLC?
A Yes.
Q Okay. So for those individuals and entities that you did recognize there from that list, to your

knowledge, were any or all of those involved in the Everock deal?
A Yes.
Q Was it just some of them or all of the names that you recognized?
A All of the ones that I recognized.
Q Now, sir, you testified a little while ago that you had retained some promoters through Moneyline.
A Yes.
Q To your knowledge, do promoters sometimes use subpromoters?
A Yes.
Q What's a subpromoter?
A The individual that I hire, he's got resources. He'll go out and hire somebody else to add to his resources.
Q Would you have known who the subpromoters were on the Everock deal?
A No.
Q Let me ask you about one name here that you did recognize, Gibraltar Global Securities. What is that, or what was that?
A Another brokerage firm.
Q What does it have to do with the Everock deal?
A I attempted to deposit shares and liquidate them

through that firm as well.
Q Was this -- were you using them through Moneyline, or was this independent?
A Separate -- sorry -- separate and apart.
Q Okay. Do you recall whether you had deposited more shares in Moneyline or more in Gibraltar over the course of time?
A More in Moneyline.
Q You can put that document down.
Are you familiar with Spectrum Research Group?
A Yes.
Q What is it?
A Spectrum Research Group was a company that was formed for the purpose of helping to build the online presence of companies that Mark and I also used to try to generate some business providing services for other publicly traded companies.
Q Who ran Spectrum?
A Mark and myself.
Q What was the idea behind Spectrum? What were you guys trying to accomplish?
A We were trying to create our own promotional site.
Q What role, if any, did Chuck Moeller have with Spectrum?
A In name only.

Q Can you explain that?
A The site was put up in his name. The phone number that was associated with it, I believe he arranged to have that phone number put up as part of his Internet service.
Q Now, at the time that Mr. Moeller's name was put up in association with Spectrum, was he still with Everock or had he resigned by then?
A I believe he had resigned.
Q Do you know who put the Spectrum website together?
A Yes.
Q And have you -- are you personally familiar with the Spectrum website?
A Yes.
Q Have you been to it?
A Yes.
Q Who put it together?
A Mark.
Q To your knowledge, does Mr. Dresner have skills in website design?
A Yes.
Q Do you have skills in website design?
A No.
Q To your knowledge, does Mr. Dresner have skills in creating promotional materials?

A Yes.
Q Do you have skills in creating promotional materials?
A No.
Q Please, sir, take a look at Government 22-15, which is also in evidence.
A Okay.
Q Do you recognize the e-mail at the top here?
A I do.
Q Whose e-mail is that?
A That's my personal e-mail address, fjz7654@msn.com.
Q Okay. Let me start with the bottom e-mail there. Is that an e-mail from Mr. Dresner to yourself and Mr. Spehler?
A It is.
Q And what is the date?
A January 20, 2010.
Q And what's contained in that e-mail?
A The URL for spectrumresearchgroup.com.
Q And what did you do with that e-mail?
A I forwarded it to Chuck Moeller.
MR. STOJILKOVIC: We can put that down. Thank you.
BY MR. STOJILKOVIC:

Q Now, Mr. Zangara, to your knowledge, did Spectrum put out or disseminate any information related to Everock or Nature's Peak?
A Yes.
Q Generally speaking, what kind of information did Spectrum put out?
A It would have taken whatever public information was available, repackaged it, and put it out for the optimization of the information so that this way there would be more information on the company out there.
Q Okay. What understanding, if any, do you have of how Spectrum would optimize the information being out there?
A By taking text information and creating videos around it, whether it be a PowerPoint presentation with a voice explanation, and that content is optimized considerably greater than it would be just standard text.
Q Who did that optimization for Spectrum?
A Mark.
Q And what -- to your understanding, what's the goal of this optimization? What are you hoping to achieve?
A The idea behind that was to create the Internet profile of the company and have the first search page of any of the underlying companies that you would

provide this service for, that that would dominate the search if anybody were looking at the underlying company or pulled up the symbol.

Q Sir, can you take a look now at what's been marked and provisionally admitted as Government's 16-4.

A Okay.

Q Do you recognize this document?

A I do.

Q What is this?

A It's a news release from Spectrum Research Group.

Q Okay. Does it have to do with Everock?

A It does.

Q All right. If I could direct your attention to the title and the few lines right below it. First of all, can you just read the title please, sir?

A "EVRN - SpectrumReseachGroup.com initiates independent research coverage."

Q And now, a couple of lines down, can you read the line that begins Jericho, New York. It's also on the screen if that's of any aid.

A "Jericho, New York-(WiredPRNews) April 7, 2010-Today Spectrum Research Group announced it will begin full independent coverage of EVRN.PK Nature's Peak Everock by releasing a newly updated company overview and report."

Q Sir, to your knowledge, who prepared this release for Spectrum?
A Mark.
Q To your knowledge, did anyone prepare any releases for Spectrum besides Mr. Dresner?
A No.
Q Now, the date there, April 7, 2010, to your knowledge, what was going on with Everock stock during this time period?
A It was trading.
Q Well, let me ask you: Was this during one of the tranches when you were trading?
A Yes.
Q Now, in the sentence I had you read, sir, it describes Spectrum beginning, quote, full independent coverage, unquote, of Everock. Sir, in truth, was Spectrum independent of Everock?
A No.
Q In truth, were both yourself and Mr. Dresner major shareholders of Everock?
A Yes.
Q If I could direct you further down the page to, For more information please contact. Do you see that information there?
A I do.

Q All right. Now, we see Chuck Moeller's name on this. Sir, to your knowledge, did Mr. Moeller approve or review this before it went out?
A No.
Q To your knowledge, did he approve or review any Spectrum content before it went out?
A No.
Q Going down there, a third and fourth line down, there's an address in Jericho, New York. Are you familiar with that address?
A Yes.
Q What is it?
A It's a mailbox suite.
Q Who -- I mean, do you know who had access to that mailbox suite?
A Mark did.
Q Farther on down you see a phone number beginning with 516. Do you recognize that?
A I do.
Q And what do you recognize that to be?
A That was the phone number that Charles set up on behalf of Spectrum so that this way they could take messages.
Q Now, did you have access to that number?
A Yeah, I may have.

Q What do you recall? Did you have -- how would you have access to a Chuck Moeller number?
A Charles would have given his access code.
Q Okay. Do you know whether Mr. Dresner had access to the same?
A Yes.
Q Did he?
A Yes.
Q Finally, the e-mail alerts at spectrumresearchgroup.com, are you familiar with that e-mail address?
A I am.
Q Do you know who had access to that e-mail address?
A Yes.
Q Who?
A Mark.
Q Now, sir, I think you testified a bit about kind of your goals or what you wanted Spectrum to be. Did you have any kind of long-term plan with what you and Mr. Dresner were trying to accomplish with Spectrum?
A Yeah. Ultimately, we were attempting to and had been successful at selling Spectrum services of doing CEO interviews, videos along with PowerPoint presentations, website optimization of that content, as well as putting together research reports for other

companies.
Q Now, a little while earlier in the testimony when I asked you about other promoters, I believe you told me that part of why you hired other promoters is because they had certain lists or contacts or e-mails that they would e-mail out to promote a stock. Did you have those kinds of lists?
A We tried to compile a list, and I think there were a couple of hundred e-mail addresses that were compiled.
Q Okay. Your efforts to compile that list, was that done through Spectrum?
A Yes.
Q Why were you trying to put together a list like that?
A Because a list like that is valuable. We were paying people hundreds of thousands, if not millions upon millions of shares to disseminate information throughout the investing public. And if we could have duplicated that, we would not have needed to pay other people.
Q All right, sir. Can you please take a look at Government Exhibit 16-1 which is in evidence.
A Okay.
Q All right, sir. I'll represent to you this is a

composite exhibit containing several press releases. I want to ask you some questions about them.
First of all, sir, were you generally familiar with releases put out by Spectrum?
A Yes.
Q All right. Let's look at this one that begins on the first page of the document Bates ending 630. Let me just direct you about a third of the way down there where it begins with Jericho, New York. I just want to read that to you: "Jericho, New York-www.spectrumresearchgroup.com a newly updated company report and video will be released soon for April 23, 2010 - Everock Inc., (Pink Sheets: EVRN).
"Everock I Nature's Peak continues to announce initiatives that support marketing efforts in 2010."
Do you see that, sir?
A No.
Q I'm sorry, sir?
A I do not. I don't see any slash Nature's Peak.
Q Okay. Pink sheets, Everock. Then -- I'm sorry -- I continued reading onto the next line.
A Yes.
Q All right. Now, again, what was based in Jericho, New York?
A The mailbox.

Q Okay. Looking further in this release, do you see in it, several lines down, an announcement on April 23 from Everock/Nature's Peak itself?
A I do.
Q Okay. So, sir, can you just unpack for us: What is this Spectrum release doing?
A Redisseminating already public information.
Q And the public information in this was in Everock/Nature's Peak announcement?
A Correct.
Q And if we look at these dates, this was released in April 2010?
A Correct.
Q Okay. And I believe you testified on 16-4, but I'll ask you here on this one as well: Was this during one of the Everock tranches?
A Yes.
Q Now, sir, let's turn to the third and final page of this release, which is Bates ending 632. Do you see a warning there that begins, Do not base any investment decision?
A I do.
MR. STOJILKOVIC: All right. Can we blow that up, please.
BY MR. STOJILKOVIC:

Q I want to direct you to the middle of that. Do you see where it says, "Spectrum Research Group or its affiliates may have a beneficial interest in the mentioned company; or may have received compensation for some of the companies listed in this communication"? Do you see that?
A I do.
Q All right. Do you see further below that paragraph directions to a full disclosure at spectrumresearchgroup.com?
A I do.
Q All right. Now, in fact, did you and Mr. Dresner have a beneficial interest in Everock?
A Yes.
Q Were they small or substantial in size?
A I would say substantial.
Q Here we also see the contact information that's similar to what we've seen before. I just want to ask you, sir: To your knowledge, did Mr. Moeller review or approve this release?
A No.
Q Okay. Can you flip forward a couple of pages to the next release which begins with Bates ending 634.
A Okay.
Q All right. Is this another Spectrum release, also

in April 2010? Let me ask it to you this way, sir: Do you see about a third of the way down there's a line that begins with Jericho, New York?
A I do.
Q All right. And after that, it indicates, "SpectrumReseachGroup.com Stock To Watch For April."
April 14, 2010, and it identifies Everock is the stock to watch for?
A Yes.
Q And if you look further in this one, does this also contain in it some information originally released by Nature's Peak?
A Yes.
Q Okay. So is this similar to the first part of this exhibit that we saw of a redissemination of the Nature's Peak information?
A Similar.
Q Okay. Sir, I don't think I asked you this for the first part of this, but for both of these releases, do you know who issued this, the Spectrum redissemination?
A I want to say Mark through P2 Newswire or rereleased --
MR. WEBSTER: Objection.
THE COURT: Hold on.
MR. WEBSTER: Objection just to the

foundation. He started his answer with I want to say.

MR. STOJILKOVIC: I'll rephrase, Your Honor.

THE COURT: Sustained.

BY MR. STOJILKOVIC:

Q I'm not asking about the mechanism. I'm just asking if Spectrum, as you put it, rereleased or put out information that was originally Nature's Peak's information. Who would have done the Spectrum component of that?

A Mark.

Q Did anyone disseminate materials on behalf of Spectrum other than Mr. Dresner?

A No.

Q And, sir, if we turn to the third page of this one, does it contain the link to the same disclosure as we saw in the prior release?

A What's the Bates number?

Q The Bates number I am at now is 636.

A What is the question again?

Q My question is on Bates 636, do you see the same information and the link to a full disclosure on the Spectrum Research Group website as we saw in the prior document?

A I do.

Q Okay. And does this one also have Mr. Moeller's

name?

A It does.

Q Okay. Sir, can you flip forward a couple of pages to Bates 638.

A Yes.

Q Let me read to you there. I call your attention, again, starting with the Jericho, New York: "Jericho, New York-spectrumresearchgroup.com announced they have issued a newly updated company report on April 13, 2010 for April 12, 2010-Everock Inc., (Pink Sheets: EVRN). Www.spectrumresearchgroup.com also announced plans to initiate coverage of April 12, 2010-Fresh Harvest Products."

Do you see that?

A I do.

Q Now, do you know what Fresh Harvest Products is?

A It's a publicly traded company it seems.

Q Aside from what you can discern from this document, do you personally know anything about it?

A No.

Q Did you at any point hold stock in Fresh Harvest Products?

A I did not, no.

Q To your knowledge, did Mr. Dresner hold stock in Fresh Harvest Products?

A I don't know.

Q Okay. Sir, do you know what would have been the point of Spectrum issuing coverage of Fresh Harvest Products at the same time that it's issuing coverage of Everock?

A An attempt to attract attention to the Spectrum Research Group off of the Fresh Harvest buzz or their momentum.

Q How would that have worked?

A If, in fact, Fresh Harvest was a very actively looked upon company, by aligning this release with that name, it's very possible that people who are looking at Fresh Harvest might stumble across Spectrum Research Group and Everock because it's in a like industry.

Q Okay. Sir, turning to the Bates ending in 641, does this contain the same information about Spectrum as we saw at the end of the other releases?

A It does.

Q And, sir, I'm going to try to do this last one and not belabor the point. But is this another Spectrum announcement of coverage of a couple of stocks?

A It appears to -- all I have is the about Spectrum and then the Spectrum Group disclosure on this page. On the prior page?

Q Sir, I'm sorry. I think I misdirected you. I'm

on page ending in Bates 642.
A All right. I was on 641.
So what is it, again, you want me to do?
Q My question is is this another Jericho, New York, with Spectrum Research Group announcing coverage of a couple of stocks, fast mover stocks?
A Yes.
Q Okay. And is one of those Everock?
A Yes.
Q Sir, were all of these releases that we saw in 6-1, were they all in April 2010 according to the documents?
A Yes.
Q And was this one of the tranches of Everock?
A Yes.
Q You can put that document down, sir.
And now I'd ask you to take a look at what's been marked for identification as Government's 17-1.
MR. STOJILKOVIC: Your Honor, at this time what I'd like to do is offer in 17-1 and 17-2. These are materials that were downloaded from the Internet by an SCC technician and are covered in the stipulation that was signed yesterday.
THE COURT: All right. Any objection to 17-1 and 2?

MR. WEBSTER: Your Honor, could I just have one moment?
THE COURT: Yes.
MR. WEBSTER: No objection, Your Honor.
THE COURT: All right. Without objection, Government Exhibits 17-1 and 2 are admitted.
BY MR. STOJILKOVIC:
Q Let's take a look at 17-1 first, sir. I'll represent to you this is content taken off of the Spectrum website. I apologize if the text is hard to read.
Do you see here this page is titled About Us?
A Yes.
Q Okay. And right below that, sir, do you see where it says, "Spectrum Research Group is an investor relations and financial communications firm that profiles Small-cap and Micro-cap stocks to help them gain increased awareness and visibility by potential investors, customers and others"?
Do you see that?
A Yes.
Q Is that a fair characterization in your mind of Spectrum?
A Yes.
Q And further down near the bottom of the small

text, the second-to-last paragraph, do you see it says, "Our professional management team possesses years of valuable financial, market, and business expertise. And we apply this expertise to delivering timely and useful information about the companies we profile"?

Do you see that, sir?

A Yes.

Q You know, was any part of your intent with Spectrum that other companies would hire Spectrum?

A Yes.

Q Okay. Let's look at 17-2, sir. Do you see this is titled Disclaimer?

A Yes.

Q Okay. Now, I'm going to try to highlight some language here. Bear with me, sir, and please tell me if you're having trouble finding it. The first thing I want to highlight is about a quarter of the page down. There's a sentence that begins, Because Spectrum receives compensation. Do you see that?

A I do.

Q All right. And let me read it to you, and I'll ask you some questions: "Because Spectrum receives compensation for SRG's dissemination of the Information (as disclosed in our Compensation Disclosure Section), predominately in the form of common stock shares (the

"Shares"), our publicly disseminated publications should not be regarded in any manner whatsoever as independent."
Do you see that, sir?
A I do.
Q Sir, do you know why the Spectrum Research release in 16-4 claims independent coverage of Everock but this disclaimer says Spectrum coverage is not independent?
A No.
Q Do you see reference in this sentence to a compensation disclosure section? In the sentence I just read, it talks about as disclosed in our compensation disclosure section. Do you see that?
A Yes.
Q Okay. Let me direct your attention to the very bottom. Right near the bottom of this page to the compensation disclosure section. Do you see that, sir?
A I do.
Q What does it say there in terms of a compensation disclosure about Everock, Inc./Nature's Peak?
A It says, "Everock Inc./Nature's Peak: The Companies received $25,000 from a non-affiliate third party shareholder."
Q Sir, to your knowledge, did Spectrum Research Group receive $25,000 from a nonaffiliate third-party

shareholder of Everock?
A To my knowledge, no.
Q To your knowledge, did you receive $25,000 from a nonaffiliate third-party shareholder of Spectrum?
A No.
Q To your knowledge, did Mr. Dresner receive $25,000 from a nonaffiliate third-party shareholder of Spectrum?
A To my knowledge, no.
Q Were you and Mr. Spectrum, in fact, shareholders of -- were you and Mr. Dresner, in fact, shareholders of Everock?
A Yes.
Q Okay. And were you in contact and -- strike that question.
Did you obtain your shares of Everock from a nonaffiliate third-party shareholder?
A No.
Q To your knowledge, did Mr. Dresner obtain his shares from a nonaffiliate third-party shareholder?
A To my knowledge, no.
Q Is the total sum that you ultimately made from Spectrum -- from Everock -- is $25,000 a fair approximation of that?
A Can you ask that question again, please?

Q I'm directing you to the shares of Everock that you sold over time. Did you make $25,000 off of that?
A Yes.
Q Did you make only $25,000, or did you make more?
A More.
Q A little bit more or substantially more?
A Substantially more.
Q To your knowledge, did Mr. Dresner make more than $25,000?
A Yes.
Q A little bit more or substantially more?
A More but not as much I did.
Q I'm sorry. I didn't hear you.
A I said, you know, it's not as substantially as I did.
Q But substantially more than $25,000?
A Yes.
Q Sir, if you know -- I'm sorry. Strike that.
So, to your knowledge, is this a true statement in the compensation disclosure about Everock/Nature's Peak?
A No.
Q Sir, to your knowledge, why is this statement here?
A In an attempt to put forth to other people that we

were worth that amount of money. So when I was out marketing Spectrum Research Group services, that I could theoretically ask for those kind of dollars as a promotional fee to write up and disseminate information for other publicly traded companies.

Q So you wanted other people to pay Spectrum this kind of money?

A Yes.

Q Thank you, sir. You can put this document down.

Actually, I'm sorry. I spoke too soon. Sir, does this document -- this disclosure, does it disclose your or Mr. Dresner's actual ownership of Everock stock?

A No.

Q Would you have wanted the Spectrum website to disclose the truth about your and Mr. Dresner's relationship to Everock and its stock?

A No.

Q Why not?

A It would have indicated that we were selling shareholders and probably dissuaded potential investors from buying the stock.

Q Now you can put the document down.

MR. STOJILKOVIC: Your Honor, at this time I'd like to play one of the recordings provisionally as we did with other witnesses, and the one I'd like to

play is 1-18A.

THE COURT: Any objection?

Is this already in evidence?

MR. STOJILKOVIC: We have not played this recording. This is one of the Moneyline calls. This witness is on it. I'd like to play it, ask him some questions, and then I'll establish the chain of custody through Ms. Fung.

MR. WEBSTER: I have a hearsay objection, Your Honor.

THE COURT: The Court will provisionally admit this recording subject to further consideration over your objection.

THE CLERK: I'm sorry. What number?

MR. STOJILKOVIC: 1-18A.

THE COURT: Is there a date on this conversation?

MR. STOJILKOVIC: I know the dates. The date is not included in the recording.

THE COURT: All right. Is that eventually going to come into evidence?

MR. STOJILKOVIC: Yes, Your Honor.

THE COURT: All right. Why don't you just represent what date it is.

MR. STOJILKOVIC: Your Honor, I represent to

the Court that this is a call on August 16, 2010.

THE COURT: All right.

(An audio is played.)

BY MR. STOJILKOVIC:

Q Mr. Zangara, do you recognize the voices on this call?

A I do.

Q Who is speaking?

A Myself and Anna Hiskey.

Q What are you trying to do in this call?

A Market Spectrum Research Group services.

Q You describe in this call you have an analyst who does write-ups, CEO interviews, links to search engines. Who are you talking about?

A Mark.

Q And you represent that these services lend credibility or, in your words, legs or substance to some of these deals?

A Yes.

Q Okay. Did you and Mark try to lend credibility and legs and substance to the Everock deal through Spectrum?

A Yes.

Q Sir, I believe you've testified that you're generally familiar with Spectrum's website.

A Yes.
Q Prior to testifying today, have you reviewed a Spectrum video regarding Nature's Peak?
A Yes.
MR. STOJILKOVIC: Your Honor, at this time I would ask to play Government Exhibit 20-2. It's one of the videos we also played earlier with a prior witness.
THE COURT: All right. You may.
(A video is played.)
BY MR. STOJILKOVIC:
Q Mr. Zangara, do you recognize the voice on this video?
A I do.
Q Who is it?
A Mark Dresner.
Q Are you confident of that?
A Yes.
Q Is that the usual tenor of his voice?
A It's a little deeper.
Q Do you know why his voice sounds a little deeper on this than it does to your recollection?
A It could be the way it was recorded. It could have been altered.
Q You don't know, though, personally?
A I'm not 100 percent sure.

Q Did you ever ask Mr. Dresner to alter the way his voice is recorded on a Spectrum release?

A No.

Q To your knowledge, did anyone else ask or instruct Mr. Dresner to do that?

A No.

Q In some of the content of this video, it discussed the Nature's Peak press releases frequently which kept investors informed. Do you recall that?

A Yes.

Q And it would release press before and after doing something. Do you recall that point?

A Yes.

Q Who, in fact, was working on these Nature's Peak releases?

A From the company or in general?

Q In general, who was doing that?

A Robert Oppenheimer, Todd Spehler, Mark Dresner.

Q And did the timing of those releases coincide with what was going on at Moneyline brokers?

A Yes.

Q Did it coincide with the tranches, the sales?

A Yes.

Q Were you aware that Mr. Dresner was putting out videos such as this?

A Yes.
Q To your understanding, what was the purpose of putting out a video like this?
A To build the online credibility and optimize this content so that this way potential investors would have information on the company, and so we could use that to reach more potential buyers.
Q Who, if anyone, would benefit, in your view, from a video like this being disseminated?
A Myself, Mark, Todd, Robert Oppenheimer, the company, and all of us.
Q Okay. And why would you benefit?
A Because we would be able to sell shares of stock that we owned.

MR. STOJILKOVIC: I'd also like to play a second video, which is another one we did with a prior witness, 20-4.

THE COURT: All right. You may.

MR. STOJILKOVIC: The Court's indulgence.

(A video is played.)

BY MR. STOJILKOVIC:
Q Do you recognize the voice on this recording?
A Sort of, kind of.
Q You're not for sure?
A I'm not 100 percent sure.

Q Let me ask you: The speaker introduced himself as Chuck M. Does this sound like Charles Moeller's voice?
A No.
Q Are you confident of that?
A Yes.
Q Did you ever instruct anyone to create videos and represent themselves out to be Chuck M.?
A No.
Q To your knowledge, was there anyone who generated content for the Spectrum website other than Mark Dresner?
A No.
Q In this video, the speaker talks at one point about stocks that give off signals that are good stocks and that you can kind of ride them, ride the wave like a surfer. Do you recall?
A Yes.
Q And some of these signals -- I believe the video mentioned company news and trading volume and movements in price. Do you recall that?
A I do.
Q Did the Everock/Nature's Peak company put out company news?
A It did.
Q Was Mr. Dresner involved in that process?

A Yes.
Q Did the Everock deal involve increases in trading volume?
A There were, yes.
Q Okay. Would those happen when, in part, the Moneyline accounts were being used to sell stock?
MR. WEBSTER: Your Honor, counsel is leading the witness.
THE COURT: Sustained.
BY MR. STOJILKOVIC:
Q How would there be increases in trading volume in the Everock deal?
A When promoters were hired and they disseminated the public information that was put out, they would bring other investors in. So more eyes meant more buying.
Q And how were those promoters retained?
A With stock.
Q Okay. Did that stock come -- which accounts did that stock come from?
A Mine.
Q Just yours?
A I'm fairly confident that it did.
Q Okay. Did you ever discuss with Mr. Dresner the fact that you were retaining promoters on Everock?

A Yes.
Q This video during one part of the wave indicates -- the speaker indicates -- suggests buying in chunks and keep buying. Mr. Zangara, on the Everock deal, at a time when you were selling, what were you hoping the market would do?
A Continue to go higher.
Q Were you hoping that you could liquidate your stock?
A Yes.
Q Are you familiar with something called CEOinsiderTV?
A I am.
Q What is that?
A It was another tool that we used, another site that, I believe, the CEO interviews were taken and posted on.
Q Do you know whether that was used in relation to Everock?
A Yes.
Q What do you know about that?
A That that was, again, another site that was used in order to create content that could be put out and optimized on the Internet.
Q Who ran CEOinsider?

A Mark.
Q Okay. Do you know whether any CEO interviews were done relating to Everock?
A Yes.
Q What do you know about that?
A I know they were done.
Q Okay. Who did them?
A Mark.
Q Are you familiar -- well, I'm sorry. Strike that.
I believe you described earlier in your testimony as BHI Group being your company.
A Yes.
Q Did BHI have a bank account?
A Yes.
Q To your recollection, did that account get any moneys from the Everock deal?
A Yes.
Q I'd like you to take a look at what's been marked for identification as Government 15-12.
A Okay.
Q Are you familiar with this document, sir?
A Yes.
Q What is it?
A It's a bank statement for the BHI Group, the corporation, my company.

Q And what's the date range for this statement?
A September 01, 2010, through September 30, 2010.
MR. STOJILKOVIC: Your Honor, I would move in Government 15-12. It is covered by the stipulation filed last week under Item 20.
THE COURT: Any objection?
MR. WEBSTER: No, Your Honor.
THE COURT: Without objection, Government Exhibit 15-12 is admitted.
MR. STOJILKOVIC: All right. Can we put up the first page, please.
BY MR. STOJILKOVIC:
Q Do you recognize the address there in the top portion of the page?
A I do.
Q What is that address?
A My home address.
Q Okay. And can you just read off the last four digits of the account number there on the top right.
A 1249.
Q Okay.
A 1249.
Q All right, sir. I'd like to ask you to move to the very last page of the document. Do you see that, sir? It's Bates ending in 486.

A Yes.
Q Okay. Do you recognize this check image, sir?
A I do.
Q Who is this check written from?
A Bastille Advisors, Incorporated.
Q Who is it written to?
A The BHI Group, Incorporated.
Q In what amount?
A $81,400.
Q On what date?
A September 24, 2010.
Q To your knowledge, sir, did these moneys have anything to do with Everock?
A Yes.
Q Did you do other deals like Everock through Moneyline?
A No.
Q Okay. Sir, did you share any of these proceeds with Mr. Dresner?
A These specific proceeds or the proceeds in general of --
Q Let's start with the general.
A Yes.
Q Okay. Can we go back to the third page of this document.

A And the ending Bates number?
Q I'll get there, sir. Just one moment. It's 481.
A Okay.
Q Do you see there, sir, a series of electronic withdrawals?
MR. STOJILKOVIC: Can we blow that up, please, on the top of the page.
A Yes.
Q Okay. And the last of these, sir, do you see that's an electronic withdrawal in an amount of $81,400, the same amount we saw in that check?
A I do.
Q What's the last four of the account these are going to?
A 1568.
Q All right. Now, sir, you can put that down.
I'll ask you to look at 15-13.
A Okay.
Q Do you recognize this document?
A I do.
Q What is it?
A UDF Consulting, Incorporated, another corporation that I created, that I owned.
Q And what's the account statement date?
A September 1, 2010, to September 30, 2010.

MR. STOJILKOVIC: Your Honor, I move this record in.

THE COURT: Any objection?

MR. WEBSTER: No, Your Honor, no objection.

THE COURT: Without objection, 15-13 is in.

BY MR. STOJILKOVIC:

Q All right. Again, sir, does this account bear the same address as we saw with your prior BHI account?

A It does.

Q And what are the last four digits of this account?

A 1568.

MR. STOJILKOVIC: Can we blow it back up, please. Can you blow out the bottom of the first page that says deposits and additions.

BY MR. STOJILKOVIC:

Q Do you see there a series of incoming transfers, including the last one for $81,400?

A I do.

Q Okay. And, sir, is this the transfer that came over from your BHI account into this UDF account?

A It was.

Q And what was the date?

A 27th of September.

Q 27th of September.

Now, can you turn to page 4 of this document.

MR. STOJILKOVIC: Can we blow up the electronic withdrawals, please.
A What is the Bates number?
Q It ends in 652.
A Okay.
Q Do you see there, sir, some transfers that you made out on September 27?
A I do.
Q Do you see a transfer out to Mark Dresner?
A I do.
Q In what amount?
A $14,000.
Q I think you can put that document down.
Sir, are you familiar with something called Digital Edge Marketing?
A I am.
Q What is it?
A It's Mark Dresner's corporation.
Q Do you know whether Digital Edge Marketing had a bank account?
A I do.
Q Did it?
A It did.
Q Did you have access to that account?
A No.

Q To your knowledge, did you direct any Everock proceeds into that account?
A Yes.
Q Please look at what's been marked for identification as Government 15-14. Are you familiar with this?
A Yes.
Q What is it?
A It's my Chase bank account for The BHI Group.
Q And for what time period?
A October 01.
Q Of what year?
A 2009 to November 30, 2009.

MR. STOJILKOVIC: Your Honor, I'd move in 15-14 at this time.

THE COURT: Any objection?

MR. WEBSTER: No, Your Honor.

THE COURT: Without objection, 15-14 is admitted.

BY MR. STOJILKOVIC:
Q Let's look at the first page.

MR. STOJILKOVIC: The Court's indulgence. I apologize, Your Honor.

BY MR. STOJILKOVIC:
Q Sir, I'm going to ask you to look at the document.

Is that okay?
A Okay.
Q All right. What's the -- I'm sorry, sir. I believe you already indicated this is a statement in November 2009.
A From October through November 2009.
Q All right. If I could direct you to the fourth page of the document, which is Bates ending 308.
A Okay.
Q Do you see a withdrawal on November 4 about halfway down the page?
A I do.
Q In what amount?
A $10,000.
Q Can you turn all the way to the third-to-the-last page, which is Bates ending 334.
A Okay.
Q What do we see there?
A A cashier's check from Chase, JPMorgan.
Q In what amount?
A $10,000.
Q On what date, if you can tell from the cashier's check?
A 11-4-2009.
Q Who is it made out to?

A Digital Edge Marketing.
Q Now, sir, to your recollection, did Mr. Dresner direct any proceeds of the Everock deal to you from Digital Edge Marketing's bank account?
A Yes.
Q Please turn back to the third page of this exhibit. I'm going to focus you in, sir, on the top half of the page that reads deposits and additions.
THE COURT: Which page is it?
MR. STOJILKOVIC: It is Bates 307.
BY MR. STOJILKOVIC:
Q Do you see any deposits there from the Digital Edge Marketing account?
A Yes.
Q On what dates and what amounts?
A 11-08 or 06, $33,000.
Q And further down, do you see one on --
A 11-20, $9,634.79.
Q Now, sir, around the time of these two deposits, did your account also receive deposits from Moneyline?
A Yes.
Q Are those the ones that happened on 11-9 and 11-23?
A Yes.
Q Do you see there indicated they're from HSBC Bank

of Sandias Azucaradas?

A Yes.

Q Sir, looking at these records, do you have any understanding or recollection of why you'd be getting money from Digital Edge in or around the same time that you were getting amounts of money from the Sandias Azucaradas account?

A It's just the way we decided to split up the money or whatever my particular function was at that point, whether I was paying another promoter or whether I was sending money to -- whether it be Oppenheimer and/or Spehler.

Q Sir, to your understanding, what's the source of these moneys here both from Digital Edge and from Sandias Azucaradas? What's the ultimate source of those moneys?

A The sale of stock.

Q What stock?

A Everock.

THE COURT: Mr. Stojilkovic, we'll take our afternoon recess at this time.

MR. STOJILKOVIC: Thank you.

THE COURT: All right. We'll stand in recess until 4:00.

Mr. Zangara, do not discuss your testimony

during the recess.
THE WITNESS: Yes, Your Honor.
(Recess from 3:44 p.m. until 4:03 p.m.)
THE COURT: All right. Mr. Zangara, you remain under oath.
THE WITNESS: Yes, Your Honor.
BY MR. STOJILKOVIC:
Q Mr. Zangara, before we broke, we were looking at some records of transfers between one of your accounts and the Digital Edge Marketing account. What I want to ask you now is, to your knowledge, did Mr. Dresner distribute some Everock proceeds to individuals besides yourself?
A Yes.
Q To your knowledge, who did he distribute proceeds to?
A Joe Manfredonia.
Q Okay. How do you know that?
A That was the arrangement that we made.
Q Who made that arrangement?
A Myself, Mark, Todd, and Joe Manfredonia.
Q Okay. Why was Joe Manfredonia getting proceeds?
A For producing the publicly traded vehicle that we subsequently used for the reverse merger.
Q Mr. Zangara, the different participants of the

Everock deal that you talked about, did they have different roles?
A Yes.
Q Why was that?
A Different specific areas of expertise.
Q What, if anything, were you hoping to establish by having different people carry out discrete roles?
A Well, again, certain people had certain abilities. And the idea was that if, in fact, I was knowledgeable because of my brokerage background and experience in depositing and liquidating and selling the shares and hiring properties because I had exposure and experience there -- other people had the abilities -- writing abilities. Other people were part of the creative and running the company. So it was kind of compartmentalized in that regard.
Q Even though the structure was compartmentalized, did you personally have an understanding of what other people were doing?
A Yes.
Q Did you have discussions with Mr. Dresner about what you were doing?
A Yes.
Q Did you have discussions with Mr. Dresner about what people besides you and Mr. Dresner were doing?

A Yes.
Q Did you have discussions on the front end of the scheme -- did you have any discussions -- I apologize.
In the front end of the deal, did you have any discussions with Mr. Dresner about Nature's Peak and the fact that it was looking for financing?
A It was understood, yes.
Q That was a topic of conversation?
A Yes.
Q Did you have any discussions around that time with Mr. Dresner about getting the Everock shell from Joe Manfredonia?
A I don't know that he was involved with that, with the acquisition or getting the shell from Manfredonia. That was a prior relationship that I had had.
Q How was Mr. Manfredonia ultimately paid?
A With the proceeds from the sale of shares.
Q Okay. Who did those proceeds come from?
A Those shares happened to be in Mark's account. We liquidated and transferred over to him at Moneyline.
Q So based on your interactions with him, did at some point in time you discuss the fact with Mr. Dresner that Mr. Manfredonia was related to this?
MR. WEBSTER: Objection, leading.
THE COURT: Sustained.

MR. STOJILKOVIC: Okay. I withdraw the question.

BY MR. STOJILKOVIC:

Q You indicated that Mr. Dresner was involved in editing Nature's Peak and Everock press releases.

A Yes.

Q To your knowledge, was he selling shares through Moneyline at the time those releases went out?

A Yes.

Q Did you discuss with him that you were also selling shares?

A Yes.

Q Were those coordinated sales?

A Yes.

Q Did you discuss with him that you retained additional promoters through Moneyline?

A That I attained promoters --

Q Retained additional promoters through Moneyline?

A I don't recall having specific conversations if, in fact -- I was paying them through Moneyline. I didn't retain them through Moneyline.

Q Did you at any point discuss with Mr. Dresner that there were additional promoters?

A Yes.

Q And was Mr. Dresner involved in running Spectrum

and other outlets that optimized Everock coverage?
A Yes.
Q And, as we saw in some of the Spectrum materials, under what name was Mr. Dresner running Spectrum? Under whose name?
A I don't understand the question.
Q What was the name in all the press releases?
A Oh, Chuck M. -- Mark -- I'm not 100 percent sure.
Q I'll withdraw my question.
Sir, to your recollection, was there anything of consequence on the Everock deal that you knew but did not disclose or somehow communicate to Mark Dresner?
MR. WEBSTER: Objection, leading.
THE COURT: Overruled.
BY MR. STOJILKOVIC:
Q You may answer.
A No.
MR. STOJILKOVIC: I pass the witness.

CROSS-EXAMINATION

BY MR. WEBSTER:
Q Good afternoon, Mr. Zangara.
A Good afternoon.
Q Mr. Zangara, as I understand the deal that you set up, you get other people whom you have referred to as promoters to redisseminate already publicly available

information, correct?
A Yes, sir.
Q And what was being done through Spectrum Research Group was to also redisseminate already publicly available information, correct?
A Yes, sir.
Q And with respect to the videos that we watched during your testimony, that information that we see in the slides, that would have been redisseminated publicly available information, correct?
A Yes.
Q And Spectrum Research Group only issued four press releases or announcements throughout a two-and-a-half year period; is that correct?
A I do not know the number, sir.
Q I'm sorry. You don't know the number of press releases?
A No, sir.
Q I believe you were shown four. Have you seen any others besides those?
A No.
Q And the goal was not to kill the stock of this company, right?
A Correct.
Q You wanted the stock to maintain at least a

certain level or maybe even better, go up, so that everyone could dispose of these shares?

A Correct.

Q And when Mr. Oppenheimer came to you or -- to Mr. Spehler -- I'm sorry -- with the idea of how to raise capital, did you become aware that they had been trying to raise capital from multiple other sources for a long, long time?

A No.

Q You didn't know that?

A No.

Q I see.

The publicly available research that Spectrum and others redisseminated, do you know where that came from?

A It's public information. It's on the Internet.

Q Some of it come from the company itself?

A Some of it, yes.

Q So you'll see announcements, for example, where they have a deal with Whole Foods or they're attending the Fancy Food trade show. Those sorts of things would have come from the company itself?

A And issued through PR Newswire or some other news service that would then make them public information.

Q I see. And so the press releases that were

disseminated by the company itself through PR Newswire, who did you say drafted those?
A Robert Oppenheimer with the help of Todd Spehler and then edited for just grammatical content. Mark would edit them.
Q So just to make sure there were no typos and things like that?
A Correct.
Q And with respect to those press releases, that was the entirety of his function, cleaning them up -- or I think you said put a shine on them, right?
A Yes.
Q Just to make sure they look professional?
A Correct.
Q But in terms of the content, that was drafted by Oppenheimer and Spehler?
A Correct.
Q With respect to Spectrum Research Group, you testified that Mr. Moeller set up a phone number so that if people called that number, there could be messages, correct?
A Correct.
Q Who instructed him to do that?
A Myself and Mark and him in a conversation.
Q All three of you had a conversation together?

A Correct.
Q And the upshot of it was that Mr. Moeller was tasked with setting up a phone number?
A Yes.
Q And that that phone number would be set up so that when people called Spectrum Research, they would get a voice mail message?
A Yes.
Q And then did all of you have the access code or did Moeller -- I think you said Mr. Moeller gave it to you all. Right?
A I believe so.
Q Because he is the one who had established that number?
A Yes.
Q When you began to learn about Nature's Peak and their products and their sales and things like that, that was a legitimate company, right?
A Yes.
Q They had a natural product, correct?
A Yes.
Q And they were actually selling it in the marketplace, correct?
A Yes.
Q And they were going to the big trade shows and

creating some buzz about this product, correct?
A Yes.
Q In the CEO interview video -- are you aware of that one with Mr. Wilkinson?
A I believe there were two, but yes, I am aware of them.
Q There were a couple of them?
A Yes, I believe so.
Q I know he was on some national show. Correct?
A Correct.
Q To promote the Nature's Peak's products, right?
A Yes.
Q And then he did the interview with Mark Dresner on the CEOinsiderTV website, correct?
A Yes.
Q Those things that Mr. Dresner and Mr. Wilkinson were discussing, such as the fact that the product was gluten free and sugar free and kosher, those were accurate, right?
A To the best of my knowledge, yes.
Q And the other items in those interviews with respect to the company's products and its sales and marketing plans, these were accurate to your knowledge?
A Yes.
Q So when that information was redesignated either

in the form of these four Spectrum Research announcements or the other announcements or publicity that was coming from the promoters you hired, they were just redisseminating that truthful information that had been disseminated by the company already, right?

A To the best of my knowledge, yes.

Q And your plan was when that truthful, redisseminated, publicly available information was then made known again through some other method, you would hope to sell the shares of stock and make money from that, correct?

A Yes.

Q You were hopeful that other investors might see the value in this truthful, redisseminated, publicly available information, correct?

A Yes.

Q You personally retained the promoters or hired these promoters, correct?

A Yes.

Q So they weren't hired by Everock or Nature's Peak, right?

A No.

Q And you arranged for their compensation to tout the redisseminated, truthful, publicly available information?

A Yes.
Q At what time did Mr. Moeller cease to be affiliated with Everock?
A I'm not exactly sure, but the understanding -- the plan was to have him to be -- to drop and not be a director and/or affiliate as soon as the merger was done.
Q Was it maybe early 2009, January 2009?
A It's in the discovery package. I did see the document where he asked to be, you know, dropped and released. You'll see it in the reportings from the OTC record where he was a director, and on the next one, he was not. So it would be in between that time frame. I don't recall the exact date.
Q So at that point, he was simply a shareholder, I suppose, in Everock, correct?
A Correct.
Q By virtue of the shares that he retained?
A Correct.
Q And that was his compensation for cleaning up the publicly reporting shell?
A Correct.
Q And he didn't sit on the board of directors meetings or anything like that to your knowledge?
A No.

Q I see. He didn't engage in the day-to-day operation of the company to your knowledge?
A No.
Q With respect to the disclosures that were in the press releases from Spectrum Research Group, I think you said that that compensation number at the bottom, that wasn't there to deceive investors; it was there to try to promote paid business for research reports. Correct?
A Correct.
Q And one of your hopes with respect to Spectrum Research Group was that companies would hire you to do research reports?
A Correct.
Q And did that, in fact, happen?
A Yes.
Q So you all made some money doing that?
A Yes.
Q In one of the videos, there was reference to some industry statistics about the market for mayonnaise and vegetable spreads. Do you remember that one?
A I do.
Q Do you have any reason to doubt that that was true?
A No.

Q One of those videos referred to the fact that Everock or Nature's Peak was developing eye-catching points of sale in grocery stores. Was that untrue?

A No.

Q There was a statement that Nature's Peak and Everock, based on the type of product that they had and the timing of that product, were fishing a very deep, very wide pond. Was that untrue in terms of the market availability?

A I'm not an expert in that particular market, but you know, I couldn't testify here today to the accuracy of that statement. But I couldn't also tell you that it's not true.

Q So you can't say it's untrue?

A No, I cannot.

Q And again, they did go to this Fancy Food convention. That's in there too, right?

A Yes, sir.

Q Or trade show. Did you go to the Fancy Food?

A I did not.

Q As part of those disclosures on the four Spectrum Research Group press releases which occurred over a period of this two-and-a-half years, it indicated that folks affiliated with Spectrum may have a beneficial interest in the company. Was that true?

A Yes.
Q Was part of the CEO interview website -- was part of that plan to interview CEO's?
A Yes.
Q And did you all interview CEO's other than Mr. Wilkinson?
A Yes.
Q Did you get compensated for that?
A Yes.
Q If Mr. Moeller says the phone number used for Spectrum Research Group was some old fax line that he didn't use anymore, that wouldn't be true; would it?
A I --
Q He got one call and unplugged it. That wasn't consistent with what you just said, right?
A You have to re-ask that question, sir.
Q I'll withdraw the question.
Did you think that Nature's Peak was a notch above other pink sheet companies?
A Yes.
Q So when that was publicly disseminated, that was a truthful statement, correct?
A Yes.
Q And I think you said that when you all disseminated this publicly available, truthful

information, one reason was that so potential investors could have more information about the company, correct?
A Correct.
Q Or about other companies, correct?
A Correct.
Q Mr. Zangara, you have some background in the securities industry, correct?
A Correct.
Q Could you tell the judge, please, what licenses you held.
A I held a Series 7, which was a general securities license; Series 63, which allowed me to work in a number of different states; and a Series 24, which allowed me to supervise other brokers.
Q And did you work in any brokerage houses over the course of your career?
A I did.
Q What brokerage houses?
A The first firm that I was registered at was Steinberg & Lehman. I went to Rooney Pace, which closed down. Both of those firms closed down subsequently. Then from Rooney Pace, I went to Barrett & Company; Moseley, Hallgarten and Estabrook, which was taken over by Gruntal & Company; Prudential-Bache; Robert Todd Financial; and I finished my career at

Tassy & Company.

Q I see. So you are quite knowledgeable about the securities industry?

A Yes.

Q Did Mr. Dresner hold any securities licenses?

A No.

Q The fact that you hired all of the promoters directly -- when you reviewed that statement in one of the securities filings that were made by Everock that said the company does not retain a promoter, that statement is true because you were the one who retained the promoters, right? You weren't on the board, and you weren't an officer. You were merely a shareholder, right?

A Well, in context, it is a true statement. In reality, I worked with the other participants. We all worked together, and I, in essence, was the promoter by virtue of the fact that I was hiring promoters. We all had an understanding of what it was that we were doing.

Q Well, when Mr. Wilkinson represented on those securities filings that the company did not retain a promoter, that was true, right?

A Correct.

Q The reason you used Moneyline Brokers didn't have anything to do with the fact it was offshore, right?

A No.
Q Just the fact that you could move stock and money from one customer account to another customer account?
A Correct.
Q And after this redisseminated, publicly available, truthful information was sent out, again, in some fashion, you would sell the shares -- and I believe you testified to this -- in a manner to keep a fair and orderly market, correct?
A Yes, sir.
Q The decision of when to issue the press releases was made by Mr. Oppenheimer; is that fair?
A It was probably collective, Oppenheimer, myself, and Spehler, when the shares were free trading. They weren't releasing news releases if we didn't have stock for sale.
Q So that was a decision made by you three?
A Yes.
Q Did you have any role in retaining the accountant who did the financial statements that were attached to the securities filings of Everock?
A No.
Q Who did that, if you know? If you don't know, that's fine.
A I wouldn't be able to testify 100 percent, you

know, beyond reproach that it was Robert Oppenheimer, but it would have been his job to do so.

Q That's fine. I understand.

The goal for Everock, this plan that you had, was not to hurt market participants, correct?

A No.

Q It was to make money based on an increase in the stock price, which you hoped would be facilitated by the redissemination of publicly available, truthful information, correct?

A Yes.

Q And you also wanted to see Everock/Nature's Peak succeed as a company, correct?

A In my best interest, yes.

Q Initially, when you met with the government, you were asked who you thought had done something wrong, and you identified Mr. Oppenheimer, Mr. Spehler, and yourself, correct?

A Correct.

Q I believe you also testified that you compartmentalized the different phases of what you were trying to accomplish, correct?

A Correct.

Q So that you were the -- would you say you were the main person who put the various pieces together or you

did it with Spehler and Oppenheimer?
A I would say with Spehler and Oppenheimer.
Q Do you know a gentleman named Mark Malone?
A No.
Q Did you ever call Moneyline Brokers and ask whether Mark Malone was trading shares in Everock?
A I believe there is a phone conversation that covers that, yes.
Q Okay. Well, if you don't know Mark Malone, why would you be asking about him trading shares?
A He was a promoter, a subpromoter of one of the promoters, and I came to find out that he had shares. And it was understood that I would be selling shares in concert along with him selling shares. So we weren't -- we didn't have a rogue situation where someone received shares and they just sold them and we didn't benefit from that relationship.
Q I see. Because you did have that with one person who sold a bunch of shares, and you said it was a horror show or something, right?
A Numerous occasions.
Q Without your direction. So you do remember Mark Malone?
A I'm familiar with the name. I don't believe I've ever spoken with Mark Malone.

Q I understand.
A I believe he was a subpromoter hired as a secondary to someone who I had hired who the shares went into their account.
Q Do you know who Christina Hedenborg is?
A That does not sound familiar.
Q With respect to the sale of shares or the distribution of proceeds from those sales, did Mr. Dresner ever do any of that without you directing him to do so?
A He might have been directed by other parties, Spehler or --
Q But someone told him what to do?
A Yeah. We all conversed as to how and what the ultimate objective was and how the moneys were going to be split.
Q You considered Mr. Dresner more like an employee, correct?
A He worked in other projects as an employee.
Q Did you inform Ms. Hiskey that you were in control of the Digital Edge Marketing shares that were held at Moneyline?
A I may have.
Q It's not any kind of violation to do a reverse merger; is it?

A No.
Q Was Mr. Wilkinson very intent on doing this deal?
A I would say yes.
MR. WEBSTER: Thank you very much, Mr. Zangara. That's all I have.
THE COURT: Any redirect?
MR. STOJILKOVIC: Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. STOJILKOVIC:
Q Mr. Zangara, counsel asked you: At an interview with the government, you had identified yourself, Oppenheimer, and Spehler as people who had done something wrong. Do you recall that?
A Yes.
Q Was that before or after your plea? Do you recall that interview?
A I don't.
Q If you don't, that's fine.
At a subsequent interview, did you also discuss Moeller and Dresner's role in this?
A Yes.
Q Why didn't you talk about them in that first interview as having done something wrong?
A As I had mentioned, Charles, a dear friend of mine, had at my request taken on the position of CEO to

oversee the cleanup of the shell. He wasn't part of making any decisions. He wasn't part of decision making in any way, shape, and form, and he was compensated. That was strictly all.

As far as Mark, another dear friend of mine, his participation -- although he was not an employee, he was, in essence, a part, and we shared in the percentages and proceeds of the sale. I did not see him as the controlling person in the decision making of putting this project together. I saw him more on the terms of Oppenheimer, Spehler, and myself.

Q So is it a fair characterization -- tell me if it's not. Basically, are you saying that you provided direction to Dresner and Moeller?

MR. WEBSTER: Objection, leading.

THE COURT: Sustained.

MR. STOJILKOVIC: I'll withdraw that question. I'll let the prior answer stand.

BY MR. STOJILKOVIC:

Q Counsel asked you about truthful dissemination of publicly available information related to Everock.

A Yes.

Q Now, in the materials we've reviewed today in court, did you ever see in any public materials the truth disclosed about your and Mr. Dresner's being

issued millions of dollars of Everock stock?
A No.
Q Did you see the truth about you and Mr. Dresner engaging in coordinated sales of that stock?
A No.
Q Did you see in any public document the truth disclosed about the timing of those coordinated sales coinciding with the press releases issued by Nature's Peak?
A No.
Q Did you see the truth about your and Mr. Dresner's actual compensation from or extent of stock ownership of Everock?
A No.
Q Did you see the truth about Moeller's role as a, quote, unquote, control person who actually took orders from you?
A No.
Q Did you see disclosed that Moeller's role in Spectrum was, in your words, in name only?
A No.
Q Finally, Mr. Zangara, you had indicated you didn't want to hurt the market, and you were asked about that a little bit more on cross. Do you recall that?
A Yes.

Q What do you mean by that?
A If, in fact, we took 20,000,000 shares and tried to sell it on a day where only a million shares traded, the stock might go from 2 cents to a tenth of a penny. The more selling and buying, stocks go down; the more buying and selling, they go up. So if you can kind of match the buying that's coming in with the selling that's going out so as not to artificially deflate the market, you have a better chance of perpetuating and keeping the deal going.
Q Okay. Now, once the tranches of Everock that you've testified about, once they were complete, did you obtain your proceeds from the deal at that point?
A Yes.
Q Once they were complete, would Mr. Dresner have obtained his proceeds from the deal at that point?
A Yes.
Q And anybody else you shared proceeds with, they would have had them once those tranches were complete?
A Correct.
Q Now, what about the investors who bought from you? Do you know when they cashed out?
MR. WEBSTER: Beyond the scope of cross, Your Honor. I object.
THE COURT: Overruled.

A No.
Q Do you know what happened to them?
A It was a free market. They could have bought and sold shares at any time. No, I wouldn't -- I don't know specifically any.
Q Once the tranches you testified about were over, to your knowledge, did either you or Mr. Dresner or anyone continue to put out press releases related to Everock?
A After?
Q After the tranches?
A No.
Q What, if anything, did you do to help Nature's Peak once those four tranches were over?
A We were done.
Q What to your knowledge, if anything, did Mr. Dresner do to help Nature's Peak once those four tranches were over?
A I don't know.
MR. STOJILKOVIC: Nothing further, Your Honor.
THE COURT: All right. Thank you.
May this witness be excused?
MR. STOJILKOVIC: Your Honor, we would request he be subject to recall.

THE COURT: All right. Mr. Zangara, you need to remain available to be recalled; otherwise, you're excused. Please do not discuss your testimony outside of the courtroom.

THE WITNESS: Yes, Your Honor.

(The witness stands aside.)

----------------------------------
Time: 4:38 p.m.

I certify that the foregoing is a true and accurate transcription of my stenographic notes.

/s/
Rhonda F. Montgomery, CCR, RPR

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES OF AMERICA, ) Case 1:15-cr-00178
)
Plaintiff, )
)
v. ) Alexandria, Virginia
) January 27, 2016
MARK S. DRESNER, ) 3:17 p.m.
)
Defendant. )
) Pages 1 - 80

TRANSCRIPT OF PAUL WILKINSON'S TESTIMONY

BEFORE THE HONORABLE ANTHONY J. TRENGA

UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

FOR THE PLAINTIFF:

KOSTA S. STOJILKOVIC, ESQUIRE
N. NATHAN DIMOCK, ESQUIRE
MICHAEL T. O'NEILL, ESQUIRE
OFFICE OF THE UNITED STATES ATTORNEY
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3700

FOR THE DEFENDANT:

STEVEN T. WEBSTER, ESQUIRE
AARON S. BOOK, ESQUIRE
WEBSTER BOOK, LLP
300 North Washington Street, Suite 404
Alexandria, Virginia 22314
(888) 987-9991

THE DEFENDANT, MARK S. DRESNER, IN PERSON

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

**I N D E X**



| WITNESS | EXAMINATION | PAGE |
| --- | --- | --- |
| Paul F. Wilkinson | Direct | 3 |
| | Cross | 47 |
| | Redirect | 77 |

PAUL F. WILKINSON, PLAINTIFF'S WITNESS, AFFIRMED

DIRECT EXAMINATION

BY MR. DIMOCK:

Q Good afternoon, Mr. Wilkinson.

A Good afternoon.

Q Could you please state and spell your full name for the record.

A It's Paul Francis Wilkinson, P-A-U-L, F-R-A-N-C-I-S, W-I-L-K-I-N-S-O-N.

Q And, Mr. Wilkinson, where are you from?

A I'm from the San Francisco Bay Area. I was born in San Francisco. I grew up on the peninsula, and I currently reside in Los Gatos in the mountains.

Q And could you describe generally, Mr. Wilkinson, your educational background.

A I started out pretty early in high school in the electronics sector and stayed with that until three years of college. I didn't get a formal degree, but I had about seven years of electronic courses and engineering courses.

Q And could you just generally describe your work history.

A Mainly in the consumer electronics business and mobile electronics. I worked on creating a mobile -- high-end mobile security system. Now I'm more akin to

home automation, home control systems, audio and video systems for customer residences.

Q Do you own your own company?

A Yes.

Q Okay. Is this the only company that you've ever owned?

A No.

Q Could you explain that.

A This is -- my current company I started after I left Ultimate Control in 2006. In that time period -- I started Nature's Peak in 2004 while I was employed at Ultimate Control, and then I left Ultimate Control to work on Nature's Peak while also working in the consumer electronics business to pay the mortgage and put the food on the plate.

Q Could you explain how it is that Nature's Peak came about.

A Nature's Peak was created after a lot of interest from family and friends to see the product move forward. So I had a dip and a spread that we made in the kitchen for many years. When I invited company over, family and friends, they really liked it. It was a great dip, for instance, for artichokes and could be used as a sandwich spread and many other applications. So I was egged on, I guess, by my family and friends.

They said, Hey, you have to put this on the market because it's a great product.

And so that was our first step, getting out to the market and determining that there is a market. And after that determination, raising capital from an angel investor that loved the product and wanted to see it move forward. He was part of the early momentum that encouraged us to bring it to market.

Q And who is that angel investor you just described?

A That's Dick Coughlin, Richard Coughlin.

Q And how did you know Mr. Coughlin?

A He was part of my Indian Princesses group up in the mountains, a father-daughter group.

Q And do you know approximately how much he invested in Nature's Peak?

A Over $600,000.

Q Did you invest your own money in Nature's Peak as well?

A Yes.

Q About how much over the years?

A Over $300,000.

Q So prior to 2007, what was the primary funding mechanism for Nature's Peak?

A Angel investment and sweat equity.

Q Around late 2006, early 2007, did you encounter a

need for additional funding?
A Yes, we did. We always had the need as we grew, but the main reason why we needed it is if we were going to grow to be a national company, we needed to get funds secured for production and for receivables, financing. So we were in need of a million or two in cash and about a million in credit for receivables financing.
Q And during that time period, did any opportunities come up that you decided to explore?
A Yes, many opportunities came up. We pursued, as far as I know, all the opportunities that were -- that came up as far as referrals go, yes.
Q At any point, did the idea of the company going public come to your attention?
A Yes, in 19 -- in 2008 that was presented after we -- 2008-2009 time period after we exhausted a lot of individual potential investors. Keep in mind that was a time period where the economy was going south. And so raising money for a start-up venture wasn't high on everybody's, you know, investment list.
Q What do you remember about how it is that going public came to your attention as an option?
A It was through our business consultant, Robert Oppenheimer, who was also on our board. He had some

associates in New York that he met through another company that he was working with out there, and they also pointed us -- those people in New York pointed us to other potential investors that we went and met with that were equity investor types, two or three. Two I recall for sure. It may have been a third one, but that didn't pan out. But they referred me to them, and we met with them. We gave them our business plan. That started in 2006.

Q Let me ask you a couple of follow-up questions. You mentioned on your board. Who was on the board of your company?

A Dick, Richard Coughlin, and Robert Oppenheimer.

Q And did you have any history with public companies or any expertise with public companies during that time period?

A Zero.

Q And you mentioned Mr. Oppenheimer. How is it that you came to know Mr. Oppenheimer?

A I met Mr. Oppenheimer in a business course called Entrepreneurial Edge, and we've known each other for many years. Before I started Nature's Peak, he worked with us in the consumer electronics business I was in.

Q What was his role with regard to that?

A A business consultant.

Q Okay. And then you mentioned Robert Oppenheimer and some people in New York. Did you come to know who those people in New York were?
A Yes. It was Todd Spehler and then Frank Zangara and Mark Dresner, and then later there was a couple -- there was an attorney involved, George Cornell. And there was another attorney, but he wasn't in New York, Michael Hair. He was in Arizona.
Q Okay. What do you recall, if anything, about Mr. Oppenheimer's role in terms of the company going public?
A He worked with Todd and Mark and Frank -- the New York team, I call it -- in preparing what we needed to do, the documents that we needed in order to make the merger with EVRN work.
Q What was your understanding of the mechanics of that process?
A I had little understanding of it then, and I still have little understanding of it now. So I was focused on the production and marketing side of the company, which was pretty overwhelming considering I also had to earn money. Because the company wasn't making enough money to pay me a salary. So I had to make that to pay my mortgage and put food on my plate.
Q Did you have any understanding in terms of how

going public would help Nature's Peak?
A Yes, some understanding. That it would be a vehicle to raise money and have potential that our stock -- our privately held stock would be eventually turned into publicly traded stock that we could potentially sell if we wanted to.
Q And when you say we, who are you referring to?
A The board. We made the decision to move forward with the merger, and those are some of the benefits that were explained to us.
Q Okay. What was your understanding of the mechanism as to how this process of going public would ultimately lead to the capital that you needed coming in?
A That's part of the mechanism that I didn't understand.
Q And then I think you testified that you did ultimately decide to go public. Is that correct?
A Correct. We did the merger, which made us public.
Q What do you remember about that, about the merger you mentioned? I think you also mentioned Everock previously.
A There was just a lot of documentation that needed to be done before and after. So that was prepared. I did some of the review on it. Most of it I didn't

quite understand, again, the mechanics of the stock and the stock split and the stock being issued. But I was aware of it because documents were given to me to sign.
Q Okay. And what was your understanding of how Everock fits into this?
A Everock was previously a company in the mining business, I was told. So they no longer had any operations. And so they were a nonoperational company, but they were traded publicly. And so merging our company with that company would give us the public status.
Q Okay. Did you know at the time whether or not Everock had any shareholders existing?
A Yes. How many I'm not sure, 1,000, 2,000. I'm not sure.
Q Okay. Did you have any understanding as to what would happen with those shareholders once the merger took place?
A That they would just continue to be shareholders in Everock.
Q Okay. And did you ultimately wind up meeting some of the people in New York that you mentioned?
A Yes, at the Fancy Food show.
Q What's the Fancy Food show?
A The Fancy Food show is the largest trade show in

the industry. If you're kind of anybody in the food business without being a commodity type of food, being a specialty food, you would be at the Fancy Food show. That was held in San Francisco half the year, and then the other half of the year it would be in New York and sometimes held in LA.

Q Who do you recall meeting at the New York show?

A I recall meeting Todd --

THE COURT: Excuse me. Who is Todd?

THE WITNESS: Oh, I'm sorry. Mr. Spehler.

THE COURT: Spehler?

THE WITNESS: Yeah, Mr. Spehler.

A -- and Mr. Zangara and Mr. Dresner, I believe.

Q And so you indicated that the board then eventually made a decision to move forward with this proposal going public; is that correct?

A That's correct.

Q Once that decision was made, who conveyed that decision to the people in New York that you've described?

A Repeat the question.

Q Once that decision was made, who conveyed that to the individuals in New York that had brought this to the company's attention?

A That would have been Robert, Mr. Oppenheimer.

Q Did you have an understanding at the time in terms of where the capital would come from to cover the cost of going public?
A That the New York team would cover most of the cost, but I do remember checks going out of the company for some attorney's fees.
Q Okay. I know you mentioned also attorneys earlier. How were these attorneys chosen to work on this particular transaction?
A George and -- George Cornell and Michael Hair were chosen, I believe, by Todd as one of the New York guys that made that decision. It wasn't our team.
Q Okay. And was the expectation that you or Nature's Peak would be putting up money in order to facilitate this process?
A Well, no, because we didn't have the money to put up to facilitate this process. That was very clear. The amount of money that went out for some attorney's fees was as much as we could do at the time because we were trying to work our capital in the production and then getting paid from the distributors and putting that money back into production. It's sort of a leapfrog way of getting the company going.
Q What was your understanding in terms of -- well, first off, let me ask you this: Do you know whether or

not Everock had a CEO?
A Charles Moeller was the CEO.
Q What was your understanding as to what would occur with Mr. Moeller once this merger took place?
A Well, at first he was going to be on the board for six months or a year. And then after so many months, he resigned.
Q Do you know why he resigned?
A I don't remember.
Q Okay. What do you recall about the next steps once the decision was made to go forward in terms of the merger?
A More paperwork. Once the decision was made, there was a lot of paperwork that was generated to meet specific guidelines of being a public company, guidelines of the pink sheets, which I think is the same as the OTC pink sheets. And there was a lot of disclosures and documents that we had to fill out at that time.
Q How would you describe your understanding of those documents and disclosures and what was going on during that time period?
A Well, I didn't know any different. So it was whatever needed to be done needed to be done. I don't know if that answers your question but...

Q Okay. Was there any discussion about how Nature's Peak would ultimately find investors by going through this process once the merger was complete?
A This is the cloudy part. A mechanism of which somehow we had publicly traded stock would enable us to raise the necessary capital for us to have for our production run and credit line. The mechanism still to this date I'm unclear of.
Q Okay. You mentioned that there were a lot of documents and agreements and materials that -- paperwork, I think, that was going around at the time. Do you know who was preparing those materials or who was involved in preparing them?
A The New York team -- as far as I can remember, the New York team would prepare the documents. And then Robert would review them, and then I would eventually be given them for review and a signature.
Q Okay. During this process, did you -- I know you mentioned the two attorneys that had been recommended. Did you have any other counsel representing you or Nature's Peak's interest through this process?
A We did -- well, not when we merged into Everock. Then it became the other attorneys. But prior to that, we did have representation.
Q And that was when you were as a private company?

A That was when we were a California corporation, correct.
Q What happened after the company became public? What do you recall?
A Well, there was more documentation that was required. We had to file quarterly reports, annual statements. The financials had to be kept up and reviewed, and then at that time we did -- we started doing press releases.
Q Okay. I'd like to show you some documents now with the assistance of the court security officer. We'll start with what's been previously marked as Government Exhibit 24-01.
THE COURT: All right. Is there any objection to this document?
MR. WEBSTER: I'm sorry, Your Honor. I'm just catching up.
THE COURT: All right.
A Okay.
Q If you can, just hold on a moment while defense counsel gets a copy.
A No problem.
MR. WEBSTER: No, Your Honor, there's no objection.
THE COURT: All right. Without objection,

Exhibit 24-01 is admitted.

MR. DIMOCK: Thank you, Your Honor. We would ask to publish as well.

THE COURT: Yes.

THE COURT REPORTER: I'm sorry. Is it 24-1 or 24-01?

MR. DIMOCK: It's 24-01. That's how the numbering is on the sticker.

THE COURT SECURITY OFFICER: Counselor, it's marked 24-1. There's no zero.

MR. DIMOCK: Oh, I must have an older --

THE COURT SECURITY OFFICER: No problem.

BY MR. DIMOCK:

Q Mr. Wilkinson, starting on the first page of this e-mail, do you recognize this?

A Yes.

Q Okay. And who is this e-mail from?

A It's from me.

Q And what's the date on it?

A The date is December 14, 2006.

Q And do you know who this is being sent to?

A It was sent to Mr. Spehler.

Q And let me just clarify: The tms@infusioncapital.net, is that Mr. Spehler's e-mail address?

A That's correct.
Q Then who else is on this e-mail?
A Robert Oppenheimer.
Q Okay. Does it have an attachment?
A Yes.
Q If you would, go to the next page of the exhibit. What's this document entitled?
A Nature's Peak, Proposed Term Sheet, Series A Preferred Stock.
Q What's your understanding of what this related to in late 2006?
A Well, as I mentioned earlier, there was a couple of individuals that Mr. Spehler referred us to for potential funding. We were asked how much we needed and how much we were willing to sell and at what price. So this would have been a term sheet, and this is how we raised capital from the angel investors and other investors where we sold preferred shares.
Q Okay. And if we go to the second page of the document, do you see on the lower section where it says by Equisition Capital II, LLC?
A Yes.
Q What name is listed there?
A That's Mark Dresner.
Q And that's not signed, correct?

A That's not signed.
Q Okay. What's your understanding as to why Mr. Dresner's name was listed on this document?
A To the best of my knowledge, Todd requested that.
Q Okay.
A Mr. Spehler.
Q Do you know if any funding actually came in connection with this document?
A No.
Q Okay. And just to be clear, this was prior to the time that Nature's Peak actually merged with Everock?
A Correct.
Q Okay. Thank you.
I'd like to show you another document. This one would be marked as Exhibit 24-2.
THE COURT: Any objection to this document?
MR. WEBSTER: No objection, Your Honor.
THE COURT: Without objection, Exhibit 24-2 is admitted.
MR. DIMOCK: Thank you, Your Honor.
BY MR. DIMOCK:
Q Mr. Wilkinson, do you recognize this?
A Yes.
Q Okay. In the subject line, it says updated and then two letters, SS, for your review. Could you

explain what SS means?
A That's my abbreviation for a spreadsheet.
Q Okay. And what generally is this e-mail string relating to?
A This would be -- well, this was one of many e-mails that went back and forth when Todd and Mark were helping us with the business plan. So Mark was, as far as I understood, a business consultant for Todd, and he had a lot of expertise in this area. He reviewed the business plans and marketing plans and gave us a lot of good input.
Q Okay. And do you know -- in the top of the page on the first page, it suggests that there's a call that's going to take place. Do you know if a conference call with Mark did take place or not, if you recall?
A It probably did. There were many conference calls that took place. I can't say 100 percent whether that particular one did, but it probably did.
Q Okay. That will be all for that document.
The next one I'd like to have you look at is marked as 24-3. If you can, take a look at that document, Mr. Wilkinson. Do you recognize that document?
A Yes, I recognize the document.

Q Is this an e-mail that you sent?
A Yes.
Q And does it go to a mark@dresner.com?
A And to Todd Spehler.
Q And does this relate to the Nature's Peak merger?
A Yes.
MR. DIMOCK: Your Honor, we would ask to admit Government Exhibit 24-3.
THE COURT: Any objection?
MR. WEBSTER: Your Honor, there appear to be a number of comments in the draft of this disclosure statement that come from Robert Oppenheimer. So to that extent, we would object to that as hearsay.
MR. DIMOCK: Your Honor, we would not offer those comments for the truth of the matter asserted.
THE COURT: All right. I'm going to admit Exhibit 24-3. The Court will reserve on the admissibility of the comments.
MR. DIMOCK: Thank you, Your Honor.
BY MR. DIMOCK:
Q Mr. Wilkinson, what's your understanding -- excuse me. Just a moment while I find my place here.
What's your understanding of what this e-mail and the attached draft document were related to?
A Well, this was part of the information, the

disclosure statement that we needed to have in order to perform the merger.
Q Okay. If we go to the second page of the exhibit, it would be the first page of the attachment. Do you see that?
A Yes.
Q And if we go to the middle of the page, do you see where it says Investor Relations Contact for the Issuer?
A Yes.
Q Who is listed there?
A That's Mark Dresner's name and address in New York.
Q What's your understanding as to why Mr. Dresner was listed under investor relations contact on this draft?
A I'm not sure. Todd could have asked him to be on that.
Q Okay.
A But that's speculation.
Q Okay. So you don't understand at this point?
A No, I don't understand why he was on there. I am speculating that it was agreed by the New York team that he would be on there.
Q If we could go to the third-to-the-last page of

the document, it would be either the 14th page of the exhibit, or for anyone who is following the Bates number, it's ending in 706154.

A Got it.

Q Okay. And do you see in the middle of the page under Item D?

A Yes.

Q What does that say?

A That says, "Promoters: This does not apply to the company."

Q What's your understanding of what a promoter is?

A I don't know what a promoter is.

Q Okay.

A And it said this does not apply to the company. So it wouldn't have been something I would have needed to know.

Q Okay. All right. Thank you.

The next document I'd like you to look at is what's been previously marked as Government Exhibit 24-4. Do you have that, Mr. Wilkinson?

A Yes.

Q Just a few basic questions: Do you recognize this document?

A Yes.

Q Is this an e-mail string between you, Mr. Spehler,

Mr. Dresner, and Mr. Oppenheimer?
A And my accountant.
Q Okay. And does this relate to Nature's Peak?
A Yes.
MR. DIMOCK: Okay. Your Honor, we would move 24-4 into evidence.
THE COURT: Any objection?
MR. WEBSTER: No, Your Honor.
THE COURT: Without objection, Exhibit 24-4 is admitted.
MR. DIMOCK: Thank you, Your Honor.
BY MR. DIMOCK:
Q So, Mr. Wilkinson, to the best your recollection, what is this particular e-mail discussing?
A Well, there was, again, a lot of information we needed to give for this merger and afterwards, and part of that was financials. So my accountant, Mr. McDermott, would send me draft copies of the financials, and then I sent that on to Mark and Todd to make sure that the format that it was in was acceptable for what we needed for whichever document this needed to go on, whatever disclosure document it needed to be attached to.
Q Okay. And this is now early 2008, correct?
A February 2008, correct.

Q Okay. All right. The next document -- no more questions on that document.

I'd like to turn to what's been previously marked as Government Exhibit 3-5.

A Okay.

Q I'll just wait a moment for defense counsel and the Court to also access that.

Okay. Mr. Wilkinson, do you recognize this document?

A Yes.

Q Okay. Is that your company Nature's Peak's letterhead?

A Yes.

Q Does it have your name listed at the bottom of it?

A Yes.

Q And does this also relate to the financing and merger that you've been testifying about?

A Yes.

MR. DIMOCK: Your Honor, at this point, we'd move Government Exhibit 3-5 into evidence.

THE COURT: Any objection?

MR. WEBSTER: No, Your Honor.

THE COURT: Without objection, Government's 3-5 is admitted.

BY MR. DIMOCK:

Q Mr. Wilkinson, what's your understanding of what this document represents? What's going on in this document?
A Well, since my lack of understanding of the mechanism, I think this was an issuance of shares and the stock merger. And so shares went to a Mr. Moeller, who was the acting CEO of Everock.
Q Okay. Do you understand why Mr. Moeller was receiving shares at that time?
A As part of the merger. I don't understand the -- why this amount or -- just I was told that was what we needed to do.
Q Okay. And this letter is -- what's the date on this letter?
A March 2010.
Q Okay. And do you see in the first paragraph or sentence where it talks about removal of restrictions and restrictive legends?
A Yes.
Q Do you have any understanding of what all of that means?
A Not really.
Q Okay. And lastly, does your signature appear on this document?
A Yes. It looks like my electronic signature.

Q Okay. Could you explain that. What do you mean by your electronic signature?
A Well, Mr. Oppenheimer had -- and which he worked on editing a lot of these documents. For convenience sake, so he didn't have to send me something that I'd have to sign and back to him, he had my electronic signature on file. So he would call me and say, Can I use this, your signature, and I would say yes.
Q Okay.
A That was a convenience thing.
Q Okay. That will be it on that particular document.
The next one I'd like you to look at is what's been previously marked as Government Exhibit 3-7.
A Okay. This is a similar document.
Q Okay. And just a couple of preliminary questions: Is that Nature's Peak's letterhead?
A Yes.
Q And does your signature appear on it?
A My electronic signature.
Q Okay. And does this also relate, as best you understand, to the merger that took place?
A Absolutely.
MR. DIMOCK: Your Honor, we would move Government Exhibit 3-7.

THE COURT: Any objection?

MR. WEBSTER: No, Your Honor, no objection.

THE COURT: Without objection, Exhibit 3-7 is admitted.

MR. DIMOCK: Thank you, Your Honor.

BY MR. DIMOCK:

Q Do you have an understanding as to what this particular document is related to?

A It looks like a follow-up on the last one.

Q Do you understand where it talks about removal of restrictions and restrictive legends in this letter? Do you have any understanding as to what all that means?

A No. That's the same as the last one. I am not exactly sure what that means.

Q All right. Thank you, Mr. Wilkinson.

MR. DIMOCK: The next document I'd like to have the witness review is what's been previously marked as Government Exhibit 24-5.

BY MR. DIMOCK:

Q If you could, look that over, Mr. Wilkinson.

A Well, this was an e-mail from Mark to myself and Mr. Oppenheimer with Mr. Spehler CC'd.

Q And does this also relate to Nature's Peak?

A Yes, it does.

MR. DIMOCK: Your Honor, we move in Government Exhibit 24-5.

THE COURT: Any objection?

MR. WEBSTER: No, Your Honor.

THE COURT: Without objection, Exhibit 24-5 is admitted.

BY MR. DIMOCK:

Q All right. If you could, Mr. Wilkinson, could you read that first sentence.

A "This will confirm that I'll conduct a phone interview with Paul tomorrow at 7/14/2010 at 12:30PM Eastern Time (9:30AM Pacific)."

Q Okay. What, if anything, do you recall about a phone interview that was going to take place in July 2010?

A This was for an interview that was done with Mark that a PowerPoint -- it was for some PowerPoint presentation for PR.

Q Okay. If you look down at the middle of the page, do you see where it says, I will need authorization?

A Yes.

Q Okay. Would you read that and the sentence that follows it.

A "I will need authorization from you (via a Nature's Peak email address) to link our press releases

to the EVRN ticker/quote page.

"Please send TWO emails: one for CEOinsiderTV.com and another for Spectrum Research Group."

Q Okay. What did you understand at the time about what this requirement was for?

A I don't know what the requirement was for. As authorization to use the PR piece, I'm assuming.

Q Okay. Are you familiar with Spectrum Research Group?

A No. But CEOinsiderTV, after watching the video, the PowerPoint or whatever you call it, that was the -- where it was going, where the PR was going to.

Q Okay. And the next document I'd like to move to is what's been previously marked as Government Exhibit 24-6. What generally is this document, Mr. Wilkinson, when you're done looking it over?

A This is just a note from Mark getting prepped for the interview.

Q Okay. So this relates to the other e-mail that you just testified about?

A Yes, it does.

MR. DIMOCK: Your Honor, we would move Government Exhibit 24-6.

THE COURT: Any objection?

MR. WEBSTER: No, Your Honor.

THE COURT: Without objection, Exhibit 24-6 will be admitted.

MR. DIMOCK: Thank you, Your Honor.

THE COURT: Thank you, Mr. Dimock.

We'll take our afternoon recess at this time. We'll stand in recess until 4:15.

(Recess from 3:58 p.m. until 4:15 p.m.)

THE COURT: Mr. Dimock.

MR. DIMOCK: Thank you, Your Honor.

THE COURT: Mr. Wilkinson, you remain under oath.

THE WITNESS: Thank you.

BY MR. DIMOCK:

Q So, Mr. Wilkinson, just before we took the break, you had just -- we had just admitted Government Exhibit 24-6, and I think that you had testified this was an e-mail relating to the call you were setting up for this interview. Do you remember that?

A Yes.

Q Okay. Do you know whether this interview -- do you recall whether it actually took place?

A Yes, it did take place.

Q Okay. How did it take place?

A I was in my office, and Mark called in from New York, I presume.

Q Okay. And what do you recall about the mechanics of it in terms of the questions and the answers?
A There was company history involved, where we were at, where we were going. We had a script that got worked on by Mark and the New York team and Robert and myself and a couple of other people in the company that helped us with marketing.
Q Okay. And whose idea was it to do this interview?
A It was one of the New York guys.
Q Okay. And when you say you had a script, could you just expand on that. What do you mean by that?
A Well, the answers -- so I wasn't going to stutter when he asked the questions, we wrote them down so I can be faster responding. Also, it flowed better.
Q Okay. In preparing for your testimony today, have you reviewed a video of an interview with you by Mark Dresner?
A Yes.
Q Is that the video discussed in these particular e-mails?
A Yes.
MR. DIMOCK: Your Honor, we'd like to play that video and move it into evidence. It's marked as Exhibit 19-2.
THE COURT: Any objection?

MR. WEBSTER: No, Your Honor.

THE COURT: Without objection, Government Exhibit 19-2 is admitted.

MR. DIMOCK: Okay. What I'm going to try to do, Your Honor, is put my hand up to pause at a couple of points to ask a couple of questions.

THE COURT: How long is this interview?

MR. DIMOCK: It's about nine minutes in total.

THE COURT: All right.

MR. DIMOCK: Thank you, Your Honor.

(A video is played.)

BY MR. DIMOCK:

Q Okay. I'm going to just pause there for a moment. You just made a comment. First off, that's your voice, correct?

A Correct.

Q You made a comment about meeting the current OTC or something to that effect. What does that mean?

A I'm not exactly sure.

Q Do you know where that particular language came from?

A That would have come from Mark or Todd.

Q Okay. And I'll ask you the same question as it relates to the second bullet on your screen, which is

the slides that go along with it. Do you see that?
A The earned current information?
Q Uh-huh.
A Designated for high level of financial reporting transparency.
Q Yeah. What's your understanding of what the significance is of that, if any?
A That was part of the reporting process we did and disclosures and financial reporting.
Q Did you create these slides that go along with this?
A No.
MR. DIMOCK: Okay.
(A video is played.)
BY MR. DIMOCK:
Q I just want to pause there for a moment and ask you a couple of questions. Prior to this slide, when you were talking, you talked about the fact that you had received a lot of orders. You were starting to get orders for your product in. Do you remember that?
A Yes.
Q Then on this slide, you talked about the fact that you were now in the Whole Foods Market?
A Correct.
Q Did you at that point have the ability to meet all

of the orders you were hoping to get? Would capital be required for that?

A At that point, we produced enough product to fill the first wave of orders, but we needed more production capital if the growth was going to keep -- if we were going to keep up with the growth.

Q And at that time, what was your expectation as to where that production capital would come from?

A Well, at that time, through the process of the merger, we were going to be able to raise the necessary capital, a million to two million, and get our credit line established and meet our business plan goals.

Q Okay.

(A video is played.)

BY MR. DIMOCK:

Q Mr. Wilkinson, shortly before the end of the slide show and the recording, there was a point where you made a comment about reporting to shareholders, and there was also a bullet point that said the goal of rewarding shareholders. Do you remember that?

A Yes, I do.

Q First off, were those your words? Was that something you wrote?

A Most of this was scripted, but I did have input into it. I didn't write that particular part.

Q And what was your understanding as to what that part related to in terms of rewarding shareholders?

A Well, shareholders that we've had since the beginning, the -- what we started the company with, the initial investors, people, the sweat equity. The thought has always been we build the company up, and it become a certain size, and everybody will see their investment back and hopefully make money. That was the objective.

It would also benefit anybody else who came along, and then with this new merger, anybody a part of that that owned stock in Everock would also benefit.

Q Now, this is around middle of July 2010, correct, based on the e-mails that you've reviewed?

A Correct.

Q Around that time period, do you know if any shares in the company had been sold at that point?

A Well, that part is cloudy. So I read e-mails about Charles Moeller and other shares being distributed. But I wasn't sure how much, and I don't recall at what time.

Q Okay. Do you recall whether by that time the company had received any capital or funding in connection with this merger?

A It did receive some capital as far as I can

recall, $100,000 to $200,000.
Q Okay.
A It wasn't enough to keep us -- keep the production runs going.
Q So in terms of meeting those orders that you were talking about in the video, was it sufficient to meet those orders that you had coming in?
A Initially, and then we had to let the distributors know we couldn't produce any more product.
Q Okay. And the money that did come in, what was your understanding of what the source was of that money or what it represented?
A Well, again, I'm not sure of the mechanism. It came in through Robert, I believe, as a loan to the company.
Q Okay. I want to show you just a couple of other documents.
MR. DIMOCK: They're three more exhibits, Your Honor, just for the Court's edification. The first one is going to be marked as Government Exhibit 25-01 -- it's actually 25-1. Your Honor, actually, the three documents that we're going to be going over with this witness are 25-1, 25-2, 25-3. I've conferred with defense counsel. We've stipulated over these, and I think these will come in without

objection. I'll let defense counsel confirm that.
THE COURT: Any objection?
MR. WEBSTER: No, Your Honor.
THE COURT: All right. Without objection, Exhibits 25-1, 2, 3, and 4 are admitted.
MR. DIMOCK: Actually, Your Honor, just 1, 2, and 3.
THE COURT: 25-1, 2, and 3 are admitted.
MR. DIMOCK: Thank you, Your Honor.
BY MR. DIMOCK:
Q So do you have 25-1 in front of you?
A Yes.
Q Okay. Do you generally recognize this document?
A One of the many disclosure documents that we had to fill out to keep proper status, corporate status, pink sheet, OTC.
Q Okay. What's the title of this particular one on the first page?
A Issuer's Initial Disclosure Obligations.
Q Okay. And if you could, turn to the 19th page of the document. If you notice in the corners, it will say page blank of 21. So it would be the one that's marked 19 of 21.
A I'm here.
Q Okay. Do you recognize the signature in the

middle of the page?

A Yes, that's my electronic signature.

Q Okay. And then if we could -- if you could, basically, just thumb through this document. Can you tell me whether or not Mr. Dresner's name appears anywhere in this?

A No, it doesn't appear so. I hope it's not a test and it's hidden somewhere in here.

Q No. We're not here to trick any witnesses.

Do you recall earlier before the break you testified about a document? It was Exhibit 24-3. It was an e-mail, and it had a draft sort of disclosure statement attached to it. Do you remember that document?

A Yes, with my comments and Robert's and Mark's comments on there, yes.

Q Do you remember that it had Mr. Dresner's name listed as an investor relations contact?

A Yes.

Q Do you have any understanding as to why the document that ultimately got filed no longer listed Mr. Dresner as a contact?

A No. It was something that the New York team probably said doesn't need to be on there or something.

Q Okay. So you don't know?

A I don't know, no.
Q Okay. If you could, finally, look at page 13 of the document. It's 13 of 21.
A Yes.
Q And do you see Item B in the middle of the page?
A Yes.
Q What does that say?
A It's the same, promoters. Which I'm not sure what a promoter is. But it didn't apply, so I didn't need to know.
Q Okay. That will be it on that document.
If we could now go, please, to 25-2.
A It's another disclosure statement.
Q What do you recall, if anything, about this particular document?
A Just another one of the many.
Q Okay. If you look at page 9 of the document at the bottom of the page --
A Yes.
Q -- do you recognize the signature?
A That's my signature, my electronic signature.
Q Your electronic. Okay. And if you could, then please go to page 3 of the document.
A Yes.
Q Do you see under Item 1 where it says, For

investor relations please contact?

A Yeah. That was Robert Oppenheimer's Core Business ONE. That was his address or was his address in San Francisco.

Q Okay. Do you have any understanding as to why by the time this document was filed it now listed Mr. Oppenheimer for investor relations?

A No.

Q Could you also look at page 7 of the document, and I would direct your attention to Item 8 at the bottom of the page.

A Okay.

Q Okay. And can you read just the second-to-last sentence -- or actually, the last two sentences.

A "However, the company does anticipate a sale of some equity securities within the first two quarters of its 2009/2010 fiscal year in order to fulfill its objectives in securing additional capital. The Company anticipates the issuance of securities for equity will be restricted."

Q Do you understand what that provision means?

A Part of the merger.

Q Okay. And do you understand what the part about whether shares are restricted or not means?

A I am fuzzy in that area.

Q Okay. Then the last document I'd like to look at with you, Mr. Wilkinson, is Government Exhibit 25-3.
A Okay.
Q What is this document?
A The same thing but it's annual.
Q Okay. So it says Annual Update Disclosure Statement - 30 June 2009? Is that the title?
A Correct.
Q Okay. Could you go to page 25, please.
A Yes.
Q And do you recognize the signature in the middle of the page?
A Yes, my electronic signature.
Q Okay. And then if you could go, please, back to page 20.
A Issuance History?
Q Uh-huh.
A Okay.
Q And do you see under Item E, as in echo --
A Yes.
Q -- towards the bottom of the page? Could you read that paragraph, please.
A "Aug 2008 (effective date) the Company issued 300,000,000 restricted shares to Mr. Charles Moeller, who was President of the Company at that time, in

exchange for prior services valued at $30,000.00. Subsequently Mr. Moeller effectively returned 270,000,000 of these shares to the Company in connection with the acquisition of Nature's Peak a California corporation."

Q Okay. What's your understanding or what was your understanding at the time of what this provision was about, particularly the second sentence?

A Again, I'm not quite clear on the mechanism, but this was part of the -- what we had to do for the merger.

Q Okay. When you say it was part of what we had to do, what do you mean by that? How did you know what had to be done?

A Well, I didn't know. It was what was instructed to me to do. So...

Q Okay. That will be it for the documents, Mr Wilkinson, but I do have a few more questions to ask you before we finish up with your direct.

A Okay.

Q First off, let me ask you this: When you were a private company, when Nature's Peak was private, did Nature's Peak issue press releases?

A No, there wasn't any press releases.

Q Okay. When you became a public company, were

press releases issued by the company?
A Yes.
Q And why is that?
A Part of what I was requested to do.
Q Okay. What was your understanding about why press releases were needed?
A It was needed for PR purposes, and I thought this was normal process when you become a public company. If you have news, you release press releases in my lack of knowledge of public companies' responsibilities.
Q Okay. Did you draft any press releases for the company?
A No.
Q Okay. What about in terms of deciding when press releases would go out? Did you make those decisions?
A No.
Q Do you know who made those decisions?
A It was the New York team.
Q And when you say the New York team, who do you mean?
A Well, I wasn't sure whether it was Mark or Todd, part of the team. It was Mark, Todd, and Frank. I'm not sure which one of them made that decision.
Q Okay. What about the drafting of the press releases? Do you know who was drafting them?

A I believe mostly Mark, and then Mark would give them to Robert for editing purposes. And then I would look over it for accuracy purposes. Robert would look over it for editing and accuracy purposes.

Q Okay. Did you ever have to make any edits to them?

A I did. They weren't major edits, but I wanted to make sure that anything that was said about the companies and what we were doing, any of the marketing was 100 percent accurate.

Q Okay. What was your -- during the time period when the merger takes place and for, say, a year or so after the merger, as it relates to the company's operations, what was your primary focus?

A I was always focused in the operations part of it, the production side, marketing side, running the business. I was a small business. You wore many hats, and I wore many of them.

Q Okay. Let me ask you this: Other than the press releases that you said that you would have looked at that were for the company, are you aware of whether any other companies were putting out press releases on Nature's Peak's behalf?

A No.

Q At some point, did the company stop releasing

press releases?
A Yes.
Q Why was that?
A That was after there was some issues with the New York team, and Mr. Oppenheimer came back from a meeting with Spehler and said that he had --
MR. WEBSTER: Objection, hearsay.
THE COURT: I'll let it in subject to you connecting up with an adequate foundation.
MR. DIMOCK: Sure, Your Honor. It relates to why they decided to stop.
THE COURT: All right. I understand. I'll reserve on it.
BY MR. DIMOCK:
Q Okay. You can continue.
A He said he discovered some things and they weren't proper and for us to break off of any communications or dealings with the team in New York.
MR. WEBSTER: I move to strike that answer, Your Honor. At this point, clearly, that's hearsay.
THE COURT: All right. I'm going to continue to reserve on it.
Go ahead.
BY MR. DIMOCK:
Q As a result of what you were told, what did you

next do as it related to this process of raising capital through the merger?

A We were in limbo, I remember. We couldn't do anything. I sought counsel, and we couldn't do a thing.

Q Okay. And ultimately, where does Nature's Peak stand now?

A The same place, in limbo and can't do a thing. The original investors can't do a thing because we were told that.

Q Does Nature's Peak still have any debts?

A It had debts at the time, and it would still have debts.

Q And are you responsible for any of those debts?

A Not personally.

Q Okay. And has it been difficult for you to testify about any of this?

A Well, it just brings back a lot of -- seven years of my life into this and several hundred thousand dollars which I'm still paying off. So it's been a real struggle, a real struggle watching that video for the third time. And it just hits me every time. So the whole process -- you know, we had something that was really going, and we thought this involvement, this business involvement that we were going to do was going

to leapfrog the company into being something that was a very uniquely positioned company in the natural food market.

MR. DIMOCK: No further questions, Your Honor.

THE COURT: All right. Thank you.

Mr. Webster.

MR. WEBSTER: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. WEBSTER:

Q Mr. Wilkinson, you have repeatedly referred in the course of your testimony to the New York team, correct?

A Correct.

Q And in the New York team, you are including Mark Dresner, correct?

A Correct.

Q But back on January 12, 2015, when you met with the FBI, you described in a similar fashion the discussions between Mr. Oppenheimer and the New York folks. I'll put that in quotes. And you define the New York folks as Charles Moeller, Frank Zangara, and Todd Spehler, correct?

A Correct.

Q At that point, you didn't include Mark Dresner as one of the New York folks or the New York team,

correct?
A Correct. I actually forgot. I knew who it was. I just forgot the name.
Q You didn't say that there was some other person whose name you had forgotten?
A I may have said that, yes.
Q You may have said that to the FBI and they didn't write it down?
MR. DIMOCK: Objection, Your Honor. The witness wouldn't have knowledge of what was written down.
THE COURT: Rephrase the question.
MR. WEBSTER: Sorry. I didn't mean to interrupt, Your Honor.
BY MR. WEBSTER:
Q Did you say it or didn't you? Did you say there was another person whose name you couldn't remember?
A I don't recall.
Q You did refer to the New York folks as Spehler, Zangara, and Moeller, right?
A Correct.
Q Not Dresner?
A If I said that at the time. I didn't recall his name at the time.
Q So since meeting further with the government or

the FBI, you have now revised your view of the New York team or the New York folks to include Mark Dresner?

A It was actually immediately after that interview. Which I'm surprised it didn't get written down because I thought it was at the tail end of that interview where I did remember his name. I told my attorney that.

Q I'm sorry. You had an attorney at these interviews?

A Yes.

Q Who was your attorney?

A Buck Farmer.

Q And where is Mr. Farmer from?

A San Francisco.

Q Did you have another gentleman as an attorney?

A Andy Pontious.

Q Where is he from?

A San Francisco.

Q Did these same firms represent you in connection with the reverse merger into Everock?

A No. No.

Q What law firms represented you when you -- I'm talking about Nature's Peak, Incorporated.

A George Cornell and Michael Hair.

Q Okay. So they were the lawyers for Nature's Peak,

Incorporated?
A Correct.
Q And you relied on them for legal advice with respect to, for example, the merger agreement transaction detail that you all signed?
A Correct.
Q Did you sign a merger agreement?
A I assume so.
Q Do you remember whether or not you signed a merger agreement?
A Well, my signature was electronic. So my signature was put on it, yes. So I don't remember physically signing it.
Q Are you suggesting to the Court by your references to this electronic signature that somebody else has been utilizing your signature on securities filings, for example?
A No, I'm not suggesting that. I just didn't physically sign it, but I was asked by Mr. Oppenheimer. When I needed to sign a document, he asked me.
Q And you would look at the document and say, Yes, I approve your using my electronic signature?
A Yes.
Q So you're not suggesting some unauthorized use or some forgery of security filings?

A Not suggesting.
Q Were all of the securities filings post merger with Everock signed by you?
A Myself and Robert.
Q Yes.
A Yeah.
Q Did you personally sign all of the securities --
A Well, again, I personally writing, no, but agreeing to have Robert put my signature on it, yes.
Q Did you review the securities filings prior to them being filed?
A A lot of the security filings, as well as the disclosures, was out of my wheelhouse. So I depended on the team, which included Robert and Mark and Todd, to -- that they knew what they were doing. So I signed it. I'm not -- that's not my trade.
Q Could you take a look at, please, 25-1 which is admitted in evidence. I believe counsel for the government looked with you at the signature on page 19.
A Yes.
Q Okay. And you either signed that or you authorized someone to place your electronic signature on this document?
A Yes.
Q Did you read this document before you signed it or

authorized someone to sign it on your behalf?
A Probably not the whole thing.
Q Would you look right above here, right above your signature where it says you certify that, "1. I have reviewed the Information and Disclosure statement, Exhibits, and all notes thereto."
Were you making that affirmation and representation to the market, to the capital markets on or about June 3, 2009?
A I read so many of these documents, and a lot of this -- a lot of stuff I didn't quite understand fully. So this was several documents. I reviewed this. I commented on it. Did I read and understand every word? I didn't understand every word. I may have read it, but I didn't understand everything. So I relied on other people to tell me that this was accurate and what we needed to do.
Q Let's just focus on this one part of the document that you clearly must've read because your signature is right underneath these representations, okay?
Number 2 --
MR. DIMOCK: I'm going to object to that characterization. I don't know if that was a question or a statement.
THE COURT: All right. Overruled.

Go ahead. Ask your question.
BY MR. WEBSTER:
Q "2. Based on my knowledge, this disclosure statement does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made. In light of the circumstances under which such statements were made, such are not misleading" -- I think that's a typo -- "with respect to the period covered by this disclosure statement."
Were you making that representation by affixing your signature to this document on or about June 3, 2009?
A As far as I recall, yes.
Q And so what you're telling the market for your stock is that everything in this disclosure statement is true and they can rely on it, right?
A To the best of my knowledge of what I understood.
Q And also, you're, in Number 3, saying that the financial statements and other financial information included or incorporated by reference in this disclosure statement fairly represent -- I think that should say fairly present, but it says fairly represent in all material respects the financial condition, results of operations and cash flows of the issuer as

of and for the periods presented in this disclosure statement."

You were making that representation to the capital markets and people who wanted to purchase the securities of Everock, Inc., correct?

A Yes, absolutely.

Q And that one you seem to have more familiarity with. Is that because you reviewed very carefully the financial statements of --

A My accountant would send me the financial. I understood those more than the other portions of the stocks and mechanisms and all of that. So that one -- and I've been working with this accountant for a long, long time. So my confidence level is that -- although, I'm not a CPA -- that that was accurate.

Q Who is the accountant?

A Bill McDermott.

Q Bill McDermott. And how long had you been working with him at this time frame? Let's say in 2009.

A Over a decade.

Q And was that just in relation to Nature's Peak or some other business operations?

A No, other business.

Q Was he a certified public accountant?

A Correct.

Q Did he have experience in auditing the financial statements of public companies to your knowledge?
A I don't recall.
Q Well, he certainly produced the financial statements that are made part of some of these security filings, right?
A Yes, I would assume that he did.
Q Have you since discovered that any of the financial information in those financial statements was untrue or misleading in any way?
A Not to my knowledge.
Q Has Mr. McDermott, for example, ever suggested to you that he may have made a mistake or mistakes with respect to the financial statements on which purchasers of Everock securities would be relying?
A No. No.
Q And so you have confidence that those financial statements are, in fact, accurate, correct?
A Yes.
Q The fourth representation that you made here is that the information is complete and presented fairly in all material respects.
Do you stand by that representation that you signed?
A With the knowledge that I had at the time, yes.

Q Yes. And likewise, if we could, go to 25-2 and 25-3 which you reviewed with the government. Do you have, sir, 25-2 in front of you?
A I do.
Q On page 9, would you look at that, please, which has your signature or your electronic signature.
A Yes.
Q Again, it has these very similar representations made by you to potential purchasers of the securities of Everock, Incorporated, correct?
A Correct.
Q And you stand by those representations today?
A Again, as far as I understood.
Q Attached to this filing two pages back from your signature are the Nature's Peak financial statements as of the quarter ending March 31, 2009. Do you see those?
A Behind it?
Q Yes, sir, two pages behind where your signature is affirming the accuracy of this filing.
A Yes.
Q Okay. Were these prepared by Mr. McDermott?
A Correct.
Q Do you have any doubt, as you sit here today, that anything in these financial statements which you were

submitting for purposes of potential purchasers of Everock securities, do you have any doubt that these financial statements are accurate?
A To the best of my knowledge, they're accurate.
Q So nobody has suggested to you that these financial statements are inaccurate in any material respect, correct?
A Correct.
Q And if you could, look at Exhibit 25-3, please, on page 25.
A Go ahead.
Q Yes. That's your signature or your electronic signature, correct?
A Correct.
Q And you authorized this signature to be put on here in some manner, correct?
A Yes.
Q And you're making the same representations as you made for the previous two filings that we looked at with respect to the accuracy of this filing, correct?
A Correct.
Q And this one is the annual update disclosure statement, dated June 30 -- or as of June 30, 2009, correct?
A Correct.

Q Do you stand by these representations of everything in this securities filing?
A To the best of my knowledge.
Q And if you'd flip one page back this time to the financial statements, do you see those?
A Yes.
Q Were these prepared by Mr. McDermott?
A Yes, they were.
Q Do you have any doubt that these financial statements that were presented to potential purchasers of Everock securities were and are accurate?
A I have no doubt that they were. If Bill prepared them, Mr. McDermott, they were accurate.
Q Would you also look at Exhibits 25-4 through 25-7. With respect to Exhibit 25-4, could you look at page 9, please.
A It's my electronic signature.
Q Yes. The signature dated November 16, 2009?
A (Nods head up and down.)
Q You made all of the similar representations that we just talked about with respect to this securities filing, correct?
A Correct.
Q And you're not aware of any inaccuracies in this one, right?

A To the best of my knowledge.
Q This one also contains financial statements as of September 30, 2009. You have full confidence that those financial statements that were presented to the equity markets were accurate when they were made and they are accurate as of today, right?
A Yes.
MR. DIMOCK: I'm going to object, Your Honor, on a foundational basis. Counsel several times now has characterized these as having been presented to investors in Everock and the financial markets, but I don't think we've clarified whether the witness is aware of whether that was --
THE COURT: I'll let you explore that on redirect.
MR. DIMOCK: Okay.
BY MR. WEBSTER:
Q Do you know how a public company has to report information to people who might purchase its securities?
A No.
Q Even though you were the president of a publicly reporting company that sold securities to the general public, you're not aware of what disclosures are required to be made, sir?

A I know disclosures need to be made. What all the disclosures need to be made, I relied on my team for that. That wasn't in my wheelhouse, and yes, I was president and CEO.

Q But when you signed this document that makes these representations, the buck stops with you, right?

A Yes.

Q And when you reviewed press releases for their accuracy, the buck stops with you, right?

A Yes.

Q Because when you reviewed those press releases for accuracy and then sent them out knowing that investors may rely on them, you wanted to make sure they were correct, right?

MR. DIMOCK: Objection. I think his testimony was that he wasn't sure how they were sent out. Also, objection to investors relying upon.

THE COURT: All right. Overruled. I'll allow you to clarify that if necessary.

MR. WEBSTER: Thank you, Your Honor. I'll just try to clarify that.

BY MR. WEBSTER:

Q Your testimony was that you reviewed the Nature's Peak press releases during the time it was a public company for accuracy, correct?

A For the accuracy of the statements that I was a part of. Let me clarify that. If there was a portion in those press releases that had to do with a particular event, a marketing event, a distributor, something that I could comment on for accuracy, I did.
Q But if there were other things in the press releases, you wouldn't review them other than what you've just described?
A If there's other things I didn't understand, I would count on my team to understand them. It would be nice to know everything on the planet, but that's just not the case. I had to focus on the business.
Q You told the FBI that your role in regards to the Nature's Peak press releases was to review them for accuracy, correct?
A Correct, what I could review for accuracy. That's correct.
Q You also told them the press releases were sent to PR Newswire for dissemination, correct?
A I don't recall, but they were sent to PR Newswire, I believe, or another agency that sent them out.
Q As of --
A I didn't send them out myself.
Q I'm not suggesting that you sent them out yourself, sir. I think it was suggested that you

didn't know how these were disseminated, but you told the FBI they were disseminated by the PR Newswire, correct?
A I learned that, yes.
Q When did you learn that?
A That's a good question.
Q Thank you.
A I think I recalled -- I'm not sure if I recalled it at that meeting because I didn't -- I didn't recall the exact company name because there were several companies involved in this. I wasn't sure which PR company it was.
Q But you did know, sir, what a press release was, correct? When you reviewed a draft press release, regardless of whether you knew factually how it was going to be distributed, you knew what a press release was, right?
A In general, yes.
Q What is your understanding in general of what a press release is?
A A press release would give the public information of what a company -- an event in a company that has transpired primarily for giving news to not only stockholders but to the public in general about the -- how do I put it -- the wins that we had, like the

signing up of Whole Foods, the -- when we got distributors on board, when we got certain reps on board.

So when I reviewed those press releases, it was because some event happened, as far as I remember, and we wanted to let the public know about it. That's part of this process of merging with this company to become a public company and the responsibilities, I guess, of a public company from that point on.

Q And those are all the types of things that you would have reviewed in these press releases for accuracy, correct?

A The types of things would have been the accuracy of the events that had taken place.

Q Such as events that took place like the distribution of your product by Whole Foods in the Mid-Atlantic region?

A That's exactly right.

Q And the assistance of your partners, such as Avenue Gourmet and the other company -- I'm sorry -- whose name I can't remember?

A The Source One Marketing.

Q Source One Marketing. Thank you.

A Okay. And the other distributors -- KeHE was a big one. As we got our product out and as we were

being accepted into the large distributors, that was considered news. At least that was what I was told. That's newsworthy.

Q Did you believe it was newsworthy even --

A It was a big event for me, yes --

Q Understood.

A -- and everybody else in the company because that's what we strove for is to get into the market. You don't get in the stores without getting in the distributors. So when we signed up a distributor, it was a big deal.

Q And so, for example, when you mentioned those types of things in the interview that you and Mr. Dresner recorded together, those were truthful, correct?

A Those are all positive things and, yes, truthful.

Q And counsel for the government referred to one line that said that Nature's Peak or Everock, if you will, had a goal of rewarding shareholders. Was that true?

A Well, that would have been true from the initial shareholders that we took on to the company.

Q Did you have a goal after the company went public through this reverse merger of rewarding shareholders through building a successful company?

A Absolutely.
Q Did you have an opportunity to review the PowerPoint slides that were used in that interview?
A Yes, recently.
Q I'm talking about back then, back when you did the interview.
A I believe I saw it on a PowerPoint. I'm not sure if I saw it in the video or not.
Q In any format, sir?
A Yes.
Q So you reviewed it for accuracy?
A Yes.
Q And it was accurate?
A And it was accurate.
Q The company history was accurate, correct?
A Correct.
Q The financial statements at that time were accurate, right?
A Yeah. I have no reason to believe at any time any financial statements of the company would be not accurate, a blanket statement.
Q You refer to it as the best dip. I suppose that's somewhat of an opinion as opposed to a verifiable fact, right?
A Yeah. I used to -- in trade shows, we'd say it

was the best dip on the planet, but I revised that for this and said it was the best dip on the market.

Q I see. You were being cautious?

A Yeah, less cocky.

Q Okay. The best tasting sandwich spread on the market, I think that's what you said.

A Yes.

Q And you believe that?

A Even today.

Q And you believe that today?

A Absolutely, 100 percent.

Q And it was gluten free; wasn't it?

A Yeah.

Q Sugar free?

A Yep.

Q Kosher?

A Yep.

Q No MSG?

A Yep.

Q Long shelf life?

A Yes.

Q No preservatives?

A Correct.

Q There was a statement in there, I believe, by Mr. Dresner that most food products actually fail in

the marketplace. Did you believe that statement to be true?

A Most start-up companies fail in the marketplace. So that would ring true in any market.

Q You didn't have any problem with putting that in the video or the PowerPoint, right?

A It's a fact.

Q Very well.

Did you believe at that time that your company was building momentum?

A Absolutely.

Q Your relationships with Source One were legitimate, correct?

A Absolutely.

Q And the company or its representatives did, in fact, attend the Fancy Food show in New York, right?

A Correct.

Q And was this --

A Multiple times.

Q Multiple times. How many times?

A Three, maybe four years, and more out in San Francisco.

Q I beg your pardon. I was under the impression it was just in New York. They had it in San Francisco as well?

A Correct.
Q So on both coasts you were attending the Fancy Food show?
A The Fancy Food show was two times a year, the bigger shows, and that was in -- Javits, I believe, is the convention center in New York and then the Moscone Center in San Francisco, correct.
Q And did you meet Mr. Dresner at the New York Fancy Food show?
A Yes.
Q Did he come there and taste your product and say hello?
A Yes, along with Todd Spehler.
Q And was there a buzz around your product at the Fancy Food show?
A Yes.
Q That was accurate?
A All of that is accurate.
Q That was not puffery?
A No. It was -- actually, we had a -- and the same with KeHE. We had a very busy booth. So that wasn't -- all of the statements are accurate.
Q KeHE, who is that? That's K-E-H-E?
A K-E-H-E. They are one of the largest natural food distributors in the U.S.

Q Did they have some kind of food show?
A Yes.
Q Where is that located?
A Dallas.
Q So you traveled to Dallas?
A Correct.
Q Was there buzz around that?
A Enormous.
Q The road map that you presented in the interview seemed to center around three items, sales, fiscal responsibility, and product development, correct?
A The road map --
Q On the interview that you did and part of the PowerPoint slide --
A Okay.
Q -- it said it was a road map for the company. Do you remember that part?
A Yes. I mean, that was stuff that Mark or Todd wrote.
Q And that you stated in the interview, correct?
A Correct.
Q You reviewed, again, what was wrote before you said it?
A Correct, and I said it.
Q So you affirmed that those things were accurate?

A Correct.

Q And you knew this was an attempt to create some sort of buzz for your product, right?

A PR generally is like marketing. Whether you're doing a brochure, an advertisement, or whatever, this was a buzz for the product and the company.

Q And as part of the interactions with Mr. Dresner, he reviewed sales plans, marketing plans, and gave you a lot of good input, correct?

A That's absolutely correct.

Q The investor relations contact who's listed on all of your securities filings, was that the investor relations contact for Everock?

A Well, I guess it was initially Mark but then became Robert. So I'm not sure at what time period that transitioned to, and I'm really fuzzy on why it transitioned.

Q I'm just talking about when you were a public company. When you were a public company, you did not identify Mark Dresner as a contact for investor relations, correct?

A Again, I'm not clear on the exact timing of that. If in the filings -- if he wasn't in there in the filings after we were public, then that would be correct.

Q What was your understanding of what the contact was for investor relations?
A Man, I'm fuzzy on that. I don't know. I don't want to speculate.
Q Did you ever go back to the merger agreement and see if the merger agreement was honored?
A No.
Q You are certainly dissatisfied that you didn't get more money, correct?
A Well, yes.
Q And so did you ever go back to the merger agreement and see if anybody violated or breached it in any way?
A I'm not sure if the merger agreement spelled out the dollars that were -- you know, that they were looking to put into the company, they meaning the New York folk team.
Q Well, the New York folks does not include Mr. Dresner, but the New York team now does. So who are you referring to?
A Dresner and Spehler and --
Q I see. Mr. Dresner made promises to you about how much you could get from a reverse merger with a public shell?
A It was -- the three of them did, correct.

Q Okay. Specifically, what did Mr. Dresner say regarding the financing? You just said Mr. Dresner made representations to you about how much money you could receive from a reverse merger with a publicly reporting shell company, and I would like you to identify specifically what he said and the exact date when he said it.
A I don't recall the exact date, and I'm not sure which of the three were representing this. I do believe that Todd and Frank had more of the dollars representation of why to do this merger than Mark did.
Q And Mark focused on things like sales and marketing?
A Correct.
Q And you understand, sir, that Mr. Dresner is here on trial --
A Correct.
Q -- for some very serious offenses?
A Correct.
Q And so when you say things like Mr. Dresner made representations to you about how much money you could get out of this reverse merger, you understand that you need to be much more careful, correct?
A Correct.
Q Prior to any contact with Mr. Spehler or

Mr. Zangara or the New York folks, you had sought multiple other sources of financing, correct?
A Correct.
Q What are the sources of financing that you sought before you were contacted or before Mr. Oppenheimer contacted the New York folks on your behalf?
A They would have been friends, family. There were some people in the business that -- reps that referred us to people, distributors, local distributors.
Q Let's start with them. How would that raise you money? How would that raise you money?
A They would see the product, and because they were in the industry, that the owner of the distributor or store chain could see the investment opportunity there.
Q So did you make pitches --
A Correct.
Q -- to investors?
A Correct.
Q What materials did you bring with you when you would make pitches to these potential investors?
A The product.
Q The product?
A Yeah.
Q And how about --
A The product, a brochure.

Q Any financials?

A And the -- if there was interest in the company, we would provide anything, the financials. And if we had our business plan done at that time or revised at the time, it would have been our business plan.

Q And how many folks did you pitch prior to having contact with the New York folks?

A Maybe two or three dozen.

Q Out of the two or three dozen, how many did you provide financial statements to?

A Maybe half of that. The financials were in our business plan. So anybody who got a business plan got the current financials.

Q What were the proposed structures of the investments or financing?

A We had two shares of stock, preferred and common, and we had a value on the preferred stock. That was a mechanism we used as a private company, and that I understand much better than the merger and what happened afterwards.

Q When you say you had a value on the preferred shares, did you mean that somebody did a valuation of the company?

A We did an evaluation on the company. The accountant looked at it. We had several people look at

it. And you can come up with a company value using many different methods.

Q Sure, like discounted cash flow, for example. Did you use that?

A No.

Q Comparable sales, did you use that?

A Our track history and our sales *pro forma*, where we were going to be, at what time, and what year, we used that to evaluate the company. Certainly, the company didn't have the assets and the cash in the bank or whatever to have -- it's like this company is worth X because it has all of these assets. So we were a start-up company, and we had the potential there. So the business plan would state how much money -- revenue we would be bringing in year after -- you know, a five-year projection, and that's what we based the price of the stock on.

Q I see. And these various proposals that you made to two or three dozen investors, some of which included your business plan and, therefore, your financial statements, you understood the proposed structure of those potential transactions?

A For the most part, yes.

Q Were there parts of it that you didn't understand?

A I can't recall at this time if there were parts I

didn't understand.
Q Did you form Nature's Peak, Incorporated, yourself?
A Yes -- no. I had the help of Robert to form the corporation.
Q Robert Oppenheimer?
A Correct, the initially privately held corporation. He did most of the paperwork.
Q Articles of Incorporation?
A Correct.
Q The bylaws?
A The bylaws, all of that.
Q Who helped you with the issuance of stock to your shareholders?
A It would be our attorney at the time.
Q Did your attorney produce an offering memorandum or something called a private placement memorandum or a prospectus?
A I recall those documents.
Q Did you review those?
A I would have reviewed those.
Q You understood that those were necessary in connection with the offering or sale of securities?

MR. DIMOCK: Your Honor, I'm going to object at this point on relevance. We are kind of going down

this road of his private company.

THE COURT: I will let you ask this question, but I think you need to move on.

BY MR. WEBSTER:

Q You understood all of those concepts?

A Yes. It was in -- you know, it goes back a ways. So what you mentioned sounds familiar.

Q But you had to make certain disclosures to potential investors?

A Absolutely. Whatever we did my attorney reviewed at the time.

Q And you reviewed to make sure it was 100 percent accurate just like those press releases, right?

A I reviewed the press releases, and they were accurate for what I knew of the press releases.

MR. WEBSTER: That's all I have.

THE COURT: Any redirect?

MR. DIMOCK: Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. DIMOCK:

Q Counsel asked you some questions about Mr. Dresner and your being interviewed by law enforcement. Do you remember that?

A Yes.

Q In terms of when you remembered Mr. Dresner's name

in relationship to when you were interviewed, how soon was that?

A It was right after the -- it was right at the end of the interview, and I'm not sure whether that became part of the interview or I told my attorney afterwards. Because they mentioned his name. I couldn't put the face to the name, and I couldn't do that. But afterwards I connected the dots. I was like, Okay, Mark helped with the PR.

Q At that time, how long had it been since the last time you had heard the name Mark Dresner?

A Years.

Q You were asked some questions about the attorneys that were involved in the merger. Do you remember that?

A Uh-huh.

Q And you were also asked about attorneys that you had separate from the merger that did other things for you. Do you remember that as well?

A Yes.

Q Were those the same attorneys?

A No. Those were different attorneys. Attorneys we had for the merger were -- I believe it was Todd. It could have been Frank. They suggested these attorneys.

Q And I just want to clarify. You were asked about

the New York folks versus the New York something or other. But when you talk about the people in New York, who are you talking about?
A I'm talking about Todd and Frank initially and then Mark and then Charles and then George -- let me get the last names. Sorry. So it would be Spehler and Zangara first, and then Mark came on as a consultant. Then Charles Moeller was the person -- the CEO of Everock, and George Cornell was the attorney. And then after George, the attorney was Michael Hair. He wasn't from New York. He was from Arizona, but he was referred by Spehler or Zangara. I don't think Mark had anything to do with that.
Q You were also asked about your electronic signature. Do you remember that?
A Yes.
Q Are you able to say with 100 percent certainty that every time your electronic signature was used you were given the document to review in advance and asked to approve it?
A Well, not with 100 percent certainty, but it was a protocol that Robert and I followed.
Q And are there parts of these documents that you've looked at today that you still to this day just don't fully understand?

MR. WEBSTER: Objection, leading.

THE COURT: I'll let him answer.

Go ahead.

A Yes.

Q Lastly, did you have to rely on other people in any way in terms of those materials?

MR. WEBSTER: Same objection.

THE COURT: Overruled.

BY MR. DIMOCK:

Q You may answer.

A Yes.

MR. DIMOCK: Nothing further, Your Honor.

THE COURT: All right. Thank you.

May this witness be excused?

MR. DIMOCK: Yes. From our perspective, yes.

THE COURT: May the witness be excused?

MR. WEBSTER: Yes, Your Honor.

THE COURT: Mr. Wilkinson, you're excused. Please do not discuss your testimony outside of the courtroom. You're free to go.

(The witness stands aside.)

----------------------------------

Time: 5:30 p.m.

I certify that the foregoing is a true and accurate transcription of my stenographic notes.

/s/

Rhonda F. Montgomery, CCR, RPR

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES OF AMERICA, ) Case 1:15-cr-00178
)
Plaintiff, )
)
v. ) Alexandria, Virginia
) January 27, 2016
MARK S. DRESNER, ) 11:00 a.m.
)
Defendant. )
______________________________) Pages 1 - 4

EXCERPT OF DEFENSE'S OPENING STATEMENT

BEFORE THE HONORABLE ANTHONY J. TRENGA

UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

FOR THE PLAINTIFF:

KOSTA S. STOJILKOVIC, ESQUIRE
N. NATHAN DIMOCK, ESQUIRE
MICHAEL T. O'NEILL, ESQUIRE
OFFICE OF THE UNITED STATES ATTORNEY
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3700

FOR THE DEFENDANT:

STEVEN T. WEBSTER, ESQUIRE
AARON S. BOOK, ESQUIRE
WEBSTER BOOK, LLP
300 North Washington Street, Suite 404
Alexandria, Virginia 22314
(888) 987-9991

THE DEFENDANT, MARK DRESNER, IN PERSON

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

OPENING STATEMENT

MR. WEBSTER: Thank you, Your Honor.

Your Honor, in terms of the government's proof, there will not be much dispute as to accounts that were set up, where money flowed, stock sales that were made, things like that. In fact, we've stipulated, as the Court knows, to, I think, just about every bank or brokerage document that they would seek to introduce. That is not going to be the issue in this case. The issue is going to be whether or not Mr. Dresner harbored an intent to defraud anybody or whether he was simply operating in good faith with people whom he knew and whom he trusted.

Mr. Dresner will testify, and that's what he will tell the Court, that he had known Mr. Zangara for some time; that with respect to the Moneyline account, it was, in fact, true that Mr. Zangara asked him to set it up; and that he directed Mr. Dresner when to do things with respect to the account; and that Mr. Dresner, who trusted Mr. Zangara, followed that instruction. Mr. Dresner will testify that he was not knowingly part of any pump-and-dump scheme; that his main role with respect to Nature's Peak -- which we should not forget and the evidence will show was a legitimate company with legitimate products --

I saw a filing from the government which said it had these purported -- it had these purported products in its trial brief. I did not understand the reference because there won't be any dispute that Nature's Peak, in fact, had legitimate products.

-- that Mr. Dresner believed in those products; and that he assisted with certain press releases in order to essentially advertise those products, if you will. Put the word "advertise" in quotes.

The press releases that he did were based on either research of the industry -- he would sometimes cite industry statistics about gluten free or natural foods -- and also facts that he confirmed about the company itself and its operations. The final arbiter of what would go out in any press release on behalf of Nature's Peak-Everock was the company itself. And Mr. Dresner did not control that, nor did he control the timing of it.

Those two points, the account that Mr. Dresner held for Mr. Zangara and at whose direction he would operate the account and the issue of these press releases and what he did with respect to these press releases for a legitimate product and a legitimate company, are going to be the crux of

Mr. Dresner's testimony.

I will not belabor our disputes with the government's view of these issues. That will become clear either through our cross-examination or in the testimony of Mr. Dresner. But at the end of the case, based on Mr. Dresner's operating in good faith with people whom he trusted and in retrospect should not have trusted, we will ask you to find Mr. Dresner not guilty.

THE COURT: All right. Thank you, Mr. Webster.

MR. WEBSTER: Thank you.

----------------------------------

Time: 11:04 a.m.

I certify that the foregoing is a true and accurate transcription of my stenographic notes.

/s/

Rhonda F. Montgomery, CCR, RPR