UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case 1:15-cr-00178 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Alexandria, Virginia |
| | ) | February 8, 2016 |
| MARK S. DRESNER, | ) | 4:27 p.m. |
| | ) | |
| Defendant. | ) | |
| | ) | Pages 1 - 30 |

TRANSCRIPT OF THE DECISION OF

THE HONORABLE ANTHONY J. TRENGA

UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

FOR THE PLAINTIFF:

KOSTA S. STOJILKOVIC, ESQUIRE
N. NATHAN DIMOCK, ESQUIRE
MICHAEL T. O'NEILL, ESQUIRE
OFFICE OF THE UNITED STATES ATTORNEY
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3700

FOR THE DEFENDANT:

STEVEN T. WEBSTER, ESQUIRE
AARON S. BOOK, ESQUIRE
WEBSTER BOOK, LLP
300 North Washington Street, Suite 404
Alexandria, Virginia 22314
(888) 987-9991

THE DEFENDANT, MARK DRESNER, IN PERSON

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

THE COURT: The Court has reached a decision.

Does the government want to put anything on the record before we proceed, Mr. Stojilkovic?

MR. STOJILKOVIC: No, Your Honor.

THE COURT: Mr. Webster?

MR. WEBSTER: No, Your Honor.

THE COURT: The defendant, Mr. Dresner, has been indicted on two charges, conspiracy to commit wire fraud in Count 3 and securities fraud in Count 4. The Court has assessed the evidence in light of the indictment's allegations.

The government was not obligated to prove each and every allegation in the indictment, but I think it is helpful to summarize the indictment and the scheme alleged in the indictment for the purposes of considering the evidence as to this particular defendant.

The indictment alleges an overall scheme to defraud that began approximately between September 2008 and March 2014 and during which the defendant, together with Defendants Gallison, Hiskey, Zangara, Charles Moeller, and others, agreed to defraud actual and potential investors in various publicly traded companies on the U.S. securities market, which alleged to include both Warrior Girl and Everock, although the

evidence at trial was limited to Everock.

The indictment alleges that in furtherance of this scheme, these individuals fraudulently concealed the true ownership of those companies and artificially manipulated stock prices and/or trading volume.

The indictment also alleges in detail the central role played by an offshore brokerage firm known as Moneyline -- owned and operated by Gallison -- in assisting its clients with the facilitation of fraudulent stock deals and money laundering for the purpose of deliberately circumventing U.S. securities laws and criminal and regulatory authorities. In that regard, the indictment alleges the various activities by Gallison and others but not specifically Dresner, including money laundering, the creation of shell companies with nominee directors under the Moneyline umbrella, and the use of those shell companies to open bank accounts and brokerage accounts with multiple retail securities brokerage firms in the United States.

It also alleges that Gallison directed clients of Moneyline to transfer shares of microcap companies, such as Warrior Girl and Everock, into the various brokerage accounts in the names of the shell companies in order to hide the true ownership and control over the shares since it would appear to the

brokerage firms and regulators that the true owner of the shares were the Moneyline shell entities as opposed to the clients of Moneyline.

Gallison, through Moneyline, also internally allocated and distributed the shares that were deposited to brokerage accounts to the clients of Moneyline, including Dresner, as well as the shares between its clients and various promoters.

It also alleges that Gallison and others engaged in manipulative trading or liquidation of securities in the Moneyline shell accounts and caused the proceeds of those sales to be commingled with the proceeds of other stock sales that took place in the accounts. Gallison then caused the proceeds to be deposited first to a bank account in the United States and then offshore and then as directed by Moneyline clients, including Dresner.

More specifically as to Dresner, the indictment alleges in Count 3 that at least as early as September 2008 and continuing through at least September 2010, Dresner conspired with Gallison, Hiskey, Zangara, Moeller, and others to commit wire fraud through a scheme and artifice to defraud and obtain money and property from investors in Everock's common stock through materially false and fraudulent

pretenses, representations, and promises.

The purpose of the conspiracy is alleged to unjustly enrich the defendants and their coconspirators through the sale of securities to the general investing public by artificially inflating the market prices of, volume of, and demand for the common stock of Everock.

As far as the manner and means of the conspiracy, it is alleged:

That in order to effectuate the Everock pump-and-dump scheme, Zangara, Moeller, and a client of Moneyline, a resident in New Jersey and who acted as a promoter of Everock, which the evidence would show was Joe Manfredonia, facilitated a merger of Everock, a shell company controlled by Manfredonia, with Nature's Peak, a privately held operating company.

Dresner, together with Zangara, Moeller, and Oppenheimer, is alleged to have represented to Paul Wilkinson, the CEO of Nature's Peak, that a merger would enable Nature's Peak to raise capital and grow its brand when in reality Dresner and others utilized the merger to obtain nearly all of Everock's shares, which they could then distribute to promoters and sell as part of the Everock pump-and-dump scheme.

It further alleges that beginning around March 2009, Zangara and Moeller initiated the transfer

of millions of their Everock shares into Moneyline-controlled nominee brokerage accounts.

Zangara and Dresner then caused the distribution of the Everock shares within Moneyline accounts to promoters who both touted Everock and made purchases of Everock shares in the open market to increase the volume of trading in Everock shares.

It's further alleged that the promotional materials include website postings, e-mail blasts, and online videos which are disseminated to create the appearance that Everock had significant business and growth and to generate investor interest so that the investing public would purchase the shares that Zangara and Moeller controlled.

In order to further the pump-and-dump scheme, the indictment alleges that Zangara and Moeller caused the submission of false filings with the OTC Markets Group and then caused submission of an annual update disclosure statement within the OTC Markets Group falsely stating that Moeller had effectively returned 270,000,000 of the 300,000,000 shares he controlled to the company when, in fact, Moeller did not return any of the shares of the company but instead continued to transfer millions of shares to various promoters while also liquidating tens of millions of shares through

Zangara's corporate accounts and various Moneyline accounts.

Likewise, it is alleged that the annual update disclosure statement also falsely indicated that Everock does not retain a promoter despite Moeller and Zangara's controlling the majority of the Everock shares.

The indictment alleges that beginning in November 2009, Zangara and Moeller caused the issuance of false press releases that touted purported investments in Everock and Nature's Peak by certain individuals operating a company called Core Business One that purported to be an investor that provided financing for Everock.

The indictment alleges that between March 2010 and April 2010, Zangara and Moeller caused the issuance and dissemination of additional multiple press releases that touted Everock's purported business prospects while continuing to liquidate millions of shares of Everock.

And that in or around April 2010, Moeller, acting through his promoter entity Spectrum Research Group, issued a press release falsely stating that Spectrum would institute full independent coverage of Everock. The announcement is also alleged to contain a

misleading disclaimer that the company may have a beneficial interest in Everock when, in fact, Moeller and Zangara and their coconspirators controlled the vast majority of Everock stock that was available for sale.

The indictment alleges that throughout the summer of 2010, Zangara and Moeller liquidated tens of millions of Everock shares out of Moneyline accounts and that those two individuals, together with Hiskey and Gallison and others, coordinated those sales.

During the summer of 2010, the indictment alleges that Dresner acting with Zangara, Moeller, and Oppenheimer, the secretary of Core One, and others continued to cause the issuance and dissemination of multiple press releases touting Everock's business operations and opportunities in order to generate investor interest in the company.

In connection with the summer 2010 promotional campaigns, Gallison, Hiskey, Zangara, and others discussed the need to coordinate the sale of Everock shares with the press releases and promotional activities and to secretly coordinate liquidation of the Everock shares through multiple brokerage accounts.

As the press releases were being disseminated simultaneously with the promotional materials they had

initiated and funded, the indictment alleges that Dresner, together with Zangara, Gallison, and Hiskey, sold Everock shares to unsuspecting investors and obtained substantial illegal proceeds in the process.

After selling shares, Dresner, together with Gallison, Hiskey, Zangara and others, caused the proceeds of the scheme to be wired from brokerage accounts in the United States into offshore accounts maintained in the name of shell entities and then back to the different accounts in the United States in order to hide the source ownership and control of the illegal proceeds.

In Count 4, Dresner is charged with securities fraud. Specifically, the indictment alleges that beginning as early as September 2008 and continuing through at least September 2010, Dresner and others knowingly and willfully used, attempted to use, or aided and abetted in the use of one or more manipulative and deceptive devices and contrivances contrary to Rule 10b-5 of the Securities and Exchange Commission regulations. Specifically, the indictment alleges that Dresner employed one or more devices, schemes, or artifices to defraud; made one or more untrue statements of material fact, and omitted to state one or more material facts necessary in order to

make the statements made, in light of the circumstances in which they were made, not misleading; and engaging in one or more acts, practices, and courses of business which would operate as a fraud and deceit upon actual and potential investors in Everock.

In order to convict the defendant of conspiracy to commit wire fraud as alleged in Count 3, the government must prove beyond a reasonable doubt that Dresner entered into an agreement to commit wire fraud. Wire fraud is a scheme to defraud or to obtain money or property by means of false or fraudulent pretenses, representations, or promises with the use of an interstate wire in furtherance of the scheme and a material misstatement or omission in furtherance of the scheme.

In order to convict Dresner of securities fraud as alleged in Count 4, the government must prove beyond a reasonable doubt:

First, that the defendant knowingly and willfully violated the rules and regulations of the Securities and Exchange Commission, specifically 10b-5, by either employing one or more devices, schemes, and artifices to defraud or making one or more untrue statements of material fact or omitting to state one or more material facts necessary in order to make the

statements made, in the light of the circumstances in which they were made, not misleading, or engaging in one or more acts, practices, and courses of business which would operate as a fraud and deceit upon one or more investors or potential investors;

Second, that he acted in connection with the purchase and sales of securities of Everock;

Third, that he used or caused the use of any means or instrumentalities of interstate commerce; and

Fourth, that he acted with the intent to defraud.

From the indictment and the guilty pleas that have already been entered by other defendants and the facts as have been presented in this court, the Court has no doubt that certain persons were engaged in wire fraud and securities fraud with respect to the Everock stock. The evidence also establishes that Dresner was associated with persons who were centrally involved in that fraud.

As both sides have recognized, however, this case boils down to whether the government has established beyond a reasonable doubt Dresner's criminal intent in connection with his involvement which, with respect to Count 3, is whether the defendant knowingly agreed to participate in a scheme

to commit wire fraud, that is, in a scheme to defraud someone. And with respect to Count 4, it's whether the defendant specifically intended to defraud investors when he did what he did with respect to the Everock stock.

There's no doubt that assessing someone's state of mind is also a challenging task, and in assessing the defendant's state of mind and intent, the Court must consider not only any direct evidence, such as his own statements, but also reasonable inferences based on what he was told, what he knew, and what was apparent to him. In making the assessment of what reasonable inferences of a state of mind may be drawn from the evidence, it is important to keep in mind what the law prohibits, what the law does not, what constitutes fraud and what does not even though it may constitute unfair or even improper or unlawful conduct but which does not operate as a fraud.

For example, it's not necessarily illegal or fraudulent for someone to make money at the expense of someone else even if it is under circumstances that may seem unfair in some respects. The law requires more than that some people lost money on Everock stock and Dresner made some money or that Dresner knew more about the stock and the company than investors that bought

the stock when his or others' shares were sold.

Rather, the evidence must establish beyond a reasonable doubt that he was knowingly acting and participating in an effort whose purpose he knew was to obtain profits through fraud, either, as alleged, by artificially inflating Everock's stock price and/or volume through coordinated trading, typically through both offsetting buying and selling activity to create the appearance of a more active stock market for the stock or through false or misleading statements or omissions.

In that regard, the Court has considered the evidence in this case which falls into a number of categories:

The first is the nature and structure of the Everock merger itself, the effort to free up and sell stock, and Dresner's involvement and knowledge about it.

The second is the actual distribution and trading of Everock stock and the receipt and distribution of its proceeds.

The third is the distribution of the company's public filings and the substance of those public filings and the distribution of public press releases and promotional materials, generally what was

known to the marketplace, and Dresner's association with the press releases and promotional materials, and the timing of those efforts and promotional materials relative to the trading that he knew about.

The fourth is the effects on the market price of the promotional materials and the coordinated stock trading and what Dresner knew about it.

Although there were other witnesses which the Court has considered, the evidence as to Dresner boiled down to three people, Zangara, Moeller, and Wilkinson, together with the documentary evidence concerning the flow of stocks and funds.

Let me first address the evidence as it pertains to Count 4, securities fraud. As the indictment alleges, the government's claim is that Dresner defrauded, attempted to defraud, or aided and abetted the fraud perpetrated on investors from either artificially increasing the price or volume or through false and misleading statements.

I understand the government is not specifically relying on wash sales but nevertheless is relying, as the Court understands it, on the overall trading activity as part of the scheme to defraud.

The government has alleged four tranches of trading by the group of which Dresner is alleged to be

a part of:

The first tranche is the sale of 17.8 million shares through the account of Sandias Azucaradas between March 26, 2009, and July 31, 2009;

A second tranche consisting of 70,000,000 shares between September 11, 2009, and November 25, 2009, through the Bastille Advisors' account;

A third tranche of approximately 80,000,000 shares between March 23, 2010, through September 15, 2010, by the BHI Group and which is claimed not to be relevant to Dresner's liability; and

A fourth tranche of 115,000,000 shares from June 11, 2010, through September 15, 2010, also by Bastille Advisors.

With respect to the charge of securities fraud based on manipulative trading to artificially raise the price and/or volume of Everock stock, the central evidence concerning the fact and effect of that claim of fraudulent trading is Exhibit 27-10 and the supporting 27 series of exhibits. But that chart alone really provides little about the claim and raises more questions and issues than it provides helpful information concerning the government's case and claim of manipulative trading.

For example, the group includes individuals

and entities that were not established as part of the alleged conspiracy. And so it's difficult to embrace completely the group trades column as trades that are attributable to the conspiratorial group. Likewise, and more importantly, the evidence does not establish who Dresner thought was trading from within that group other than Zangara and presumably Moeller.

But that issue aside, the exhibit shows the inherently volatile market in Everock stock, like most penny stocks, independent of any fraudulent activity. For example, it shows that before the reverse merger and the first tranche, and specifically from April 28, 2008, to September 19, 2008, without any trading by the conspiratorial group and without any listed press releases or promotions, the Everock price went from 55 cents to over a dollar, then up to $7, and then down to 5 cents, albeit on very low volume.

Five days later, on September 24, 2008, someone listed as within the group went into the market and bought 580,000 shares for 2 cents per share. The next day, without any further trading activity by the group and without any allegation of fraud, the price quintupled to 10 cents per share. Five days later, again, without any group trading, it doubled again to 20 cents. Then days later, without any group

involvement, it dropped to a tenth of the earlier value.

On October 16, 2008, the group sold some shares for 3 cents. Four days later, on October 20, it bought an additional 15,000 shares for 4 cents. Beginning two days later, from October 22 through October 30, the group, without any claims of fraud or manipulation, sold nearly the amount purchased approximately a month earlier for 2 cents for between 8 cents and 16 cents with the majority sold for around 10 cents.

Thereafter, between November 12 and December 4, without any buying or selling by the group or any promotional materials associated with group, the price quadrupled from 13 cents to 51 cents, and then four months later, the group sold at 8 cents per share approximately 700,000 shares which it had previous acquired at some point not in evidence.

With respect to the first tranche, the first sales by the group occurred between April 23 and July 1, 2009. When the company's first press release was issued, the stock price nearly quadrupled from 4 cents to 15 cents without any promotional materials attributable to the group or the company. There was group buying and selling on three days, May 27,

June 26, and June 30, 2009, but there's no evidence that the trading was done as wash sales, that is, that a buy order by someone in the group was linked to a sell order by someone in the group. It is just as possible that the buying and selling occurred at different times throughout the day in response to the price movements in the stock as reflected in Exhibits 12-3 and 12-4 for Everock stock sold through Bastille Advisors' account at Track Data Securities Corporation in September and October 2009.

During the balance of that tranche between July 1, 2009, and July 31, 2009, in one month, there were nine news items listed on days that the group sold stock, and on one day, July 9, both bought and sold stock.

Again, it's difficult to draw conclusions from the chart with respect to any cause or correlation between the news releases or trading and the pricing. For example, on July 1, the first news item was released, and the price closed at a price lower than the day before. The next day, on July 2, another news item was released, and the price closed at a price nine-tenths of a penny higher. On July 7, another news item was released, and the price closed at a price lower than the day before and continued to drop the

next day. Then on July 9, a press release was issued, and the price closed at a price significantly higher than the day before and continued to rise the next day without an additional release. On July 13, another release was issued, and the price closed at a price lower than the day before. Likewise, the next day, on July 14, another release was issued, and the price closed at a price lower than the day before.

Thereafter, without releases, the price continued to fall substantially until July 22 when a press release was issued and the price closed at a price higher than the day before. During the following week, without any additional press releases, the price either stayed the same or decreased to 2 cents. And then on July 30, a news item was released, and on high volume, the price increased to 5 cents with the group selling approximately 34 percent of the volume. The next day, on the last day of the first tranche, another news item was issued, and the price fell from the previous day.

Between the first and second tranche, that is between August 3, 2009, and September 10, 2009, without any buying or selling by the group and without any news releases, the price fell from 4.2 cents to 2.4 cents -- nearly half -- with substantial upwards and downwards

gyrations in between.

The same general observations and commentary can be made for each of the other three tranches. The third and fourth tranches contained much more buying by the group on the same days in which it was selling. But again, there's no evidence from which one could conclude that this selling and buying were in the nature of wash sales or that it artificially increased the price, particularly when during the third and fourth tranches there was substantially higher overall volumes and the groups' tradings were often at a relatively smaller percentage than in earlier tranches.

In any event, there's no evidence that Dresner was involved in any actual trading decisions other than to authorize that his shares, such as they were, be sold upon the directions of Zangara and the broker, Padilla.

There is no evidence of any discussions with Dresner and Zangara or Dresner and Gallison, one of the architects of the alleged fraudulent scheme, or with anyone else concerning the use of coordinated buying and selling to artificially inflate the price of stock. There's no evidence that Dresner was, in fact, aware that there was buying as well as selling or that the trading, in fact, artificially inflated the price.

Additionally, there was no evidence that these transactions were intended to give the appearance of trading when none, in fact, existed because the buyer and sellers were the same, which is the essence of manipulative trading.

In assessing Dresner's intent, the Court also cannot ignore that Zangara testified, first on direct, that he shared his intent with Dresner as far as his intent for trading, and he described his intent as one to sell in a way that had a fair and orderly effect on the market and to manage his shares so that neither he nor Dresner would become a 10 percent owner of shares. Then on cross-examination, he testified that his intent was to trade in a way that did not hurt the market participants, but to make money based on an increase in the stock price that would result from the dissemination of truthful publicly available information.

These self-serving statements by Zangara obviously needed to be considered within the context of other evidence, including his other testimony and his own guilty plea. But he was a witness testifying as part of his cooperation agreement, and there really is very little other direct evidence of the intent of someone who was actually involved in the alleged

scheme.

The Court did consider his more general testimony, that he had conspired with Dresner and others and that he shared with Dresner everything of consequence. But that testimony was completely conclusory. The Court was waiting for more detail and a little more meat on that bone, but it never came.

Here the issue is whether Dresner had the specific intent to defraud investors through artificially inflating the price through manipulative trading. On this issue, the Court finds that the government has failed to establish beyond a reasonable doubt that Dresner committed, attempted to commit, or aided and abetted securities fraud through manipulative trading that artificially increased the price of securities.

The next issue is whether the government has proven beyond a reasonable doubt that Dresner committed securities fraud by issuing false or misleading statements or omissions or aided and abetted the issuance of such statements or omissions. The evidence in that regard is the press releases introduced into evidence as Exhibits 16.1 through 16-4, as well as the documentary evidence and that of Zangara, Moeller, and Wilkinson.

The government did not originally contend that the company releases or the Spectrum releases contained affirmative misstatements or omissions about the company itself, but that Dresner failed to disclose his interest and that of others in the group that was selling, which was essentially Zangara. In its written submissions, the government appears to rely on both as evidence of Dresner's criminal intent and as proof that there were affirmative misstatements in those press releases about the company.

The Court has reviewed these press releases in detail, many of which are duplicative of each other. As the government's original position suggested, the evidence does not establish that the information in these reports are affirmatively false or misleading with respect to the company itself. All the witnesses, when asked, said that they believed the company's press releases were truthful and accurate and reflected publicly available information that was repackaged.

Dresner's involvement with the company press releases was one as an editor for grammar and not of substance. Likewise, the information in the Spectrum releases was a repackaging of publicly available information. Significantly, nothing in the Spectrum releases and certainly nothing in the company releases

was of the type of touting that is typically intended to artificially increase the price based on false or misleading statements, such as buy recommendations, projected share price increases, or information that was presented as in the nature of inside information.

Perhaps more important is that the evidence does not sufficiently establish that Dresner knew or thought or had reason to believe that any of the information in any of the press reports issued by the company or by Spectrum about the company was false or misleading.

Nevertheless, the government contends that aspects of the company's press releases were false or misleading and known to be so by Dresner. For example, it points to the November 4, 2009, press release by Nature's Peak, paid for by Oppenheimer, announcing the beginning of the current round of financing as false or misleading because Dresner and the other Moneyline holders were actually in the process not of raising funds through preferred shares but selling over 70,000,000 shares during the second tranche for their own benefit.

There's no evidence that the company was looking to the shares that anyone was selling as the source of funds or that Dresner was supposed to be

finding or locating that funding or selling shares for that purpose. Likewise, there's no evidence that anyone ever represented or stated in any releases that the selling of shares in the market were for the benefit of raising money for the company.

Likewise, the government claims that the press release on December 14, 2009, announcing the issuance of restricted preferred shares and a promissory note was false or misleading. Again, there's no evidence that Dresner knew or had reason to believe that anything about that statement was false, and the evidence does not establish that it was, in fact, false.

Significantly, there was also no evidence of what other promoters of the stock were distributing and certainly no evidence that Dresner, while he may have known that there were other promoters, knew what the substance of those other releases were.

In any event, the government did not introduce any evidence concerning the substance of any other associated promoters and has not chosen to rely upon that type of evidence. Accordingly, the Court cannot infer anything with respect to Dresner's criminal intent based on the existence of other promoters. Rather, this case boils down to whether

Dresner's failure to make affirmative disclosure about his and others' interest in the stock and coordinated selling that he knew about was a knowing, material omission made with the specific intent to defraud.

In assessing that claim, the Court has considered the substance of what was disclosed and what would have been reasonably apparent to the investing public through public filings and other information.

First, the Court must observe that the four Spectrum releases that lay at the heart of the government's case essentially duplicated other publicly available information and were issued during the third tranche, which did not involve the sale of any stock that Dresner owned or controlled or any Moneyline accounts, and from which Dresner did not receive any financial benefits. Although, one could draw the inference that he knew someone was likely trading when he was instructed to release those reports.

The Court has also considered whether these nondisclosures are probative of a criminal intent to deceive within the context of what was disclosed. For example, while the first report stated that it would begin independent coverage, the reports also stated that persons issuing the report may have a beneficial interest in the stocks that they were discussing and

also stating without qualification that it was not independent in any way. These statements aren't meant to indicate there were complete disclosures, but the claimed omissions need to be considered within the context of all of those disclosures.

The Court also has considered the probative value as to criminal intent reflected in his assuming the identity of Chuck M. and disguising his voice, if, in fact, that's what he was doing, particularly in light of Zangara's testimony that he never instructed Dresner to do either.

Overall, the case on criminal intent boils down to the nondisclosure of his involvement with the stock, the company, and the coordinated selling he knew about. A reasonable investor would want to know about this information, but the issue is whether the evidence sufficiently establishes that Dresner failed to make these nondisclosures for the purposes of defrauding investors, and that must be assessed in a broader context, including what was being accurately disclosed about the company, including in its financial statements, and whether there were any false or misleading statements being made about the company.

In that regard, the Court has considered one of the central contentions of the government, that it

was falsely reported that the 300,000 shares issued to Moeller were effectively returned to the company for the purposes of acquiring the stock of Nature's Peak. In other words, the issue is whether the evidence establishes that Dresner failed to make these disclosures for the purpose of causing investors to think they were buying or selling a stock in a company that was something other than what it was.

Were there a different standard of proof, the Court may find differently, but the Court finds that the government has failed to prove beyond a reasonable doubt that Dresner had the specific intent to defraud when he issued the four Spectrum releases on April 8th, 13th, 14th, and 23rd in 2010, conducted the two video interviews in evidence, or when he otherwise acted.

For those reasons, the Court finds Mr. Dresner not guilty of securities fraud as alleged in Count 4.

As to Count 3, the issue is whether the defendant knowingly agreed to participate in a scheme to defraud. The Court has already determined that Dresner did not have the intent to engage in securities fraud, and the Court likewise finds that he did not knowingly agree to participate in a conspiracy to commit securities fraud. The issue remains whether the

evidence is sufficient to find beyond a reasonable doubt that he knowingly participated in some other scheme to defraud.

In that regard, the government contends that he conspired with his codefendants to intentionally defraud investors in Everock/Nature's Peak by using that company and its CEO, Paul Wilkinson, as unwitting instruments in a scheme designed to give investors a false impression that Everock/Nature's Peak shares were under the company's control and that sales of those shares would inure to the company's benefit and contribute to its positive future.

The Court has reviewed the evidence in light of this claim and finds that there's no evidence in this case from which it could be inferred that market participants were told that their purchase of shares would inure to the company's benefit or contribute to its positive future and, therefore, concludes that the government has failed to establish beyond a reasonable doubt that Dresner knowingly entered into an agreement to defraud investors by giving the false impression that Everock/Nature's Peak shares were being sold by the company or for the benefit of the company and that sales of those shares would inure to the company's benefit and contribute to his positive future.

So for those reasons, the Court finds the defendant not guilty of Count 3.

Mr. Dresner, would you come to the podium, please.

Mr. Dresner, the Court finds you not guilty of Counts 3 and 4 of the indictment. The indictment is, therefore, dismissed against you. The bond is discharged, and your pretrial conditions of release are vacated.

You're free to go.

THE DEFENDANT: Thank you.

THE COURT: Is there anything else?

MR. STOJILKOVIC: Not from the government, Your Honor.

THE COURT: All right. Anything else, Mr. Webster?

MR. WEBSTER: No. No, Your Honor.

THE COURT: All right. The Court will stand in recess.

----------------------------------
Time: 5:04 p.m.

I certify that the foregoing is a true and accurate transcription of my stenographic notes.

/s/
Rhonda F. Montgomery, CCR, RPR