UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case 1:15-cr-00178 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Alexandria, Virginia |
| | ) | January 27, 2016 |
| MARK S. DRESNER, | ) | 10:38 a.m. |
| | ) | |
| Defendant. | ) | Day 1 |
| | ) | Pages 1 - 144 |

TRANSCRIPT OF TRIAL

BEFORE THE HONORABLE ANTHONY J. TRENGA

UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

FOR THE PLAINTIFF:

KOSTA S. STOJILKOVIC, ESQUIRE
N. NATHAN DIMOCK, ESQUIRE
MICHAEL T. O'NEILL, ESQUIRE
OFFICE OF THE UNITED STATES ATTORNEY
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3700

FOR THE DEFENDANT:

STEVEN T. WEBSTER, ESQUIRE
AARON S. BOOK, ESQUIRE
WEBSTER BOOK, LLP
300 North Washington Street, Suite 404
Alexandria, Virginia 22314
(888) 987-9991

THE DEFENDANT, MARK S. DRESNER, IN PERSON

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

**I N D E X**


| | | PAGE |
|---|---|---|
| Opening Statement by Mr. O'Neill | | 9 |
| Opening Statement by Mr. Webster under separate cover. | | |
| WITNESS | EXAMINATION | PAGE |
| Jeffrey W. Puckett | Direct | 23 |
| Harold B. Gallison, II | Direct | 43 |
| Ann Hiskey's testimony under separate cover. | | |
| Paul Wilkinson's testimony under separate cover. | | |
| Deborah Oremland | Direct | 123 |

THE CLERK: Criminal Case 1:15-cr-178, *United States of America v. Mark S. Dresner*.

MR. STOJILKOVIC: Good morning, Your Honor. Kosta Stojilkovic, Nathan Dimock, and Michael O'Neill on behalf of the United States.

MR. WEBSTER: Good morning, Your Honor. Steve Webster and Aaron Book for Mr. Dresner, who is present here in person.

THE COURT: All right. Welcome.

Before we proceed, does the government have any preliminary matters you would like to raise?

MR. STOJILKOVIC: Your Honor, just a few things. I don't believe there are any pending motions. We did file one stipulation on the docket last week. We have just this morning executed an additional one that Mr. Book signed that will just allow us to cut one fact witness, a very brief witness. I am passing that up to the Court.

I just want to let the Court know: The government anticipates its case in chief will take two-and-a-half to three days with time budgeted in for cross.

THE COURT: All right.

MR. STOJILKOVIC: And I'd ask the Court for the rule on witnesses, and I'd ask as the one exception

to that Special Agent Amanda Fung, who is seated there at the end of the table, who is the lead case agent, we'd ask that she be permitted to stay.

THE COURT: Mr. Book, Mr. Webster, any preliminary matters you want to raise?

MR. WEBSTER: No, Your Honor. We're ready to proceed.

THE COURT: All right. Mr. Stojilkovic, would you put on the record whether there have been any plea offers extended to the defendant in this case.

MR. STOJILKOVIC: Yes, Your Honor. A plea offer was extended to the defendant. It was to one count -- I believe it was Count 3, the wire fraud conspiracy -- along with the government's understanding of the guideline range, and that offer was not accepted. And we've had -- we've indicated to the other side that we remain willing to negotiate a plea, but we have not exchanged additional plea papers past that initial offer.

THE COURT: All right. Thank you.

Mr. Webster, would you put on the record whether that offer has been extended to and rejected by Mr. Dresner.

MR. WEBSTER: Yes, Your Honor. The government did extend that offer. We reviewed the

papers with Mr. Dresner. He chose to reject the plea.

THE COURT: All right. Very good.

Also, before we proceed, I'd like to have a colloquy with Mr. Dresner about his waiver of a jury.

Mr. Dresner, would you come to the podium, please.

Mr. Dresner, you've waived a jury in this case, and you've signed a waiver of jury form. Do you recall that?

THE DEFENDANT: Yes, sir.

THE COURT: Did anyone threaten you or try to influence you in any way into signing that waiver of a jury against your will?

THE DEFENDANT: No, Judge.

THE COURT: Have you discussed with your lawyers your right to a jury and the consequences of waiving that jury?

THE DEFENDANT: I have.

THE COURT: Do you understand that you do have the right to have this case tried before a jury of 12 United States citizens?

THE DEFENDANT: Yes.

THE COURT: Those 12 jurors and any alternates would be chosen from a pool of United States citizens that were selected at random from the rolls of

registered voters living in this judicial division of this district. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: Also, as far as selection, a jury of 12 jurors would be selected from the larger jury pool assembled in this courtroom at the beginning of the trial. That pool of persons would be asked questions in open court by the Court designed to determine whether any individual has any financial or personal interest in this case or would otherwise be unable to serve as a fair and impartial juror. You and your lawyers would have the opportunity to request the Court to ask the potential jury members any questions for that purpose. Do you understand that?

THE DEFENDANT: Yes, I do.

THE COURT: Based on the answers to those questions to that jury pool, you and your lawyers would have the right to challenge any potential juror for cause, that is on the grounds that a particular person's knowledge of the case, witnesses, the parties, or the issues would affect his or her ability to be a fair and impartial juror or cause an objective observer to conclude that that person's ability to be fair and impartial might be affected whether or not it is, in fact, affected. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: Also, once all challenges for cause were made and ruled upon, the 12 jurors and any alternates would be selected at random from the remaining members of the jury pool. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: In addition, once 12 persons were actually selected to serve as your jurors, you and your lawyers would have the right to exercise up to 10 preemptory challenges, that is to have removed up to 10 persons actually selected to serve on the jury without the need to provide any reasons or justification. Do you understand?

THE DEFENDANT: Yes.

THE COURT: In order to convict you, that jury of 12 persons is required to unanimously find that the government has proven beyond a reasonable doubt each and every element of the charges against you. In other words, it would take only one member of that jury to prevent a conviction. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: By waiving a jury, there will be no involvement of any members of the public in determining your guilt or innocence. Do you understand

that?

THE DEFENDANT: Yes, I do.

THE COURT: Your guilt or innocence will be exclusively determined by the Court, that is by me, the only person who will consider the evidence against you and determine whether the government has sustained its burden of proving beyond a reasonable doubt each and every element of the charges against you. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: Also, in the event of a conviction on either charge either by the Court or a jury, the sufficiency of the evidence would be reviewed by the Court of Appeals according to a standard of review limited to whether admissible evidence presented by the government was sufficient for any reasonable fact finder to conclude beyond a reasonable doubt that the government had established each and every element of its charges against you. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: All right. Thank you.

The Court finds, based on the responses of the defendant, that his waiver of a jury in this case was voluntary and knowing.

All right. We're going to proceed. The

Court will hear brief opening statements.

First of all, let me invoke the rule on witnesses. Are there any witnesses in the courtroom?

(No response.)

THE COURT: All right. Will counsel for both sides advise your respective witnesses of their obligation to remain outside of the courtroom during the trial and not to discuss their testimony with any other witness or person either before or after their testimony, and the agent may remain in the courtroom for the government.

All right. Anything else before we begin?

MR. STOJILKOVIC: No, Your Honor.

THE COURT: All right. Mr. O'Neill.

MR. O'NEILL: Your Honor, may I proceed?

THE DEFENDANT: Yes, please.

OPENING STATEMENT

MR. O'NEILL: This case is about controlling and manipulating a low-priced stock, getting substantial stock proceeds from unsuspecting investors, and hiding your role in the scheme. The defendant, Mark Dresner, is on trial for his role in virtually every stage of a stock manipulation scheme involving a company called Everock, Incorporated.

I know Your Honor is generally familiar with

the allegations in this case from prior hearings and from the government's trial brief, so I just want to preview some key points of what the evidence will show.

THE COURT: All right.

MR. O'NEILL: The government will show that the Everock scheme was a so-called pump-and-dump. Now, in its simplest form, a pump-and-dump scheme typically involves three steps to exploit basic principles of supply and demand:

First, the coconspirators secretly gained control of the shares of the stock and then deposited or parked their shares in accounts in the name of other entities, often known as nominees, so they can hide their true ownership of the share supply, as well as their coordination with each other.

Second, the coconspirators secretly coordinated to falsely inflate or pump the market price for volume of the stock they controlled. This pump phase involves a series of coordinated messages touting or promoting the stock to the investing public. The promotional materials include press releases and Web postings crafted and broadly disseminated to increase investor interest in the stock. These materials are put out by specialists, often known as promoters, who are paid with shares and proceeds of the stock and thus

also stand to gain by falsely inflating its price and volume.

Third and finally, the coconspirators coordinate to sell or dump their shares into the artificial market demand generated by the pump. The coconspirators profit at the expense of unsuspecting investors. After the coordinated promotions and the coconspirators sell their stock into the market, the stock becomes essentially worthless.

In this case, the evidence will show that Mark Dresner and his coconspirators engaged in a pump-and-dump scheme involving the stock of Everock and that they used an offshore brokerage firm in Costa Rica called Moneyline to facilitate and conceal their fraud and to launder their ill-gotten gains.

The evidence will show that through companies he controlled, the defendant crafted and disseminated promotional materials and other communications touting Everock to potential investors. The evidence will show that Dresner's communications to investors were false and misleading, not necessarily for what they said about Everock or its products, but rather for what they said and didn't say about the relationship of Dresner and his coconspirators to the company the defendant was promoting.

The evidence will show that Mr. Dresner disseminated reported research and related press releases falsely claiming that his research company was independent from Everock and was offering investors a balanced view of the company. These claims and their accompanying disclosures were false because Dresner and his coconspirators were, in fact, the largest shareholders of Everock. They had secretly caused Everock to issue them millions of shares prior to the promotions in order to facilitate their pump-and-dump of the stock.

The defendant was also involved in generating press releases that were issued by Everock. Unbeknownst to the company's CEO, who thought Dresner and his coconspirators were trying to help his company raise capital, they instead timed their press releases to coincide with their secretly coordinated dumps of Everock stock in order to enrich themselves.

The evidence will show that the coconspirators reaped about $3.3 million in illegal proceeds from the Everock scheme. The concerted selling by Dresner and his coconspirators ultimately rendered Everock stock worthless at the expense of unsuspecting investors and at the expense of a CEO who trusted them to help their company.

As Your Honor knows, the defendant is charged with one count of wire fraud conspiracy and one count of securities fraud. Both charges relate to the defendant's critical roles in various stages of the Everock pump-and-dump.

The evidence will show that the defendant intended to defraud Everock's investors and to get their money using false pretenses. Testimony from the defendant's coconspirators who have pleaded guilty in this case, as well as recorded calls and documents, will show that Dresner knowingly participated in virtually every stage of the Everock scheme from assisting in transactions he and his coconspirators used to gain secret control of Everock shares to crafting and disseminating promotions of the stock and to coordinating stock sales with these promotions.

The evidence will show that the defendant was a close friend and business associate of one of the leaders of the scheme, Frank Zangara. As Your Honor will recall, Zangara has pleaded guilty in this case. Zangara will testify that he helped to orchestrate the Everock scheme in close coordination with Dresner and other coconspirators. The defendant and Zangara worked together in New York to promote various low-priced or penny stocks, including Everock.

Before beginning their stock manipulation scheme, the defendant and his coconspirators needed to gain control of Everock stock. The evidence will show that over the summer of 2008, Dresner, along with Zangara and others, assisted in merging Everock, a publicly traded company, with an existing private company called Nature's Peak.

Nature's Peak produced a line of gourmet veggie dips and spreads. Everock was simply a public shell company that Zangara and others controlled for the sole purpose of being merged into a private company. Following what's known as a reverse merger, Nature's Peak became publicly traded under Everock's name and stock symbol.

Your Honor will hear from the CEO of Nature's Peak, Paul Wilkinson. Wilkinson will testify that he was told by Frank Zangara and others that a merger with Everock would help Nature's Peak raise money to grow his company. Wilkinson will also explain Dresner's role in generating press releases and promotional materials for Everock-Nature's Peak following the merger. What the CEO didn't know was that Dresner and his coconspirators used this merger to secretly gain control of nearly all of Everock's shares.

First, Dresner's coconspirator, Charles

Moeller, was put up as Everock's nominal president and sole director. As Your Honor will recall, Moeller has also pleaded guilty in this case. As Moeller and others will testify, it appeared that Moeller held a vast majority of the company's shares in his name and was going to transfer them back to the owners of the company. In fact, as testimony from both Zangara and Moeller as well as Dresner's own e-mails will show, Zangara controlled the Everock shares from behind the scenes with assistance from the defendant.

After installing Moeller as the public face of Everock, Zangara directed him to turn over the vast majority of Everock shares to Moneyline. That's the offshore brokerage firm that these coconspirators used to facilitate their scheme. Many of those shares were placed in Dresner's Moneyline account while others were placed in Zangara's Moneyline account.

The evidence will show that the defendant and his coconspirators had their Everock stock deposited into various U.S. brokerage accounts in the name of shell companies that were secretly associated with Moneyline. As Your Honor will recall, Moneyline's founder and co-owner, Harold B.J. Gallison, has pleaded guilty in this case.

Gallison will testify that Moneyline clients,

including Dresner and his coconspirators, used this offshore brokerage firm and its nominee accounts to conceal their coordinated selling in penny stocks, including Everock. The different entity names on the Moneyline nominee accounts made it appear that the stock was owned and sold by entities and individuals other than Mark Dresner, Frank Zangara, and their coconspirators.

Using these Moneyline accounts to conceal their coordination, the defendant and Zangara also distributed some Everock shares to other coconspirators in anticipation of the pump. Their coconspirators included additional promoters who touted Everock to increase investor interest in buying the stock. The evidence will show that the defendant also transferred substantial proceeds of the Everock scheme to these other coconspirators.

Now, as I mentioned, a simple stock manipulation scheme can occur in three steps. You get the stock. You pump the stock. You dump the stock. But pumping and dumping the stock in one fell swoop ruins the stock and ends the life of the scheme. The Everock scheme was a bit more sophisticated. The evidence will show that Dresner and his coconspirators engaged in multiple waves or tranches of promotions and

sales and that the promotional materials were disseminated nationwide, including in the Eastern District of Virginia.

In particular, summary evidence and testimony will show that following the 2008 Nature's Peak-Everock merger, the defendant and his coconspirators engaged in four waves of pump-and-dump activity, three of which were orchestrated through Moneyline in 2009 and 2010. The evidence will also show that Dresner played a key role in each of these waves by holding, transferring, and selling Everock shares in concert with Zangara and their other coconspirators.

In addition, the defendant crafted and disseminated false and misleading promotional materials about Everock, including press releases, online posts, and videos. This was so the investing public would take interest in the stock and buy the shares that Dresner and his coconspirators controlled and were coordinating to sell.

What's more, the evidence will show that the defendant assumed a false identity in the course of issuing these releases. As Moeller and Zangara will both explain, Dresner assumed Moeller's identity and used it to run a promotional entity called Spectrum Research Group. In concert with Zangara, the defendant

used Spectrum to release reported research coverage touting Everock.

The announcement of Spectrum's coverage falsely claimed that Dresner's entity was independent from Everock and failed to disclose the controlling position that Dresner and Zangara held in Everock. In fact, the only disclosure Your Honor will see is in tiny print on Spectrum's website. Even that disclosure fails to mention Dresner and Zangara's controlling interest and itself contains false information.

Your Honor will even hear a promotional voice-over video where a speaker provides penny stock tips under the name of Chuck M. and another video where the speaker touts Nature's Peak in an artificially low voice. Witness testimony will identify the speaker in both videos as the defendant.

The evidence will show that Dresner's messages to the investing public were also coordinated in time with the various dump phases of the Everock scheme unbeknownst to potential investors. Testimony and records, including the defendant's own recorded calls to and from Moneyline, will show that Mark Dresner authorized the sales of Everock stock from his Moneyline account and that he knew and expressly agreed that his stock sales were to be coordinated with those

of his coconspirators, including Frank Zangara.

Now, as to these recorded calls and other Moneyline records that we intend to offer, a former Moneyline employee named Jeffrey Puckett will testify that his concerns about illegal activity at Moneyline prompted him to secretly copy various internal Moneyline records in Costa Rica and voluntarily provide those records to the FBI. As the Court will see and hear, evidence provided by this employee included internal account records and recorded calls from Moneyline systems that confirm Dresner's involvement and agreement in the Everock conspiracy.

Your Honor will recall that a Moneyline customer service representative named Ann Hiskey has also pleaded guilty in this case. Hiskey will testify about her role in handling part of the Everock deal, including a recorded call she had with the defendant in July 2010. On that call, Mark Dresner confirmed his agreement with whatever Frank Zangara decided about how to split up the proceeds from their group's coordinated sale of Everock stock. Testimony and summary evidence will show that this call and others like it were part of the stock manipulation scheme.

In total, the concerted pumps and dumps of Everock stock resulted in approximately $3.3 million

for Dresner and his coconspirators. Over the four tranches of the scheme, the Everock stock price collapsed to become essentially worthless.

The Court will hear from one of the many Everock investors that Dresner and his coconspirators defrauded a retired auto repair shop owner who lived and worked in this district when he bought Everock stock back in 2010. This investor, named Jerry Lastuvka, will explain that the information he relied upon when he bought the stock included online news and releases and that he lost virtually his entire investment.

In contrast, the evidence will show that Dresner himself reaped nearly $300,000 in proceeds from the Everock scheme. The evidence will also show that the defendant's share of his stock share proceeds was greater than the total proceeds that were transferred back to Everock and Nature's Peak, the company that Dresner and his coconspirators were supposedly helping.

After the Court receives the evidence in this case, the government will ask Your Honor to reach the only conclusion that is consistent with that evidence, that Mark Dresner intentionally participated in the Everock scheme and is guilty beyond a reasonable doubt of wire fraud conspiracy and securities fraud.

THE COURT: Thank you.

Mr. Webster.

(Defense's opening statement under separate cover.)

THE COURT: Mr. Stojilkovic, call your first witness.

Before we proceed, I understand that the exhibits that you want to use for the witnesses are in separate folders. Is that right?

MR. STOJILKOVIC: Your Honor, I apologize if that's not the preferred. I had a trial three weeks ago with Judge O'Grady. We had them in a binder, and there was frustration of the witnesses having to shuffle. So we did that instead.

THE COURT: Right. I know. We do that to confuse counsel. We all proceed differently.

Well, we'll proceed with these for today. Let's see how we go. I think it's going to be preferable to go back to the binders, but we'll proceed with these today.

MR. STOJILKOVIC: Thank you, Your Honor.

THE COURT: Mr. Webster, are you reserving any objections as to any of the government's exhibits?

MR. STOJILKOVIC: Your Honor, we had not discussed -- I mean, we discussed certainly for a lot

of the exhibits.

THE COURT: In any event, you haven't affirmatively not objected to any of the exhibits at this point?

MR. WEBSTER: Only, Your Honor, the ones that we stipulated to in terms of the authenticity.

THE COURT: All right. That's fine.

MR. STOJILKOVIC: Your Honor, just one thing to put on the record regarding some of the exhibits. Some of the documents we're going to offer up are Moneyline records, recordings, and internal documents. Just the one thing I want to tell the Court. Our first witness is the individual who gave those materials to us. Our likely last witness will be the FBI agent who received them from him. So we're going to offer those exhibits in with witnesses provisionally and tie up the chain of custody, if it's okay, with the last witness.

THE COURT: All right. Mr. Dimock.

MR. DIMOCK: Thank you, Your Honor.

THE COURT: All right. The first witness.

MR. DIMOCK: Yes. The United States calls Mr. Jeffrey Wayne [sic] Puckett.

THE COURT: All right. Mr. Puckett will come forward, please.

JEFFREY W. PUCKETT, PLAINTIFF'S WITNESS, AFFIRMED

DIRECT EXAMINATION

BY MR. DIMOCK:

Q Mr. Puckett, good morning.

A Good morning.

Q Would you please state and spell your full name for the record.

A My full name is Jeffrey Wyatt Puckett. It's J-E-F-F-R-E-Y, W-Y-A-T-T, P-U-C-K-E-T-T.

Q Mr. Puckett, where did you attend high school?

A Virginia Beach, Virginia.

Q What is the highest level of formal education that you attained?

A A bachelor's degree.

Q And where was that from?

A Cornell University.

Q What was your major?

A Initially for two-and-a-half years, my major was engineering. Then I switched basically to liberal arts.

Q Are you familiar with someone by the name of Harold B.J. Gallison, Jr.?

A Yes.

Q When did you first meet Mr. Gallison?

A In 1993.

Q And what were the circumstances of that meeting?

A I applied for a job at his brokerage firm.
Q What was the name of that firm if you recall?
A Initially it was called La Jolla Capital Corporation.

THE COURT: What was the name of the firm, please?

THE WITNESS: La Jolla Capital.

THE COURT: Would you spell that.

THE WITNESS: L-A, space, J-O-L-L-A, space, C-A-P-I-T-A-L.

BY MR. DIMOCK:

Q Thank you, Mr. Puckett.
What caused you to apply for that position?
A I decided that I would like to find a job at a small brokerage firm and learn how to trade. So I began looking for that type of job. I was located in San Diego. So I started just looking through the paper, and I found a little ad that said, Growing San Diego BD looking for back office assistant.
Q And were you ultimately hired?
A Yes.
Q What was your position when you started there?
A Initially, basically, I was a clerk on the trading desk.
Q And what did that entail?

A Transcribing information from trade tickets to consolidated blotters and doing reports --

THE COURT REPORTER: I'm sorry?

THE WITNESS: Blotter, B-L-O-T-T-E-R.

A -- that we would send to our clearing agent. It's a summary of all the trades, and then I would do some of the agency trades.

Q And approximately how long did you remain at La Jolla?

A Through the various positions, I stayed until 1999.

Q And what caused you to leave the firm?

A The firm shut down.

Q Did you later on, again, get in touch with Mr. Gallison relating to potential job opportunities?

A Well, throughout the years, since 1999, we did talk on occasion. And in 2007, he came out to Las Vegas and was hosting a party for people and invited me, but I didn't have the opportunity to go. A year later he called me to inquire as to whether or not I was available to work.

Q And to work where?

A Well, he -- generally, he inquired as to whether or not I would be interested in a job. From talking with him, the job related to a company he was running

down in Costa Rica.
Q Do you remember the name of the company at that time?
A Well, generally we referred to it as GISBEX, but the firm that I had worked for after I left La Jolla Capital was named NevWest Securities. Mr. Gallison opened an account at NevWest Securities on behalf of a Costa Rican corporation called Sandias Azucaradas.
THE COURT REPORTER: I'm sorry?
THE WITNESS: S-A-N-D-I-A-S, space, A-Z-U-C-A-R-A-D-A-S. It's Spanish, not mine.
THE COURT: What was the name of the brokerage company? NoWest?
THE WITNESS: NevWest.
THE COURT: NevWest.
THE WITNESS: N-E-V-W-E-S-T.
MR. DIMOCK: Thank you, Judge.
BY MR. DIMOCK:
Q And in discussions about going to work for -- at that time it was called GISBEX. What was your understanding of what the job would be?
A As he explained it to me, he needed somebody who's familiar with brokerage firm operations and brokerage accounts and somebody who he has known for a long time to help him prepare monthly internal accounting reports

and also to work with the programmers to integrate the manual accounting system in with the back office system that they had developed.

Q And did you ultimately accept that position?

A Yes, I did.

Q And where were you going to work from?

A Well, initially we agreed that I would work from Las Vegas since it could all be done remotely. And I had a house and a car and dogs, so I didn't really want to move anywhere. So he agreed that I could work from Las Vegas.

Q At that time, what was your understanding, if any, as to why the brokerage was located in Costa Rica?

A Well, I had talked with him numerous times since even before GISBEX was actually put together. His idea was to locate it in a foreign country because he didn't want to have to endure the experience of dealing with regulators. And also, he explained to me that it's easier to maintain privacy for the customers.

Q Did you ultimately move to Costa Rica?

A Yes. In -- Mr. Gallison asked me to move -- to go down to Costa Rica to visit so that I could meet all the people that worked there, the programmers and the IT staff. While I was there, I met Mike Randles, who was B.J.'s partner.

THE COURT: Randles?

THE WITNESS: R-A-N-D-L-E-S.

THE COURT: Randles. And spell the name of the brokerage company again, GISBEX.

THE WITNESS: Oh, G-I-S-B-E-X.

THE COURT: All right.

THE WITNESS: It was an acronym. It stood for Global Internet Stock Brokerage Exchange.

BY MR. DIMOCK:

Q Let me just ask you a couple of questions about that as it relates to the name. Did the name change over time?

A It did, yeah. There was -- initially, GISBEX was supposed to be a clearing corporation, and they were supposed to be subsidiary companies owned by independent people. Basically, his idea was he would sell seats on his exchange, which sounded like a good idea. It's just that nobody bought seats. So he created his own firms and began to run them himself.

And so yeah, we would refer to it by various names. Generally GISBEX, but also Sandias because that was the account name, and NevWest, and that's how we referred to it. It was Sandias Azucaradas, but we just for short called it Sandias. Also, I heard the name Moneyline because that was one of the brokerage firms

that he had created. So sometimes the name Moneyline was used.

Q When you arrived in Costa Rica, what were your general responsibilities?

A Well, I mean, that's getting far ahead because it took me a while to move to Costa Rica, but ultimately, I did in October 2009. And when I got there, I first had to adapt to a foreign country and a new company. So it took a while to get to know everything.

One of the things that I had to do -- there was a room filled with stuff that had accumulated that had minor defects. Nobody had either the skill or the desire to fix them, and I did. So I spent a lot of time going through the hardware and fixing it.

And I also had to fix people's workstations, and I had to fix Internet problems. I realized that there was numerous problems with the infrastructure there at the office itself. So even though my initial purpose for going down there was to work on accounting, which I had to do, that really didn't take much time.

Before I could proceed with the second element of my job, which was to help IT integrate that manual accounting system in with the back office, I had to know how the back office system worked. And also, we had to fix those Internet problems. So I became the IT

guy.
Q Okay. Just to clarify, you said when you got there, you found stuff that needed repairing. What type of stuff are you talking about?
A Like a computer that might have a little problem. They would just get another one and put the old one in the room. I would fix it.
Q And did you have by this time any kind of background in IT?
A A lot of background. As I explained or mentioned earlier, for two-and-a-half years I studied engineering. That was going to be the focus of my career. So engineering and computers has always been my interest ever since I was a little kid. So I know how to deal with broken hardware, especially after working at La Jolla Capital because our IT budget was minuscule. So I had to work with outdated and broken equipment a lot. So yeah. And at NevWest, part of my job was to maintain the computers and deal with the computer networks.
Q Did you have any type of access to the systems as part of this IT position that you were fulfilling?
A Well, there's two levels of access. One is the back office system. As part of my job with accounting, I needed to have access to the back office system. And

the way it's written is B.J. himself assigns various levels of access. I was one of the few people who had total access to everything on the back office system. So my log-in credentials would get me any information that I wanted.

So as far as the physical access to the machines, when I arrived, everybody was told that I was to be given total access to anything, including the security guards. He said, Yeah, he can come 24/7. At the time, security was pretty strict. They had people like signing in in the morning on a log and signing out in the afternoon. So it was a big deal to be able to just come and go 24/7. Not many people could do that.

Q Just to clarify, you mentioned that B.J. gave you access. Would that be Mr. Gallison?

A Yes.

Q And as a result of the access that you had down there, what did you begin to observe as it related to the operations of the company, if anything?

A Well, I began to observe a lot of things. It took a long time to really absorb it. But I guess one of the first things I noticed was that B.J. himself, when he traveled to Costa Rica, would not use the name B.J. Gallison. He would use the name Bart Williams. Then there was --

THE COURT: What was the name? Mark Williams?

THE WITNESS: Bart, B-A-R-T.

A Which I thought was kind of odd, but considering how he had gone to jail for something he did previously, it was sort of explained to me that he just didn't want his name out there. So it made sense.

But then there was this general paranoia about, you know, too much information about, you know -- like Mike Randles did not want any pictures of the building taken or given out, and you know, there was a lot of security that seemed a little bit unnecessary. You know, that's the way it was.

Other things I noticed were in early 2010, there was a big push to get an operation going in Europe, and that was spearheaded by Mike Randles, to establish call centers in places like Barcelona where they would call people -- I guess they would call them exclusively in Europe. I don't know if they called in the United States, but I do know that they called people in England basically to get them to buy stock. So they send a wire or a check for money, and then they would get a stock certificate delivered to them.

I know from my experience being a regulated person -- I had numerous licenses that I had to apply

for with lengthy exams in order to get that license. It was basically drilled into me that that sort of practice was --

MR. BOOK: Your Honor, I object here. I think he's getting into some sort of spirit testimony. I know he's talking about experience.

THE COURT: Why don't you break down your questions.

MR. DIMOCK: Sure, Your Honor. And just to clarify for the Court, this goes to basically the witness' state of mind and the decisions that he made shortly thereafter. So this is to sort of lay the foundation.

THE COURT: Well, if you put it in that context, I'll be better able to consider it.

MR. DIMOCK: Okay.

BY MR. DIMOCK:

Q Let me jump ahead a little bit. Was there a time when you decided to reach out and contact law enforcement?

A Yes. That was -- that took a long time to reach because I wasn't too eager to do that. Also, I -- and it took me a while to really absorb all of the little tidbits of information. I started to talk with my friend in Las Vegas.

MR. BOOK: Objection. I think this is nonresponsive.

MR. DIMOCK: Well, I think the follow-up would be why did you decide to contact --

THE COURT: The objection is sustained. Ask the next question, please.

MR. DIMOCK: Yes.

BY MR. DIMOCK:

Q Why did you decide to contact law enforcement?

A Oh, well, I was trying to explain it. But basically, a friend of mine in Las Vegas had convinced me to talk to somebody who was referred to him by a friend of his in the Justice Department. And by November 2010, I agreed to do that.

Q And did you, in fact, reach out to law enforcement?

A Yes, I did.

Q And did you collect any materials prior to contacting law enforcement?

A Yeah. Because of my job, I had accumulated quite a bit of information on various hard drives and things. I thought that it best, if I'm going to meet with somebody from the FBI, that I should accumulate this stuff so I'd have something to reference. I consolidated it for the purposes of -- initially for

the purposes of travel, just to have one hard drive. I copied everything that I had that I thought was relevant onto one hard drive. It was -- the capacity that I copied was approximately 218 gigabytes of data.

And when I met with the FBI agent who was introduced to me -- there was two, but one is the one who took all the notes and asked all the questions. That was Amanda Cullen. At the end of that meeting, I gave her the hard drive.

Q Prior to that meeting, had the FBI or any other law enforcement agency asked you to collect this material?

A This was my first encounter with the FBI. I had never met anybody prior to that.

Q Okay. Generally, what types of data were on the hard drive that you gave to the FBI?

A It was a lot of data, like -- the server had been recording the phone calls. And so I had copied them and was -- had the occasion to listen to them in my spare time, yeah, basically, to learn, you know, how the business was working. I got to listen to calls between customers and so forth.

So yeah, I just copied all of those phone calls. Obviously, I didn't listen to all of them. So I just -- I figured I'd just copy them because that's

part of the information that I had. It was about 27,000 phone calls and --

THE COURT: Twenty-seven thousand?

THE WITNESS: Twenty-seven thousand, yeah. Not all of them are important. Some of them are just a few seconds.

BY MR. DIMOCK:

Q Now, in terms of those calls, based on the file information that was on the hard drive, were you able to learn anything about the calls, any of the specifics regarding the calls?

A Oh, yeah, of course. I had to figure out which -- what the filings meant because this was my first experience with a wipe system. So I was learning as I went along.

The way this particular system named the files, it was clear to me that there was a designation as to whether or not the call was initiated outside of our system or within our system or whether it was from -- it came across one of our long distance trunks or whether it was extension to extension. It would show the extension number and the caller ID if it was a trunk call.

Q Okay. Would it also indicate the date and time of the call?

A Correct, yes. The file name -- there was -- in the file name, there was a reference to the date and time. Also, the file name on the operating system, the file itself had a date and time code.
Q Okay. Over time, did you explain to the FBI how to understand this data?
A Yes. After my initial meeting with Amanda Cullen, which lasted about three hours in Las Vegas, there were some follow-up calls -- many follow-up calls over years. Initially, it was maybe once a week. She had a bunch of questions. So whatever questions she had, I answered. As I recall, a lot of those questions had to do with technical information.
Q Okay. Were there also e-mails on this hard drive?
A Yes, there was a lot of e-mails. I'm not sure whether there were duplicates, but I -- as part of my job, I would have to refurbish workstations. So I would have the e-mail archive from those workstations. Also, I had access to the e-mail servers themselves, and I had the many e-mail account credentials so that I could actually read e-mails on my own system.
And so there was -- I guess the raw count might be close to 100,000, but if you exclude duplicates, it might be 60,000.
Q Was there also client data contained on this hard

drive?
A Different types of client data. As I said earlier, I had to understand the back office system in order to be able to tell the programmers how to integrate the accounting, and the programmer, who had envisioned and wrote most of the back office system, was routinely not available. So I had to figure it out myself. There was little documentation that I could understand based upon how it was written and so forth. But I do know that I had access to the interface itself. So the interface would interpret the data from the database and present it to me with the labels and so forth as to what elements -- what the elements mean.
So basically, I wrote a program that queried the back office system transaction by transaction, and then it scraped the information off of that page. I saved both the page itself and then my -- I had a separate algorithm that would interpret that information and consolidate it into a different form. But I had the raw snapshots, and I included those. That was maybe between 50,000 and 70,000 transactions at that time.
Q Did the material also include account numbers?
A Yes, as part of the transaction record, of course, the account number.
Q Can you explain how the account numbering system

was assigned generally?

A The back office system was rewritten a few times. But basically, the design was that the system would assign all the account numbers, and they would be issued sequentially. There were gaps in the account numbers in the first thousand or so, but that was during the development time period. After that, there's pretty much no gaps.

As I explained, GISBEX initially was designed to be a clearinghouse with numerous corporations operating independently by using the back office system as a clearinghouse. So there are references in the data as to which brokerage firm had the account, but there are no duplicate account numbers. So the system -- if the last number assigned was 2,000, the next one would be 2,001.

Q Okay. At some point, did the FBI or law enforcement ask you to leave Costa Rica?

A In late 2013, Amanda called me and said, You need to start thinking about leaving Costa Rica because indictments are going to come down. We're just concerned about your safety in Costa Rica. So -- and also, probably you'll be out of a job. So you need to start thinking about it.

Initially, she told me that probably by March I

would have to be out of Costa Rica. So March 2014. But later on that was delayed. She says, Well, it's probably not going to happen.

Then in the spring of 2015, Amanda called me again and says, This time we're serious. You have to think about getting out of Costa Rica, and she gave me reasons as to why she thought that I should leave.

Q Okay. Was there going to be any kind of a financial hardship on you to leave Costa Rica?

A Well, I had settled in. I had my dog.

MR. BOOK: I object to relevance.

THE COURT: I'll hear it briefly.

MR. DIMOCK: It's going to get to --

THE COURT: That's fine.

MR. DIMOCK: I'm almost at the end.

THE COURT: All right.

BY MR. DIMOCK:

Q Okay. You can continue.

A Well, yeah. I mean, I'd be out of a job, but that was going to happen anyway. And living in Costa Rica, I had adapted. It's very cheap to live in Central America. Moving back to the United States, that was always a problem because I did want to move back earlier, but I had this daunting task of where would I move to? Would I move back to Las Vegas? I had

already sold my house. The cost of living is much higher. How do I get a job and so forth? It's just -- inertia is a lot easier. It wasn't necessarily a financial hardship. It was like more an emotional hardship. Then it just made practical sense to stay. I could move to Panama or Nicaragua or wherever. I don't care. It's a lot cheaper to live there than in the United States.

Q Did the FBI ultimately provide you with any financial assistance?

A Yes. There was a problem because they wanted me to be available in case they had some questions about the information. The trial wasn't scheduled for six or seven months later. And so it's really hard to get a job and settle someplace if I'm going to have to be traveling and taking time off. So Amanda said, Look, here's what we'll do. We're going to pay for your moving expenses, and then we're going to pay for your basic living expenses while you're in the United States until you testify.

Q Okay. How much did you receive?

A I received a check in August 2015 for $22,200.

Q And were there any obligations that came along with that?

A There was no obligations. Absolutely, there was

no conditions. They did expect me to be available should they have questions and to fly out occasionally to Virginia and, of course, to appear at trial and tell the truth.

MR. DIMOCK: Nothing further, Your Honor.

THE COURT: Thank you.

Mr. Book?

MR. BOOK: No questions, Your Honor. Thank you.

THE COURT: May this witness be excused?

MR. DIMOCK: Yes, Your Honor.

THE COURT: All right. Mr. Puckett, you're excused. Please do not discuss your testimony with anyone outside of the courtroom.

THE WITNESS: Okay.

(The witness stands aside.)

THE COURT: Mr. Stojilkovic, your next witness.

MR. STOJILKOVIC: The United States calls Harold B.J. Gallison.

THE COURT: All right. Mr. Gallison will come forward, please.

Counsel you may proceed.

MR. STOJILKOVIC: Thank you, Your Honor.

HAROLD B. GALLISON, II, PLAINTIFF'S WITNESS, AFFIRMED

DIRECT EXAMINATION

BY MR. STOJILKOVIC:

Q Please state and spell your name for the record.

A It's Harold Bailey Gallison, II, H-A-R-O-L-D; Bailey, B-A-I-L-E-Y; Gallison, G-A-L-L-I-S-O-N.

Q Do you also go by B.J.?

A Yes.

Q Mr. Gallison, did you plead guilty in this case?

A Yes.

Q What crimes did you plead guilty to?

A Two counts of wire fraud and one count of money laundering. They're conspiracy counts.

Q Under your plea agreement, are you required to cooperate with the government in this case?

A Yes.

Q Are you testifying today pursuant to that cooperation obligation?

A Yes.

Q What benefit, if any, do you hope to get as a result of your cooperation?

A I hope to get a lighter sentence.

Q To your understanding, what is your cooperation conditioned upon?

A That when called upon, I show up and answer questions truthfully.

Q To your understanding, what could happen to you if you do not testify truthfully today?
A That my plea agreement would be voided and I could be liable for additional charges or penalties.
Q Are you familiar with something known as Moneyline Brokers?
A Yes.
Q What was Moneyline Brokers?
A Moneyline Brokers was an online foreign-based brokerage firm located -- they're principal office is in Costa Rica.
Q Where was Moneyline incorporated?
A Panama.
Q Did it go by any names besides Moneyline Brokers?
A Moneyline Brokers in later years, after like 2010, became known as Trinity Asset Services.
Q Are you familiar with something called Sandias Azucaradas?
A Yes.
Q What is that?
A It was one of the -- it was a Panama corporation that was one of the accounts under the umbrella of Moneyline that was a depository custodian omnibus account for Moneyline.
Q Are you familiar with something known as GISBEX,

G-I-S-B-E-X?
A Yes. It was an online exchange that was -- that Moneyline Brokers was a member broker of. It was all part of the greater Moneyline project, so to speak. It was -- the Moneyline Brokers was the brokerage arm of GISBEX.
Q For purposes of today's testimony, is it okay if I generally refer to these entities under the umbrella as Moneyline?
A Yes, it is. That would be accurate.
Q What was your role in Moneyline?
A I cofounded Moneyline in 2000, 2001 with another gentleman, Michael Randles.
Q Were you and Mr. Randles business partners?
A Yes.
Q Were you equal partners?
A Yes.
Q Around the time that Moneyline was starting up, did you plead guilty to a felony offense?
A Yes.
Q What offense?
A In 2003, I pled guilty to one count of fraud. It was a stock fraud, a felony count.
Q Now, that prior conviction, did that have any relationship to Moneyline?

A No.
Q Were you incarcerated on that prior conviction?
A Yes.
Q During what time?
A From August 2003 until March 2006.
Q What involvement, if any, did you have with Moneyline while you were incarcerated?
A None.
Q And what was your involvement with Moneyline after you were released from prison?
A A few months after release, I rejoined Moneyline. I worked initially in the trading department.
Q Did you ever take up a full supervisory role at Moneyline?
A Yes.
Q Approximately when was that?
A A full supervisory role for Moneyline was approximately in late 2009 to late 2010. It was a gradual stage up as I learned more about the operation.
Q Where were you based after your release from prison on the prior conviction?
A In San Diego, California.
Q And have you remained based there through the present day?
A Yes.

Q Generally speaking, what kinds of stocks did Moneyline deal with?
A The most common stock that Moneyline dealt with was U.S. stocks, low-priced OTC securities commonly referred to as penny stocks.
Q What does the acronym OTC stand for?
A Over the counter.
THE COURT: Mr. Gallison, was this a federal conviction?
THE WITNESS: It was a state conviction, sir.
THE COURT: Were there any post release periods of supervision or probation or parole?
THE WITNESS: I had a -- there's a standard two-year parole, but I only -- my parole was cut short by the parole department. I had a one-year parole.
THE COURT: Were there any restrictions on your involvement in the securities business during that period?
THE WITNESS: No, not by the State of California.
THE COURT: Well, by anybody or any regulator?
THE WITNESS: I was restricted by the SEC of being involved in -- I believe penny stock IPO offerings.

THE COURT: For what period of time?
THE WITNESS: I believe it was a lifetime ban.
THE COURT: All right.
BY MR. STOJILKOVIC:
Q Mr. Gallison, where were Moneyline's clients based?
A Moneyline's clients were based all over the world. About 50 percent of Moneyline's customers were -- in fact, had U.S. addresses.
Q Did you get a larger percentage of your business from your U.S.-based clients or from your international clients?
A We got a larger percentage of revenues from our U.S.-based clients and/or clients internationally that dealt with U.S. stocks, primarily penny stocks.
Q When Moneyline took on a client, would that client be issued a Moneyline account number?
A Yes.
Q If a client wanted to deposit penny stocks at Moneyline, where would those stocks typically get deposited?
A Do you mean where the stocks were sent to or --
Q Sure. Would these stocks get deposited into a brokerage ultimately?

A The stocks would ultimately get deposited into a brokerage account controlled by Moneyline. It would be an omnibus brokerage account in a different name other than Moneyline.
Q Okay. And were -- these brokerage accounts, where were they located?
A They were primarily located in the United States.
Q And you indicated -- I'm sorry. Would you repeat what you said about whose name these accounts were in.
A They would be in different corporations, both foreign and domestic U.S. corporations that had brokerage and bank accounts, both foreign and U.S.-based.
Q To be clear, these stocks would not be deposited in Moneyline's own name?
A No.
Q And would they be deposited in the name of Moneyline clients?
A No.
Q You indicated these were omnibus accounts. What do you mean by omnibus?
A It means that the accounts were -- a particular customer's stock and cash were held -- would be mixed with numerous other Moneyline customers, quite often dozens and dozens of customers in the same brokerage

accounts.

Q If the brokerage itself or a regulator were to look at these brokerage accounts, would they be able to determine that the stock came from Moneyline clients?

A No.

Q Can you walk us through the steps that would need to happen if a Moneyline client wants to sell stock.

A The Moneyline client was able to enter transactions on the online websites from his accounts and/or could call in to a customer service rep and enter the order. At that point, it would be transmitted or picked up by the trading department of Moneyline, and the trading department would execute the transaction typically in a U.S. sub-brokerage account with a U.S. broker where the -- if it was a sell, for instance, where the stock was located.

Q Once the stock is sold, how would the proceeds of that stock sale get back to your client?

A The money would be wired most commonly to a U.S. brokerage -- excuse me -- U.S. bank accounts in the same name of the brokerage accounts. And then from there, it would subsequently be wired from the U.S. bank account to a Panama bank account.

Q Where would it go from the Panama bank account?

A The most common transaction process would be that

the Panama bank account would then wire the funds to the underlying Moneyline customer who had requested a payout from his account.

Q So even if your customer was U.S. based, the money would run through Panama before going back to the customer?

A That's correct.

Q Mr. Gallison, was it by design that these stocks would not be submitted in U.S. brokerages in the name of the Moneyline client?

MR. BOOK: Objection, leading.

MR. STOJILKOVIC: I'll rephrase.

BY MR. STOJILKOVIC:

Q The setup that you described of how the stocks were deposited and how the proceeds were moved, why was it set up the way it was?

A For the privacy and confidentiality of the underlying Moneyline customer.

Q Are you familiar with the term pump-and-dump?

A Yes.

THE COURT: Before you get to that, let me just ask this question so I'm clear:

Did this arrangement differ in any material respects from a normal arrangement where stocks being held in street name by a particular brokerage company

on behalf of a client?

THE WITNESS: Yes, it did.

THE COURT: How?

THE WITNESS: That in the -- at a U.S. brokerage account in street name for a particular client, the brokerage firm had to segregate the stock in the client's name. It always put a street name that anyone -- a regulator could contact that brokerage firm, and it would be disclosed, the exact holders of the stock. By doing it in an omnibus account with a foreign-based brokerage firm, there was the degree of privacy and confidentiality that could not readily be broken by an inquiry by a government body in the U.S.

THE COURT: Thank you.

You may continue, Counsel.

MR. STOJILKOVIC: Thank you, Your Honor.

BY MR. STOJILKOVIC:

Q What does the term "pump-and-dump" mean to you?

A Well, pump-and-dump is a term that's commonly connected with low-priced penny stock transactions. It involves a -- one or more shareholders of a low-priced stock that collectively control the majority of the free trade stock acting together and arranging a promotion of the stock by paying newsletter writers, e-mail tech spammers, website owners to promote the

stock with the intent of liquidating their positions working together, liquidating their positions as volume -- buying volume from the public came to the market.

The most common characteristics of a pump-and-dump were that there was most likely false, misleading press releases, there was market manipulation before and during the promotion, and there was -- quite often the shareholders that orchestrated this pump-and-dump also controlled -- through nominee or puppet officers and directors, actually controlled the actions of the company, which was quite common because it helped control the issuance and timing of the fraudulent press releases.

Q In your experience, are pump-and-dump schemes a common problem or occurrence in the penny stock business?

A Yes, they are.

Q To your understanding, were some clients of Moneyline engaged in pump-and-dump schemes?

A Yes.

Q To your understanding, was it beneficial for such clients to have the anonymity and confidentiality the Moneyline structure provided?

A Yes.

Q Why was it beneficial?
A Because, as stated earlier and discussed with the judge, the privacy and confidentiality of the clients of this layer of having the transactions come out of an omnibus-based account gave protection to the customers when such things as an SEC inquiry would happen at the U.S.-based brokerage firm.
Q Did Moneyline -- to your knowledge, did Moneyline have any stock promoters among its clients?
A Yes.
Q Could other Moneyline clients direct some of their stock to the promoters?
MR. BOOK: Objection, leading.
THE COURT: I'll let him answer.
A Yes.
Q Would it be possible for Moneyline clients to divvy up stock between their accounts?
A Yes. Moneyline --
MR. BOOK: Your Honor, I'll object. He's asking hypothetical questions, possibilities. He hasn't been designated as an expert.
THE COURT: All right. Why don't you ask it as a factual question.
MR. STOJILKOVIC: I would, Your Honor. I would just note for the record it's his business.

THE COURT: I understand.

MR. STOJILKOVIC: I don't think he needs to be designated.

BY MR. STOJILKOVIC:

Q To your knowledge, did any Moneyline clients divvy stock up between their accounts and move it from one account to another?

A Yes. This was a common occurrence at Moneyline. Moneyline charged a small, typical $20, $25 fee for customers to transfer stock and cash between accounts with other customers of Moneyline.

Q To your knowledge and recollection, did clients ever notify Moneyline in advance of a major promotion and sale of stock?

A Yes.

Q Why did clients provide such advanced notice?

A The clients of Moneyline that were involved with coordinating the promotions quite often outlaid significant cash and stock for these promotions, and they would want to make sure and doubly sure that there would be no problems; when the promotion started, that everyone would be on desk at Moneyline; that the stock had cleared at the underlying omnibus account of Moneyline; and there would be no problems with selling their positions once the volume from the expected

promotion started to be realized in the marketplace.

Q Did Moneyline charge more in commissions than typically U.S.-based brokerages?

A Well, Moneyline would charge to the customer what it costs them to transact at the U.S. brokerage, plus anywhere from 2 to 5 percent additional on top of that.

Q So just to clarify, they have to pay Moneyline's fee, plus the fees Moneyline was paying to the U.S.-based brokerage?

A That's correct. They might pay 2 to 3 percent in fees to the U.S. brokerage house and then charge typically a like amount, 2 to 3 percent additional, to the customers so that Moneyline earned fees on the transaction.

Q I want to turn to some other individuals associated with Moneyline. You had -- I believe you had mentioned Michael Randles. What was his role?

A Michael's role was to handle all the logistics of hiring and maintaining a staff in Costa Rica, including customer service personnel, IT personnel, software developers, often general office staff, and also to open up the bank and brokerage accounts that were needed -- the omnibus accounts that were needed by Moneyline to transact business for their customers.

Q When you talk about Mr. Randles' role in opening

bank or brokerage accounts, where generally were those accounts based?

A Well, they were -- the brokerage accounts were established worldwide with quite a number in the United States. The bank accounts that he established were mainly outside of the United States.

Q Where was Mr. Randles based?

A In Costa Rica.

Q Who principally ran Moneyline while you were in prison on that prior conviction?

A Mr. Randles.

Q Did Mr. Randles continue to participate in Moneyline after you got out of prison?

A Yes.

Q Are you familiar with a person by the name of Robin Rushing, last name R-U-S-H-I-N-G?

A Yes.

Q What role, if any, did she have at Moneyline?

A Robin was hired at the beginning of 2003, and she oversaw and ran the trading and back office departments of Moneyline from this point to 2010.

Q Where was she based while she did this?

A Spokane.

Q Is that in the State of Washington?

A Spokane, Washington. She would travel back and

forth to Costa Rica as well, but primarily her time was spent working out of Spokane.

Q To your knowledge, what caused Ms. Rushing to leave Moneyline?

A Around 2009, she developed mental and physical health issues she had had previously, but as she was getting older, they were getting worse. At a certain point in late 2010, early 2011, after previously taking various lengths of medical leave of absence, she basically had to retire from the business.

Q Are you familiar with a David Rushing?

A Yes.

Q What was his role?

A He was -- worked as a back office rep and assisted Robin with trading and with handling customer phone calls in the -- in Spokane.

Q What was his relationship to Robin?

A He was Robin's brother.

Q Okay. And is he still working at Moneyline?

A No.

Q Why is that?

A Somewhere in the 2009-2010 time frame, he had a very serious stroke.

Q Are you familiar with a person by the name of Ann Hiskey?

A Yes.
Q What role, if any, did she have to Moneyline?
A She was a customer service rep.
Q And about when did she start at Moneyline?
A I believe sometime in 2007.
Q Okay. To your knowledge, did Ms. Hiskey assume any of the clients or responsibilities previously handled by the Rushings?
A Yes. She would help on the phones and would help with overflow calls and would talk to certain of Robin's customers. And when Robin had medical leaves, absences, she would take them over. Then at a certain point, it progressed -- Robin's condition deteriorated, and Robin could not work anymore. At that point, Anna inherited all of Robin's previous customers.
Q Are you familiar with someone by the name of Roger Coleman?
A Yes.
Q What role, if any, did he have at Moneyline?
A Roger had a business in Nevada, Las Vegas, of forming Nevada corporations for people desiring a corporation and then being their resident agent and being paid yearly to keep up their filings on the companies. He was hired in 2008 to open up a few Nevada corporations, domestic corporations for

Moneyline.
Q Okay. And did he do anything in addition to opening up these domestic corporations?
A Yes. Sometime shortly thereafter he opened up bank and brokerage accounts for these Nevada corporations.
Q Are you familiar with a person by the name of Bart Williams?
A Yes.
Q Who is that?
A That is myself.
Q That's not your real name, though?
A No, it's not.
Q How is that name relevant to Moneyline?
A Well, for lack of saying it better, it was a stage name that I used, that everyone referred me to, which masked my true identity of who I really was.
Q Why did you attempt to mask your true identity in the course of running Moneyline?
A It was perceived and generally agreed upon that certain customers might not want to do business with Moneyline if they knew my involvement and/or who I was. So it was deemed as a possible negative to the business operation.
Q You said a moment ago that Moneyline had accounts,

bank and brokerage accounts in the United States in the names of corporations. Do you recall some of the commonly used corporate names on these accounts?
A Yes. There was Jurojin, Inc.; Vanilla Sky of Nevada; Bastille Advisors. Those are three of the common ones.
Q All right. Jurojin, Inc., is that J-U-R-O-J-I-N?
A That's correct.
Q All right. Vanilla Sky, is that just how it sounds?
A That's correct.
Q Bastille Advisors, is the first word B-A-S-T-I-L-L-E?
A That's correct.

THE COURT: Are these purported to be brokerage companies? Is that correct?

THE WITNESS: I'm sorry?

THE COURT: Are these purported to be brokerage companies?

THE WITNESS: These were Nevada corporations that were formed to be used to open up brokerage and bank accounts in the U.S. under the family of Moneyline accounts.

THE COURT: All right.

BY MR. STOJILKOVIC:

Q Why were the corporations on these bank and brokerage accounts -- why were they U.S. corporations, Nevada corporations? Why did you choose that?

A Well, in early 2009, FINRA put out a bulletin to the industry on a talk discussing the problem of -- with OTC penny stocks, and it was a red flag bulletin. And it listed about a dozen red flags that compliance officers should be looking at in regards to the business that they were doing with low-priced stocks. And one of the red flags was --

MR. BOOK: Objection, hearsay, Your Honor.

THE COURT: I'll hear this.

Go ahead. Please continue.

A One of the red flags was the use of foreign corporation accounts that had activity in transacting, selling large amounts of low-priced penny stocks.

Q Generally speaking, who was the incorporator of these corporations?

A Roger.

Q Mr. Coleman?

A Roger Coleman.

Q And generally speaking, who would be listed as officers or directors of these companies?

A Roger Coleman.

Q To your knowledge, were other individuals

associated with Moneyline ever also listed as officers or directors?
A Yes, to a lesser degree.
Q Okay. And generally speaking, who would be the signatory on these brokerage and bank accounts?
A Roger Coleman.
Q And again, to your knowledge, were other Moneyline individuals also occasionally signatories?
A Yes.
Q In order to open one of these brokerage accounts, do you know whether the customer has to disclose all of the beneficial owners?
A Yes, they do.
Q Okay. To your knowledge, did Coleman or anyone else opening these accounts ever disclose either Moneyline or the identity of the Moneyline clients as the beneficial owners?
A No.
Q Why not?
A Because it would have interfered -- well, first of all, the brokerage or bank account most likely would not have opened the accounts. Second of all, the whole concept was that -- or important concept to the operation was maintaining the privacy and confidentiality of the customers.

Q Who, if anyone, told Coleman not to disclose the true beneficial owners?
A I did, among others.
Q And in opening these accounts, to your knowledge, does the customer have to indicate the type of business the corporation is involved in?
A Yes. It's a standard bank or brokerage new account question.
Q And to your knowledge, was the true business of these corporations disclosed?
A No.
Q How do you know that?
A I've seen numerous bank and brokerage new account forms.
Q And who, if anyone -- I'm sorry.
A Back when they were being opened, I would always get a -- I would typically get a copy of the bank or brokerage new account form sent to me via e-mail.
Q Okay. Did these forms generally also request information on either annual income or net worth or the like?
A Yes.
Q Again, based on what you know, was the correct information disclosed?
A No.

Q Why wasn't the correct information disclosed?
A Well, these accounts were, in fact, really omnibus accounts being held for other customers. So even if they were generating lots of stock sales and had lots of net worth equity in the account, it really wasn't -- for example, Bastille Advisors, it really wasn't Bastille Advisors' cash and stock. Okay. So the assets and the income that were put on the new account forms were generally really put there just in high enough levels so that the accounts would be limited as little as possible as to what type of transactions the account -- the underlying account could do.
Q Once these brokerage accounts were opened, how would stocks be deposited into them?
A Typically, the stocks would be sent to whoever was the -- if it was a U.S. stock, whoever was the U.S. certificate processing agent at that time, and then they would be forwarded on to the transfer agent and put in the name of the underlying depository omnibus account's name, sent back to the certificate processing agent, and then forwarded on to the brokerage firm for deposit in that omnibus account but with the appropriate paperwork of stock power and corporate resolution.
Q So is it your testimony that the -- for a Bastille

Advisors' account, would the stock actually have to be in Bastille Advisors' name in order to be deposited?
A Yes, it would.
Q How would the stock of a Moneyline client end up in the name of Bastille Advisors?
A The certificate processing agent would do it, or quite often the customer would have the stock delivered to Moneyline already in the name of Bastille Advisors.
Q How would any of your clients know to put their stock in the name of something called Bastille Advisors?
A They would discuss this with the customer service rep.
Q Mr. Gallison, are you familiar with something called Everock, Incorporated?
A Yes.
Q To your knowledge, was stock of Everock, Incorporated, ever sold through Moneyline?
A Yes.
Q To your knowledge, did one Moneyline client have positions in Everock stock or did multiple Moneyline clients have positions in Everock stock?
A Multiple customers had positions in Everock.
Q To your knowledge, were any of those customers stock promoters?

A Yes.

Q To your knowledge, did any of the clients who held Everock stock notify Moneyline in advance of a cycle of promotions or stock sales?

A Yes.

Q Did Moneyline sell any Everock stock?

A Yes.

Q And did it do so pursuant to instructions from its clients?

A Yes.

Q Did Moneyline sell a small amount of Everock stock or a large amount?

A A large amount. Moneyline sold in excess of 200,000,000 shares of Everock stock.

Q And what did Moneyline ultimately do with the proceeds of those stock sales?

A The proceeds of approximately $2.5 million -- Moneyline would, in the normal course of business, eventually wire out those proceeds to the customers that it sold the stock through their Moneyline brokerage accounts.

Q Mr. Gallison, with the assistance of the court security officer, I would like you to take a look at what's been marked for identification as Government's 4-1.

A Okay.
Q Are you familiar with this document?
A Yes.
Q What is it?
A It is a letter from Roger Coleman on behalf of Bastille Advisors providing some backup new account documentation to Albert Fried & Company -- I call them AFC for short -- as part of the process of opening up a new account with Albert -- with AFC.
Q What was AFC?
A AFC was a stock brokerage in New York that accepted penny stock deposits.
Q And who, if anyone, asked Mr. Coleman to do this?
A He was instructed by Moneyline, and most likely, he was instructed by myself to open up the account.

MR. STOJILKOVIC: Your Honor, I'd move to admit Government 4-1. I'll note it's covered by Item 11 in the stipulation we filed last week.

THE COURT: All right. Any objection?

MR. BOOK: No, Your Honor.

THE COURT: Without objection, Government Exhibit 4-1 is admitted.

MR. STOJILKOVIC: May we publish it, Your Honor?

THE COURT: Yes.

BY MR. STOJILKOVIC:

Q What is the date of the letter, sir?

A It's December 3, 2009.

Q And looking at the remaining pages of the document, generally speaking, what is in those pages?

A These pages are snapshots of the Nevada Secretary of State website showing all the corporate information for Bastille Advisors that has been filed with the Nevada Secretary of State and that they also then show on their websites.

Q To your understanding, is this part of the information that's required to submit to the brokerage in order for a corporate account to be opened?

A Yes.

Q You can put that down. Thank you.

Please take a look at what what's been marked for identification as Government Exhibit 4-2. Do you recognize this document, sir?

A Yes.

Q What is it?

A This is the New Account Application for Bastille Advisors to open an account with AFC.

MR. STOJILKOVIC: Well, Your Honor, I'll move in 4-2 as well covered by the same stipulation.

THE COURT: All right. Any objection?

MR. BOOK: No objection.
THE COURT: Without objection, Exhibit 4-2 is admitted.
BY MR. STOJILKOVIC:
Q First, directing your attention to the top right-hand corner of the page, do you see the field there for account number?
A Yes.
Q What is that account number?
A 02000032.
Q Okay. Can you tell us, sir, based on this document whether this account was, in fact, opened?
A Yes. Brokerage firms typically only issue an account number after approving the account and opening the account.
Q Let's focus on the information in the middle of the page starting with the name of the primary account holder.
MR. STOJILKOVIC: Can you blow that up a little bit.
BY MR. STOJILKOVIC:
Q What is the name identified there for the primary account holder, sir?
A Bastille Advisors, Inc.
Q And do you see a few fields below there an address

associated with Bastille Advisors?
A Yes.
Q And that's an address in Las Vegas, Nevada?
A Yes.
Q Are you familiar with that street address, sir?
A Yes. That's -- Roger Coleman owned a condo at that address for a number of years.
Q If you could turn to the second page, sir, I'll direct your attention to the table at the top of page 2.
MR. STOJILKOVIC: Please blow that up.
BY MR. STOJILKOVIC:
Q Do you see information there about annual income?
A Yes.
Q Is that information true?
A No.
Q Again, why was this information checked?
A It was checked to meet the minimum standards for as little restrictions on the account as possible in terms of what type of stocks that they could transact in.
Q Can you turn, sir, to the next page, page 3. I'm going to direct your attention -- that page is the beginning of something called Customer Cash Account, Margin and Short Account Agreement. Do you see that,

sir?
A Yes.
Q I actually want to direct your attention several pages into this agreement. It has a series of numbered points, and if I could direct your attention to Point No. 17.
A Okay.
MR. STOJILKOVIC: Can we blow up Point No. 17.
BY MR. STOJILKOVIC:
Q Sir, can you read out loud the last sentence of that point?
A "The undersigned further represents that no one except the undersigned has an interest in the account or accounts of the undersigned with AF&Co."
Q And turning to the next page, sir, who are the undersigned on this account?
A Roger Coleman, Sr., is the primary account holder, and Robin Rushing is an authorized person, a signer on the account.
Q And again, sir, were these -- did individuals besides these two people have beneficial interest in these stocks?
A Yes.
Q Now, who were the true beneficial owners of the

stock that was deposited into this account?
A Various Moneyline customers, one or more. You can't tell by simply looking at this document.
Q You can put that document down, sir.
Can you please take a look at what's been marked for identification as Government Exhibit 4-3.
A Okay.
Q Are you familiar with this type of document?
A Yes.
Q What is it?
A It's instructions from Roger Coleman on behalf of Bastille from June 2010 requesting that the transfer agent for Everock transfer electronically -- it's called DWAC -- it came from a transfer agent to a brokerage firm -- to transfer electronically from the transfer agent 45,000,000 shares of Everock to Bastille's account with AFC. Actually, it was directions to AFC to match and compare this transaction so that they could receive the stock of the 45,000,000 Everock had deposited in Bastille's account at AFC.
MR. STOJILKOVIC: Thank you.
Your Honor, I move the admission of Government 4-3 covered by the same stipulation.
THE COURT: Any objection?
MR. BOOK: No objection.

THE COURT: Without objection, Government Exhibit 4-3 is admitted.

MR. STOJILKOVIC: Can we put that up and just highlight starting with the account number down.

BY MR. STOJILKOVIC:

Q Mr. Coleman [sic], is this the same account number as we saw in the account opening documents in 4-1 and 4-2?

A Yes.

Q And what is the amount of Everock shares that are requested to be deposited here?

A Forty-five45,000,000.

Q And for the record, can you explain, again, what DWAC signifies?

A It is a mechanism to transfer electronically stock that most likely was previously in physical certificate form directly from the transfer agent to the brokerage firm, a process that -- like a wire transfer basically happens instantaneous, the advantages being that if the physical stock certificate was sent from the transfer agent to the brokerage firm, it could take two to three weeks before the stock was cleared for sale. But in this type of a DWAC transaction, the stock would be available for sale immediately upon receipt by the brokerage firm, which would typically take 24 hours.

Q Mr. Gallison, how did Roger Coleman and Moneyline come to be in essentially control of 45,000,000 shares of Everock?

A A Moneyline customer would have had to initiate this transaction from the transfer agent's side and inform a Moneyline customer rep that the stock was at the transfer agent available for a DWAC pickup. And then the customer service rep would notify Roger, and Roger would ask the counterparty on the transaction, in this case the brokerage firm, to match up the transaction. There was a posting, a mechanism on a special website.

THE COURT REPORTER: I'm sorry?

BY MR. STOJILKOVIC:

Q Can you just repeat what you were saying.

A The brokerage firm and transfer agent would use special websites as part of the depository trust corporation that was specific for DWACs, and the transfer agent would post the transaction for the benefit of Bastille Advisors on the website. And then the brokerage firm only had to go in and match it, basically hit the accept button, and the stock would be electronically transferred to the brokerage firm. Then the brokerage firm would credit the Bastille account.

I'm sorry, I can't quite exactly remember what I

said. So I'm trying to just explain as best as I can.

THE COURT: So am I correct that under this arrangement, the stock does not actually pass through the Bastille Advisors' account; it goes directly from Moneyline acting through the Moneyline rep to the transfer agent; the stock is put in the name of Bastille Advisors and then passed on to, in this case, AFC at the direction of Bastille?

THE WITNESS: That's correct.

THE COURT: All right.

THE WITNESS: Yes.

BY MR. STOJILKOVIC:

Q You can put that document down, sir.

Please take a look at what's been marked for identification as Government Exhibit 4-4. Do you recognize this document?

A Yes.

Q What is it?

A It is a DWAC request similar to the previous exhibit. This one is dated June 29 apparently for an additional 45,000,000-share Everock DWAC pickup.

Q Again, does this relate to Everock stock?

A Yes, it does.

MR. STOJILKOVIC: I move in 4-4, Your Honor.

THE COURT: Any objection?

MR. BOOK: No, Your Honor.

THE COURT: Without objection, 4-4 is admitted.

BY MR. STOJILKOVIC:

Q Now, Mr. Gallison, these shares of Everock that we're seeing deposited in this AFC account, were those shares ever liquidated?

A Yes. Well, first, once the stock was verified by Moneyline that it had been received into one of their omnibus depository accounts -- in this case, Everock at AFC -- it would then be credited to the customer's Moneyline account. It would be credited on the servers in Costa Rica and Panama, and the customer could log into their account and see the stock credited to their account. And at that point, they were able to -- if they desire, to enter sellers and liquidate the stock.

MR. STOJILKOVIC: Okay. We can put that exhibit down. You can have that exhibit back.

BY MR. STOJILKOVIC:

Q Let me ask you this way: When stocks were liquidated from this AFC brokerage account, where would those proceeds go first?

A They would go to a bank account in Bastille's name, in this case in Las Vegas, Nevada.

Q Why was the bank account also in Bastille

Advisors' name?

A Well, brokerages -- U.S. brokerages typically would only wire funds from a customer's account to an identical named bank account in the customer's name identical to the brokerage accounts.

Q Mr. Gallison, I'm going to ask you to take a look at a series of exhibits. Please take a look at what's been marked for identification as Government Exhibits 4-18 through 4-24. Take a moment to look at them.

THE COURT: Is there going to be any objection to these?

MR. BOOK: No, Your Honor.

THE COURT: All right. Without objection, Exhibits 4-18 through 4-24 are admitted.

MR. STOJILKOVIC: Thank you, Your Honor.

THE WITNESS: Okay.

BY MR. STOJILKOVIC:

Q Mr. Gallison, generally speaking, what are 4-18 through 4-24?

A They're wire requests from Bastille Advisors to AFC to wire proceeds from Bastille's brokerage account with AFC to Bastille's bank account with JPMorgan Chase in Las Vegas.

Q All right. And just looking from 4-18 through 4-24, what's the date range of these wire requests?

A It's August 5 to September 20, 2010.

Q And can you just quickly tell us the amounts of each of these wire requests?

A Okay. The August 5 one is 62,500. August --

MR. BOOK: Your Honor, the documents speak for themselves.

THE COURT: You can put on the record what they are.

MR. BOOK: Thank you.

MR. STOJILKOVIC: I'm sorry, Your Honor. Did you sustain it?

THE COURT: No. He may put on the record the amounts.

BY MR. STOJILKOVIC:

Q Please continue.

A August 12 for 87,000 -- these are all 2010 -- August 23 for 80,000; August 31 for 50,000; September 7 for 92,000; September 14 for 149,000; September 20 for 105,000.

Q Now, are these fairly typical wire request amounts for your brokerage accounts?

A Yes.

Q And was this AFC brokerage account an omnibus account as you described it?

A Yes.

Q Looking at these wire instructions, can you tell whether these proceeds are ultimately intended for a single customer or multiple customers?

A No, you can't tell the customers or the stocks involved either.

Q That's my next question. Just looking at this, can you tell whether or not these are, say, Everock proceeds?

A No.

Q Okay. What kinds of additional records would you have to consult to determine what stock proceeds are being moved here?

A You would have to look at the -- typically the account statements of Bastille's account with AFC in this case.

Q And what kinds of records would you have to determine to figure out which Moneyline clients corresponded to the stock that was being sold?

A You would have to access the back office of Moneyline and review the customer accounts to see which customers had sold Everock stock in this case or which customers had sold the stock that caused the stock to be sold in the omnibus account at AFC.

Q And to clarify here, when you're talking about which customers that sold the stock, are the customers

themselves actually selling stock?
A Customers are selling the stock on the online foreign-based platform, but the --
Q Where is the stock?
A Excuse me?
Q Where is the stock itself?
A The stock itself is -- in these cases is -- in this case is in an omnibus account at AFC.
Q So the actual -- is it fair to say that the actual sale of the stock comes from the brokerage account at the instruction of someone like Roger Coleman or somebody?
A That's correct. There's --
Q But then to make sure or to clarify, would Moneyline keep a ledger linking those stocks up to particular clients?
A That's correct. Typically, what would happen was the customer would enter an order. The order would be processed. And if the stock was held at AFC, it would be sold at AFC. After the transaction had been verified as being done at AFC, the transaction would be posted to the customer's Moneyline account. So there was a cause-and-effect process of the customer initiating the order and then the order getting executed in the omnibus account in the U.S. and then

shortly thereafter being posted to the customer's Moneyline brokerage account.

THE COURT: Just so I'm clear, Mr. Gallison, the sell order comes most immediately from -- in this instance, from Bastille to AFC; is that correct?

THE WITNESS: That's correct. The Moneyline customer never had any communication with --

THE COURT: So if I'm a Moneyline customer thinking I hold Everock stock and I look at my statement and my Moneyline statement shows I have 45,000,000 shares of Everock stock and I want to sell that, who do I talk to? My Moneyline rep?

THE WITNESS: You could talk to your rep, but it was very common. You could enter your order right online. The platform was very broad, and you -- just like in an etrade or a mirror trade, you'd simply -- you could see the stock line in your account, and you could enter an order or a series of orders at different prices.

THE COURT: That would trigger a sell order by Bastille?

THE WITNESS: That's correct.

THE COURT: All right.

BY MR. STOJILKOVIC:

Q And, Mr. Gallison, once these wires reach -- go

from the AFC Bastille account to the bank account at JPMorgan Chase, typically where would they go next?
A Typically, the majority of the proceeds would then be wired to different named Panama bank accounts.
Q And typically, where would they go from that Panama bank account?
A From there it would be typically wired to an account in Panama that was being specifically used to pay out Moneyline customers. So it would typically then be wired to the Moneyline customer wherever they did their banking.
Q You can put those documents down, sir.
MR. BOOK: Your Honor, I wonder if I could request a short break.
THE COURT: All right. Let's take a 15-minute break. We'll go until 1:30, and then we'll break for lunch.
MR. BOOK: Thank you, Your Honor.
THE COURT: All right. We'll stand in recess.
Mr. Gallison, do not discuss your testimony during the break.
THE WITNESS: Yes, Your Honor.
(Recess from 12:32 p.m. until 12:45 p.m.)
THE COURT: Mr. Stojilkovic.

Mr. Gallison, you remain under oath.

THE WITNESS: Yes, sir.

BY MR. STOJILKOVIC:

Q Please take a look at what's been marked for identification as Government Exhibit 9-1. Do you recognize this document, sir?

A Yes.

Q Very briefly, what is it?

A It's a completed New Account Application for a brokerage firm by Bastille Advisors.

MR. STOJILKOVIC: Your Honor, I move in 9-1.

THE COURT: Any objection?

MR. BOOK: No objection.

THE COURT: Without objection, Exhibit 9-1 is admitted.

MR. STOJILKOVIC: Can you put up the first page, please.

BY MR. STOJILKOVIC:

Q Just focusing your attention to the top, what is the account number that's filled in there?

A I believe it's 51Y-187076.

Q And can you tell by looking at this document whether this account was opened?

A Yes.

Q Why is that?

A Because it's been issued a new account number.

MR. STOJILKOVIC: Turning to page 2, will you highlight or blow up the top half of the page.

BY MR. STOJILKOVIC:

Q Who does it indicate as the name on the account?

A Bastille Advisors.

Q Does this have that same Las Vegas, Nevada, address that we saw in the prior account opening?

A That's correct.

THE COURT: With which institution is this account?

MR. STOJILKOVIC: I'll clarify that with the next exhibit, Your Honor.

THE COURT: All right.

MR. STOJILKOVIC: It's not clear on the face of this one.

THE COURT: All right.

BY MR. STOJILKOVIC:

Q Do you see there an indication for occupation about a third of the way down in the middle?

A Yes.

Q What does it indicate there?

A Business consultant.

Q To your knowledge, was Bastille Advisors a business consulting corporation?

A No.
Q Why is this information supplied here?
A It's a standard vague answer that was used numerous times in the opening of omnibus accounts.
Q And did you provide the instruction to do that at times?
A Yes, most likely.
Q You can put this document down.
Let's look at 9-4. Do you recognize this document?
A Yes.
Q What is it?
A It's a Cash Account Agreement. It's part of any standard brokerage account. You have the New Account Applications with the customer information, and then you have certain disclosures and agreements that the customer makes in the Cash Account Agreement. Even banks have this as well, banks and brokerage accounts.

MR. STOJILKOVIC: I move in 9-4, Your Honor.

THE COURT: Any objection?

MR. BOOK: No objection.

THE COURT: Without objection, Government Exhibit 9-4 is admitted.

MR. STOJILKOVIC: Can we put up page 1 and just call out the top information, essentially the very

top information about the company and the account number. All right.

BY MR. STOJILKOVIC:

Q So first of all, is this the same account number that we saw in the prior document, 9-1?

A Yes.

Q Does this indicate the company -- I'm sorry -- the brokerage company?

A Yes. It indicates the brokerage company being R.M. Stark & Company.

Q Now, sir, can you please take a look at the second page of this document. I'll call your attention to Item No. 16.

MR. STOJILKOVIC: Can we call that out, please.

BY MR. STOJILKOVIC:

Q Can you read off, if you can see it clearly, the last sentence of Item 16.

A Yes. "The Customer also represents that no one except the Customer has an interest in the Account or Accounts of the Customer with you."

Q And was that true for this brokerage account?

A No.

Q You can put this document down, sir.

I will ask you to, please, take a look at what's

been marked for identification as Government 12-2. Do you recognize 12-2, Mr. Gallison?

A Yes.

Q What is that?

A It's a brokerage account statement for the month of August 2009, a Bastille Advisors' account held at R.M. Stark & Company.

MR. STOJILKOVIC: Your Honor, I'd move in 12-2.

THE COURT: Any objection?

MR. BOOK: No objection.

THE COURT: Without objection, Exhibit 12-2 is admitted.

MR. STOJILKOVIC: Can we focus on the first page, please.

BY MR. STOJILKOVIC:

Q First of all, Mr. Gallison, is this the same account number that we saw in the opening documents in Government Exhibits 9-1 and 9-4?

A Yes.

Q All right. And if I ask you to take a look on that first page, what does it say there under your investment consultant?

A Stacey Stark. Also, the account was closed on August 20, 2009.

Q Were brokerage account closings a common problem for Moneyline?

A Yes. They're a common occurrence for Moneyline and account holders in low-priced OTC stocks overall.

Q In general terms, why did some brokerage accounts like this get closed?

A Especially in 2009. During the whole period of like 2000 to 2015, there's been continual changes in the rules and regulations of the OTC stock market or the penny stock markets. And brokerage firms -- it was not uncommon at all for brokerage firms to change their policies of not allowing stocks under $1 a share or $5 a share or Pink Sheet stocks, just overnight changing their -- the type of stocks they accept a deposit on. And this is specifically when we're talking about the low-priced stocks. We're not talking about -- the listed stocks there was never a problem with.

So there's numerous reasons that could cause an account to get closed because of activity in low-priced stocks, but one of the most common one was that the compliance department had changed their policies on how they accepted OTC stock deposits.

Q I would like to direct your attention to the page ending in Bates No. 046.

A You say 046?

Q That's correct.

A Okay.

Q According to the information on that page, can you tell whether Everock stock was deposited into this account?

A Yes. On August 20, the account received 70,000,000 shares of Everock. It indicates that it was a DWAC transfer, an incoming DWAC from a transfer agent.

Q I'd like to call your attention to the previous page ending in Bates 045. Looking at the information on that page, can you identify Everock's share price at the time of this deposit?

A It shows it was marked for the statement purposes ending at the end of August at two-and-a-half cents.

Q And was the date that the Everock stock was deposited the same date as the date that this account was closed?

A Yes.

Q What did you try to do when an account such as this gets closed with stock already being in it?

A Well, it would be standard procedure to transfer the securities to another existing brokerage account and/or open up additional brokerage accounts to replace the account that had been closed.

Q You can hand this document back, sir.

Please take a look at what's been marked for identification as Government Exhibit 12-11.

A Okay.

Q Are you familiar with this document?

A Yes.

Q In general, what is it?

A It's a New Account Application for an account at Track Data Securities for Bastille Advisors.

MR. STOJILKOVIC: Your Honor, I'd move in 12-11.

THE COURT: Any objection?

MR. BOOK: No objection.

THE COURT: Without objection, 12-11 is admitted.

MR. STOJILKOVIC: Can you put up the first page, please.

THE COURT: Yes.

BY MR. STOJILKOVIC:

Q First of all, sir, do you know -- this document, was this -- I see that it indicates New Account Application. Do you know whether this account was, in fact, a new account or was this some other kind of document submission?

A Well, all you can tell by -- I can't determine

whether it was a new account or an update on an existing account by looking at this information.
Q I see. Let's go through it, and then I'll get back to that. What's the account number? Can you read that off to me? In particular, I would ask you to focus on the Penson account number.
A Penson Account No. 32490641.
Q What is the entity that this account is in the name of?
A Bastille Advisors.
Q Does it have that same Las Vegas address?
A Yes, it does.
Q Directing your attention to the bottom part of page 1, who signs there on behalf of the applicant?
A Roger Coleman. That's Roger Coleman's signature.
Q What's the date?
A August 21.
Q Is that in 2009?
A Of 2009, yes.
Q Is this one day after the R.M. Stark account we saw was closed down?
A Yes.
Q Okay. If I could ask you to turn to the page of this document ending in Bates 008. What do we see there?

A It's a corporate resolution signed by Roger Coleman. Typically, the standard corporate resolution indicates who -- what officers and directors are allowed to conduct business on behalf of Bastille with the brokerage firm or bank.
MR. STOJILKOVIC: Can we call out the top part of text on the page.
BY MR. STOJILKOVIC:
Q Sir, in the middle of that first paragraph, can you just read out loud what the undersigned represents regarding other people having an interest in the account?
A "The undersigned represents that no one other than the undersigned has any interest in such account."
Q Sir, as to this account, was this a true statement?
A No.
Q You can put that document down, sir.
MR. STOJILKOVIC: And I apologize to the court security officer. This is not one I had prepared you for.
BY MR. STOJILKOVIC:
Q But can we take a look at 12-1.
A Okay.
Q Are you familiar with 12-1?

A Yes.

Q Briefly, what is it?

A It is a brokerage statement for the month of December 2008, the brokerage being Track Data Securities and the account holder being Bastille Advisors.

Q Okay. And is this the account number that we saw as the Penson account number on the account opening Government 12-11?

A Yes.

MR. STOJILKOVIC: Your Honor, I'd move in 12-1.

THE COURT: Any objection?

MR. BOOK: No objection.

THE COURT: Without objection, Government's Exhibit 12-1 is admitted.

BY MR. STOJILKOVIC:

Q Sir, directing your attention to the first page, what did you say the statement date was for this statement?

A December 31, 2008.

Q Okay. So is that the year prior to the application materials we saw in 12-11?

A That's correct.

Q So does this -- now, after seeing this document in

conjunction with 12-11, are you able to testify why a New Account Application would have been submitted as in 12-11 in August 2009 on this account?

A It's -- by far the most common occurrence is a -- that Track Data requested a document refresh, a KYC, know your customer refresh to make sure that all the information in this 2009 -- August 2009, that all the information was current. And they might have had additional forms they didn't have back in 2008 as well. There's numerous reasons. It all has to do with having the most current disclosure statements, cash agreements, and such being signed and on file in the customer account.

Q And in the statement that precedes that document refresh that is Government Exhibit 12-1, what's in this account as of the end of 2008?

A Cash only, $8,000.18.

Q You can put that document down, sir.

I would ask you to take a look at what's been marked for identification as Government 12-3. Do you recognize that document?

A Yes.

Q What is it?

A It is a Track Data Securities account statement for the period ending September 2009 for customer

Bastille Advisors.

MR. STOJILKOVIC: I move in 12-3, Your Honor.

THE COURT: Any objection?

MR. BOOK: No objection.

THE COURT: Without objection, Government's Exhibit 12-3 is admitted.

BY MR. STOJILKOVIC:

Q Is this for the same account that we saw in 12-1 and 12-11?

A Yes.

Q And what is the prior value, that is the value in this account prior to September '09?

A $8,000.18.

Q So is that basically the same amount of cash that had been in the account since the prior year?

A It's the exact amount on the December 2008 statement.

Q All right. And were any stocks deposited into this account in September '09?

A Yes.

Q Now, let's look specifically at page ending in Bates 228.

A Okay.

Q Calling your attention to that page, can you indicate whether any Everock stock was deposited into

this account?

A Yes. On the 10th of September, 70,000,000 Everock was received in the account. It shows as being an account transfer, what's commonly known as an ACAT transfer.

Q Is this the 70,000,000 Everock shares that had previously been in the R.M. Stark account that was closed?

A It would appear so, yes.

Q Now, looking at this document, can you tell how much, if any, of the Everock stock was sold during this month period?

A Yes.

Q Where would you look to figure that out?

A Well, without doing the individual hand calculations of looking at each transaction in the account, Bates No. 227 shows an ending position at the end of September of 64,587,500 shares. From that, it can be concluded that just a shade over 5,400,000 shares was sold. If you want to be exact, 5,412,500 shares were sold from the time the stock was booked in on September 10 until the end of September.

Q You can put that document down, sir.

I'll ask you to take a look at one more which is marked for identification as Government 12-4. Are you

familiar with this document?

A Yes.

Q Briefly, is this the same account but just the following month's statement?

A This is Bastille's account at Track Data, and it's a monthly account statement for the period ending -- month ending October 2009.

MR. STOJILKOVIC: I move in 12-4, Your Honor.

THE COURT: Any objection?

MR. BOOK: No objection.

THE COURT: Without objection, Government's Exhibit 12-4 is admitted.

BY MR. STOJILKOVIC:

Q Looking at this document, can you determine how much Everock stock was sold during this month?

A Yes. You can, once again, go through each transaction separately, or you can sum it up by looking at the differential between the ending monthly totals. So there is 64 -- roughly, 64,500,000 shares in the account at the end of September, and there were 21,264,000 shares in the account at the end of October. So that approximately 43,000,000, 44,000,000 shares were sold during the month of October.

Q For the record, are you referring to the information on page ending in Bates 135?

A That's correct, and then Bates -- and also using the Bates 227 from the previous document that was the previous exhibit.
Q We can put that down. You can hand that document back.
What ultimately happened with the proceeds of these stock sales of Everock in general?
A In general, it was -- the proceeds in that account would have been wired -- were wired to the Bastille Chase account in Las Vegas. In fact, in that document, it shows at the end of the month -- I believe October 28 -- there was a $185,000 wire wired out of the account. That would have gone to the JPMorgan account, the Bastille account in Las Vegas.
Q Where would the money go after reaching the Bastille account at JPMorgan?
A From there, a majority, if not all of it, would be wired down to a bank account in Panama for further disbursement to Moneyline customers.
Q All right, sir. I would like you now to -- I would like to turn to a different category of documents. Could you, please, look at what's been marked for identification as Government 2-1.
A Okay.
Q Are you familiar with this document, sir?

A Yes.
Q Briefly stated, what is it?
A Well, it's a snapshot from the Moneyline back office showing detail on the journal transaction.
Q Does this detail relate to Everock stock?
A Yes. It's showing a stock journal of 17,855,000 shares of Everock.
Q And this document we're looking at, is this an internal Moneyline record?
A That's correct.
MR. STOJILKOVIC: Your Honor, this is one of the documents -- I'll have several -- that I'm going to offer provisionally. We'll tie up the chain of custody at the close of our evidence.
THE COURT: Is there an objection to this?
MR. BOOK: There's no objection, Your Honor.
THE COURT: All right. I'll admit it in subject to your completing the foundation.
MR. STOJILKOVIC: Can we put it up, please.
BY MR. STOJILKOVIC:
Q Now, Mr. Gallison, does this -- first of all, can you say, again, what type of transaction is being described here.
A In this detailed journal, it is showing that -- it is crediting a Moneyline brokerage account in the name

of Digital Edge Marketing 17,855,000 shares of Everock stock.

Q Okay. So let me clarify. What's the name associated with the customer account here?

A Digital Edge Marketing.

Q Is there an account number associated with that customer account?

A Yeah. It's MLB001765. We typically simply call it MLB1765.

Q And what is happening? What does this journal reflect is happening with this quantity of Everock stock?

A Well, what it's detailing is that stock has been received at Money Track, which is the website name for Track Data Securities, on or about April 6, 2009, via a DWAC transaction, which would be the transfer agent sending the stock via DWAC to Penson. They're a large clearing firm.

Q What, again, is the number of shares?

A It's 17,855,000. I got ahead of myself. It's showing that the Digital Edge Marketing's Moneyline account was being credited the stock. And if the customer looked in their account, they would see the simple posting crediting their account the 17,855,000 shares. They could click on at the end of the row of

that transaction in their account for additional detail just like a back office representative could too as well. And it would show more information, in this case, internal information. As you see, it shows internal notes and stuff on actually where the stock was received, which omnibus account received the stock.

Q Can you tell from this what Moneyline employee posted this transaction record into the system?

A You cannot tell who posted it, but it shows Operator David, and that means that David -- in this case, David Rushing approved the posting. Typically, it would be the same person. It all depended. At this period of time, David could post and actually approve postings as well. So he entered the posting in the customer account, and then he approved it. That's why it shows his name.

Q You can put that document down.

Please take a look at what's been marked for identification as Government Exhibit 2-3.

A Okay.

Q Are you familiar with this document?

A Yes.

Q Is this another internal Moneyline transaction record?

A A detailed transaction record, yes, for Moneyline.

Q Does it also relate to Everock stock?
A Yes.
MR. STOJILKOVIC: Your Honor, I'd offer in 2-3.
MR. BOOK: No objection.
THE COURT: Okay. Without objection, it's admitted.
MR. STOJILKOVIC: Can we put it up, please.
BY MR. STOJILKOVIC:
Q What kind of transaction are we seeing in this record?
A This is giving detail of an internal transfer between two Moneyline accounts, in this case, Digital Edge Marketing sending to Steve Naremore -- it's a Moneyline account -- 100,000 shares of Everock. It was executed on May 28, 2009.
Q Now, as you described in this transaction, Digital Edge is sending shares to Steve Naremore. In reality, were these shares actually being moved in the brokerage where they were held?
A Well, they're being moved in the Moneyline account in the servers in Costa Rica, Panama, for the Moneyline customer. But there would be no movement of those shares in the underlying omnibus accounts in the U.S. if there were a -- whatever number of shares were in

that account would remain unaffected and not show any transactional history. The only transaction was on the books of Moneyline, so to speak.
Q Okay. So as a result of this transaction, if, say those shares are sold, now internally Moneyline you would note, Okay, a portion of those shares should be credited to this customer's account rather than that customer's account?
A Well, if Mr. Naremore after -- this shows that it was an executed journal. And so after this was executed, Mr. Naremore was free to enter a sell order for all or part of his shares.
Q You can put that one down.
Please take a look at the next document, Government 2-4. Is this another internal Moneyline transaction detail related to Everock?
A Yes, it is.
MR. STOJILKOVIC: I would move in 2-4.
THE COURT: Without objection, it will be admitted.
BY MR. STOJILKOVIC:
Q Can you just briefly walk us through this entry.
A Okay. This is similar to the previous transaction. It is a transfer of Everock stock from between two different Moneyline accounts. In this

case, it's for 5,000,000 shares of Everock from June 26, 2009, going from Digital Edge Marketing, MLB1765, to Carol McKeown's account, MLB1787.

Q Thank you. You can put that one down as well.

Now, let's take a look at what's been marked for identification as Government Exhibit 2-5. Is this another special Moneyline record?

A Yes. It's another internal detail record of a journal transaction.

Q Okay. Does it also relate to the Moneyline customer Digital Edge Marketing?

A Yes. This shows -- gives the detail of a cash journal entry whereupon Digital Edge Marketing transferred $10,746 to the account of Perma Industries, Moneyline Brokerage Account 1690.

MR. STOJILKOVIC: Your Honor, I would move in 2-5.

THE COURT: Any objection?

MR. BOOK: No objection.

THE COURT: All right. Without objection, Exhibit 2-5 is admitted.

MR. STOJILKOVIC: Now, can we first blow up the top part of the page just with the information there.

Thank you.

BY MR. STOJILKOVIC:
Q So you describe this as a cash transfer rather than a stock transfer; is that correct?
A Yes.
Q So how would this work in practice? Is money going from one account to another? Walk us through.
A Once again, I think we were -- you're asking did the money on the books and records of the Moneyline Brokers' stock brokerage platform would show that, and because this is actually an executed -- showing it's executed, would show the transfer -- reflect the transfer of funds from Digital Edge to Perma Industries.
Q Now, in reality, did either customer, Digital Edge or Perma Industries, have bank accounts with actual cash at Moneyline?
A No. They had a brokerage account at Moneyline. The cash accounts that Moneyline had in omnibus were in various accounts in the U.S. and in Panama.
Q Okay. Would it be fair to say that this is, in essence, kind of an instruction: When moneys are being distributed out, that this portion of money should go to Perma Industries rather than to Digital Edge?
A Well, you can't necessarily tell anything more other than that this represents a transfer of moneys.

Now, Digital Edge had to have the $10,746 in their account to effect this transfer.

Q Okay. And when you say Digital Edge would have had to have that money in their account, in their Moneyline account, or are we talking about money coming to them through this kind of series of transactions that we've described?

A Well, it would have -- no. It would be showing in their Moneyline accounts.

Q I see.

A Right.

Q Can we focus in on the e-mail that's embedded in this record?

A Okay.

Q First of all, do you know how an e-mail gets embedded into a record like this?

MR. BOOK: Your Honor, I object. The fact of whether it's an e-mail or not isn't established. I'm not sure what it is.

BY MR. STOJILKOVIC:

Q How would this text that you see there that's called out, that's on the lower right-hand side get embedded into a record like this?

A There's two ways a customer could start the process of journaling cash or stock between their.

Account and another account. One was they could log into their brokerage account, and under banking, it allowed them a choice of -- it's -- one of the options was to request funds or stock be transferred. All they needed was the other person's account number and name.

But it was not uncommon for customers to either use the internal e-mail program in their brokerage account or send an outside e-mail to Moneyline. Moneyline had an e-mail address available for this. And when it was not done internally on the -- in the customer's account via the journal mechanism and was done by an e-mail, it was practice that the e-mail would actually be copied into the notes of the journal transaction. So that basically is proof that the customer had requested this event to take place.

Q Okay. For a transfer from Digital Edge to Perma Industries, which customer would've had to make that request?

A The sender, Digital Edge in this case.

Q Okay. This text that's embedded here, who is it addressed to?

A It's addressed to Robin.

Q Who would that have been?

A That would have been Robin Rushing.

Q Okay. And what is the signatory information at

the bottom of that text?
A It's showing it's from Mark Dresner and shows, of course, his e-mail address and his phone number. It also -- it appears to represent from -- it says, "This will confirm my request to make the following money transfer."
He probably discussed this with Robin.
Q I don't want --
A Okay.
Q Let's take a look at a series of documents, sir. I'd ask you to take a look at 2-6, 2-7, 2-9, 2-11, 2-13, and 2-14.
THE COURT SECURITY OFFICER: Counsel, just to be sure, it's 2-6, 2-9, 2-11, and 2-13?
MR. STOJILKOVIC: And 2-14. My apologies.
BY MR. STOJILKOVIC:
Q Sir, are all of these additional internal Moneyline records?
A Yes. They're journal -- they're details of executed journals between Moneyline accounts and cash.
Q And are all of these documents that we have up there, are they all details of transfers from Digital Edge Marketing to Perma Industries, Ltd.?
A Yes.
MR. STOJILKOVIC: Your Honor, I'd move this

group in, and again, for the record, 2-6, 2-7, 2-9, 2-11, 2-13, and 2-14.

THE COURT: Any objection?

MR. BOOK: No, Your Honor.

THE COURT: Without objection, Exhibits 2-6, 7, 9, 11, 13, and 14 are admitted.

MR. STOJILKOVIC: Can you put up 2-6, please.

BY MR. STOJILKOVIC:

Q Does 2-6 also contain an embedded message like we saw in 2-5?

A Yes.

MR. STOJILKOVIC: Can we call that out, please.

BY MR. STOJILKOVIC:

Q Again, who is the message in 2-6 directed to?

A The message is directed to Robin.

Q All right. And who is the message from?

A It indicates that it's from Mark Dresner.

Q And again, this is a transfer from the Digital Edge Marketing account; is that correct?

A That's correct.

Q All right. You can put down that set of documents, sir. I only have a couple more.

Please look at 2-8.

A Okay.

Q Is this another record related to the Digital Edge Marketing account?
A It's another journal entry in Moneyline that was executed, and this is the detail of that journal entry.
MR. STOJILKOVIC: We move to admit 2-8.
THE COURT: Any objection?
MR. BOOK: No objection.
THE COURT: Without objection, Exhibit 2-8 is admitted.
BY MR. STOJILKOVIC:
Q Now, what is this kind of transaction?
A This transaction is showing that a payout from a customer account, in this case MLB1765, Digital Edge Marketing, was booked against the account on July 27, 2009. It shows that the funds were wired out to the customer.
Q Okay. And how -- I mean, can -- again, just for clarity, walk us through the process. How would those funds get to the customer?
A Well, the customer, first, would enter a wire request with customer service, or it's much better for the back office if he entered it electronically. It was a feature. He could request a payout and store his banking information in his customer accounts. It was then processed and typically wired out to the customer

within 48 hours.
Q Okay. And if I would want to trace kind of the whole process of -- if a customer had sold stock through Moneyline and is requesting now a wire, would it be fair to say that that stock would have to be sold in the brokerage account, transferred to the bank account in the U.S., and then transferred to Panama and then on to the customer?
A That's correct.
MR. BOOK: Objection.
THE COURT: Sustained.
BY MR. STOJILKOVIC:
Q Okay. Can you -- I just want to clarify that if I want to track this type of transaction and try to track the money back to the brokerage account where the stock was initially sold out of, can you walk me through the steps that would occur.
A If it was Everock, it was most likely sold in either the AFC or the Track Data accounts. Those moneys would at some point be wired, proceeds from that account with possible other stock sales. Further, customers would be wired to Bastille's Chase bank account in Las Vegas. And then shortly thereafter, electronics of that money would be wired down to Panama, to a bank account in Panama to fulfill customer

obligations. And shortly thereafter, when the customer did wire or did request a wire of funds, the funds would be wired out from the Panama bank accounts.

Q Okay. Where would that go to from the Panama bank accounts?

A Wherever the customer had a bank account in their name. Okay. They had already given the banking wire information to Moneyline.

Q And what was the amount of this particular wire in 2-8?

A This one was for $22,064.

Q Can you put that down.

Can you please take a look now at the following grouping, 2-10, 2-12, 2-15, and 2-16?

THE COURT: Mr. Stojilkovic, we're going to take our luncheon recess at this time.

MR. STOJILKOVIC: Thank you, Your Honor.

THE COURT: We'll reconvene at 2:15.

MR. WEBSTER: Your Honor, may I ask one question?

THE COURT: Yes.

MR. WEBSTER: Do you have a motions docket on Friday morning?

THE COURT: I do. So we won't sit on Friday.

MR. WEBSTER: Yes, sir.

THE COURT: All right. My intention is to go until around 6:00 today.

MR. WEBSTER: Yes, sir.

THE COURT: All right. We'll stand in recess until 2:15.

Mr. Gallison, do not discuss your testimony during the luncheon recess.

(Recess from 1:29 p.m. until 2:19 p.m.)

THE COURT: Mr. Stojilkovic.

Mr. Gallison, you remain under oath.

MR. STOJILKOVIC: Thank you, Your Honor.

BY MR. STOJILKOVIC:

Q Mr. Gallison, I'd like you to take a look at the following documents, 2-10, 2-12, 2-15, and 2-16.

A Okay.

Q Are you familiar with these?

A Yes.

Q Are these additional internal Moneyline documents?

A Yes.

Q And are they all transaction records that relate to the Digital Edge Marketing Moneyline customer account?

A Yes.

MR. STOJILKOVIC: I'd offer up at this time 2-10, 2-12, 2-15, and 2-16.

THE COURT: Any objection?

MR. BOOK: No objection.

THE COURT: Without objection, Exhibits 2-10, 12, 15, and 16 are admitted.

MR. STOJILKOVIC: Can we put up 2-10, please.

BY MR. STOJILKOVIC:

Q Mr. Gallison, what do we see in 2-10?

A This is a transaction detail for an executed journal, in this case, a wire payout -- a payout via wire out of the Digital Edge Marketing MLB1765 accounts.

Q And what is the amount of this payout?

A $51,357.

Q And the remaining documents you have there, 2-12, 2-15, and 2-16, are they additional documentation of payout wires related to the Digital Edge Marketing account?

A Yes.

Q Can you just read off the amounts of those payout wires?

A Twenty-one -- excuse me -- 23,189 on August 3, 2009; $48,855 on August 6, 2009; $99,029 showing on August 6, 2009, as well.

Q You can put those documents down, sir.

A Okay.

Q Now, please look at what's been marked for identification as Government 2-17.
A Okay.
Q What is this?
A This is a journal detail for Moneyline Brokers representing a transfer of Everock stock between two accounts.

MR. STOJILKOVIC: I'd offer 2-17 at this time.

THE COURT: Any objection?

MR. BOOK: No objection.

THE COURT: Without objection, 2-17 is admitted.

MR. STOJILKOVIC: Can we put it up, please.

BY MR. STOJILKOVIC:

Q What accounts is this stock transfer journal related to?
A This transfer of 40,000,000 shares of Everock is going -- is coming from the BHI Group, Inc., MLB2006, and it's going to Digital Edge Marketing, MLB1765.
Q Thank you. You can put that document down as well.

Mr. Gallison, I'd like to at this time play a portion of a call with you.

MR. STOJILKOVIC: Your Honor, for the record,

what I would like to play has been marked Government Exhibit 1-7A. I'd ask to play it with this witness and, again, would tie up the chain of custody of how we got this call with our final witness.

THE COURT: Any objection to the call?

MR. BOOK: No, sir.

THE COURT: All right. This is in Exhibit 1-17A?

MR. STOJILKOVIC: It's 1-7A. The A, Your Honor, just for clarity, this is an excerpt of a longer call, and all we are playing is the excerpt.

THE COURT: All right. The Court will admit that exhibit.

(Audio is played.)

BY MR. STOJILKOVIC:

Q Mr. Gallison, do you recognize the voices on this call?

A Yes.

Q Who are they?

A It's Ann Hiskey and myself.

Q All right. You discuss -- at one point, I believe, you indicate a promo on EVRN. What was your understanding of what a promo meant under these circumstances?

A That there was a paid for stock promotion, meaning

that newsletter writers and e-mail and tech spammers and websites had been paid to recommend -- write research reports and recommend the purchase of the EVRN stock.

Q Okay. According to your understanding, why would individuals -- why would Moneyline clients want to give someone like Ms. Hiskey advance notice that this is in the works?

A Because they want to -- since they were paying out money and stock, they want to make sure, to the best of their ability, to control themselves, to the best of their abilities, the liquidation of their positions once buyers and buying volume appeared in the marketplace.

Q And I believe we heard Ms. Hiskey's voice say that the idea was to, quote, sell as much as we can each day and at the end split it up equally among the accounts. What is your understanding of that?

A Well, this was a not uncommon occurrence where you had a group of sellers that were working together. Moneyline would liquidate in an orderly fashion the stock position into selling into the volume created that was in the marketplace and at the end of the day would -- Anna would discuss -- the customer service rep would discuss with the accounts and tell them how much

number of shares were sold. And then the accounts would decide between themselves how much to allocate to each account. This allowed the customers themselves not to have to put in which sometimes could be just dozens of individual sell orders electronically. They had given instructions to Anna to sell as much as she could.

Q You indicate, We have done that before?

A That's correct.

Q Is that true?

A Yes. It wasn't, like I say, uncommon. It wasn't a common order, but it had happened multiple times previously with customers.

Q In order -- if the stock related to a particular promotion was held in multiple -- or came in from multiple customers, would you need to hear from all of those customers or could one customer authorize the sale of all the stock?

MR. BOOK: Objection, leading.

THE COURT: Overruled.

You may answer.

A One customer, using the term "ringleader" for these purposes, could provide instructions to cover just so customers -- but it had to be with those other customers already, like, telling Anna to follow the

instructions of this one gentleman. Then Anna would -- of course, any customer service rep would, of course, then after, given the instructions from the one person, then verify with each of the individual customers that that was okay. And then the trades would be executed to their accounts.

MR. STOJILKOVIC: Your Honor, I pass the witness.

THE COURT: All right. Thank you.

Mr. Book.

MR. BOOK: The Court's indulgence for a moment.

THE COURT: Yes.

(Mr. Webster and Mr. Book confer.)

MR. BOOK: No questions, Your Honor.

THE COURT: All right. May this witness be excused?

MR. STOJILKOVIC: Yes, Your Honor.

THE COURT: All right. Mr. Gallison, you're excused. Please do not discuss your testimony outside of the courtroom with any other person.

THE WITNESS: Thank you, Your Honor.

(The witness stands aside.)

MR. STOJILKOVIC: Your Honor, prior to calling our next witness, the government would like to

offer and play into the record three additional short calls that I think -- we offer them now because they precede a call we're going to play with the next witness.

THE COURT: All right.

MR. STOJILKOVIC: These are 1-18A, 19, and 110.

THE COURT: All right. Any objection?

MR. BOOK: Your Honor, the government has identified a number of calls and portions of calls they intend -- or at least identified in their exhibit list. I'll object to the extent the calls -- you heard the last one. I didn't object. They contain hearsay statements within the calls. So I would object to any hearsay statements within the calls of somebody told me this, somebody told me that to the extent it's offered for the truth of the matter. It's hard to object before the call is played.

MR. STOJILKOVIC: Your Honor, any statement relaying information in the call is just offered for the state of mind of the speakers. The three calls we are going to play now I don't believe contain such statements. They're very brief calls trying basically to -- they all contain the defendant and him trying to connect with somebody at Moneyline.

THE COURT: All right. I'm going to provisionally admit the recordings subject to the Court's ruling definitively on their admissibility once the government presents its other evidence.

MR. STOJILKOVIC: Thank you, Your Honor.

Can we start with 18A.

(Audio is played.)

MR. STOJILKOVIC: Can we now play 1-9.

(Audio is played.)

MR. STOJILKOVIC: Finally, 1-10.

(Audio is played.)

MR. STOJILKOVIC: Thank you, Your Honor.

THE COURT: All right. The next witness, please.

MR. O'NEILL: Your Honor, at this time, the United States calls Ann Hiskey.

THE COURT: All right. Ms. Hiskey will come forward, please.

Counsel, you may proceed.

MR. O'NEILL: Thank you, Your Honor.

(Ann Hiskey's testimony under separate cover.)

THE COURT: Please call your next witness.

MR. DIMOCK: Your Honor, the United States would call Mr. Paul Wilkinson.

THE COURT: Mr. Wilkinson will come forward,

please.

(Paul Wilkinson's testimony under separate cover.)

THE COURT: The next witness, please.

MR. DIMOCK: Yes. The United States would call Ms. Deborah Oremland.

THE COURT: All right. Ms. Oremland would come forward, please.

DEBORAH OREMLAND, PLAINTIFF'S WITNESS, AFFIRMED

DIRECT EXAMINATION

BY MR. DIMOCK:

Q Good afternoon, Ms. Oremland.

A Good afternoon.

Q While the court security officer is getting you some water, would you please state and spell your name for the record.

A Sure. It's Deborah Oremland, D-E-B-O-R-A-H, O-R-E, M as in Mary, L-A-N-D.

Q And, Ms. Oremland, could you explain for the Court what is your educational background.

A I have a BA from the University of Michigan and a law degree from the American University.

Q Okay. And where are you currently employed?

A At FINRA.

Q And what is FINRA?

A FINRA is the Financial Institute Regulatory

Authority -- Financial Industry Regulatory Authority. We are a self-regulatory organization. We are a private membership organization, and we regulate broker dealers and their employees.

Q Okay. And what is the NASD?

A The NASD was our predecessor company. The NASD and some of the regulatory functions of the New York Stock Exchange merged to become FINRA in 2007.

Q And approximately how long have you been employed by FINRA?

A For over 14 years.

Q Have you held various positions over that time?

A Yes.

Q Could you explain those.

A Sure. I started in the Market Regulation Department doing fraud surveillance of trading and over-the-counter securities in NASDAQ securities. Then I went to the Enforcement Department where I focused more on our member firms, and about -- after a year in Enforcement, I went to the Criminal Prosecution Assistance Group where I am now.

Q And what does the Criminal Prosecutions Assistance Group do?

A We're a small group that assists the government with their investigations and prosecutions involving

securities fraud and related offenses.
Q In addition to your education, do you have any other professional trainings that you've gone through?
A I went through a certificate course with FINRA that FINRA does in conjunction with Wharton School of Business. It is called the Certified Regulatory and Compliance Professional Certificate.
Q What, if any, is the sort of relationship between FINRA and the SEC?
A The SEC oversees FINRA.
Q What does SEC stand for just for the record?
A The Securities and Exchange Commission.
Q Thank you.
Could you just briefly explain what the difference is between private and public companies.
A Public companies, they have their shares available to be purchased and sold by the public on one of the various market centers. Private companies, they don't have their shares available for sale to the public.
Q And based on your experience, what are the reasons in general that companies go public?
A To generate capital.
Q And could you just explain on a general level how that usually works.
A Usually companies will go through an IPO process,

independent initial public offering, which involves a lot of filings with the SEC. It's an arduous process, and it can be expensive. And that is the initial sale to the public of their company shares.

Q Are there other ways for smaller companies to go public?

A Yes.

Q Could you explain that.

A Sometimes companies go public through what's called a reverse merger. In that process, there is usually a shell company that's trading on one of the markets, typically one of the over-the-counter markets. And it's a dormant shell, and it's taken over by a private company that wants to go public. So usually there's an exchange for stock, and the --

MR. WEBSTER: Your Honor, I'm going to object. She's not been designated as an expert.

THE COURT: Where is this going?

MR. DIMOCK: Your Honor, we noticed her up. She is going to be doing some summary exhibits. Also, in our notice, we indicated that she would be covering some specific terms that come up during the trial to explain what those mean based on her training and experience, basically, as more of a lay witness, not as an expert offering opinion. This was all noticed up

some time ago to the defense. We don't have a lot of definitions to go through, just a few. Then she's going to go into the summary charts.

THE COURT: All right. I'll hear this, but I'm going to keep your objection under advisement.

MR. DIMOCK: Thank you, Your Honor.

BY MR. DIMOCK:

Q So I'm not sure exactly where we were.

What is a reverse merger?

A Oh, so the private company merges with the publicly traded shell, and then the private company becomes public.

Q Okay. And what are over-the-counter securities?

A Those are securities that don't trade on one of the major exchanges, like the New York Stock Exchange or the NASDAQ. They trade on different market centers. Typically, they're smaller companies. They're more thinly traded meaning there aren't a lot of shares that are traded on a particular day, and they don't have the same sort of market capitalization as a company that trades on one of the exchanges.

Q And just a few more things.

OTC Markets Group, are you familiar with that phrase?

A Yes.

Q What is that?

A That's one of the over-the-counter markets, and companies that trade on the OTC Market Group -- it used to be called the Pink Sheets. Those are, as I mentioned, smaller companies thinly traded generally. They don't have to go through the listing requirements that New York Stock Exchange companies and NASDAQ companies have to go through. Oftentimes they don't even need to file -- well, no. They don't file documents with the SEC on a quarterly or annual basis.

Q Okay. I just have a few more.

Can you explain the difference between restricted and unrestricted stocks.

A Restricted stock, there are limitations to when you can sell the stock. Typically, you get restricted shares and you have to hold on to them for at least six months to a year. Free trading shares, you can sell them at any time.

Q Okay. And I know that earlier in the trial the term "clearing firm" came up. Can you explain what a clearing firm is?

A A clearing firm is a type of broker/dealer. They're tasked with clearing transactions for smaller firms called introducing firms, and they also take care of some back office operations for the smaller

introducing firms.

Q Okay. And one last thing because I know this is going to come up in connection with some of your summary exhibits. A transfer agent?

A A transfer agent is a company that a public company uses to do a variety of tasks, including issuing and canceling stock certificates. They also keep track of shareholders and, really, the initial issuances of stock from a company.

Q Okay. Now, have you created some summary exhibits in connection with your testimony?

A Yes.

Q Okay. Did you create all of those solely on your own?

A No.

Q Could you explain that.

A I had assistance from colleagues.

Q Okay. But were you able to confirm that everything in those charts was accurate?

A Yes.

Q Okay. And what types of information is -- we'll look at the specific charts, but generally speaking, what were the categories of information that you looked at to summarize?

A I reviewed price and volume information from

Bloomberg Blue Sheet data and documents from the transfer agent Continental.

Q Okay. Let me just walk through those very briefly.

Blue Sheet data, what is that?

A That's data received from a clearing firm for security for a specific period of time. It includes all the transactions in that stock for that given period.

Q Okay. Now, the Blue Sheet data, does that include the name and address of the account owner in it?

A Yes.

Q If there were multiple people with an interest in an account, would you be able to see that through the Blue Sheet data?

A No.

Q Why is that?

A It only contains the name that's on the account.

Q Okay. Then you mentioned, I think, pricing volume and Bloomberg. Could you explain what that is.

A Bloomberg is a subscription service. It's widely used by the industry, and it has price and volume information for publicly traded companies and also news information, among other things.

Q Is that publicly available information?

A Yes.
Q Okay. And I think you mentioned stock transfer records.
A Yes.
Q Is that for Continental Stock Transfer?
A Yes.
Q Okay. And then lastly, did you also review any kind of press information or anything like that in connection with your summary charts?
A I did.
Q Could you explain that.
A They are press releases from Bloomberg.
Q Is that all publicly available information?
A Yes.
Q Okay. All right. The first summary exhibit I'd like to look at --

MR. DIMOCK: And for the court security officer, the exhibits we'll be looking at primarily to start off are all going to be in the 27 series. With an exception, they'll generally be in order. I'll keep track for you. So we'll start with 2701.

THE COURT REPORTER: Did you say 2701 or 27-1?

MR. DIMOCK: Excuse me, 27-1.

BY MR. DIMOCK:

Q Deborah, I'll just wait for the defense and the Court to also get those exhibits.

THE COURT: Are there going to be any objections to any of these exhibits, these summaries?

MR. WEBSTER: No, Your Honor. I believe we've agreed on these.

MR. DIMOCK: I think we've agreed on the underlying data, but we haven't heard from you on the summary exhibits.

THE COURT: Identify the group of summary exhibits that --

MR. DIMOCK: Sure, Your Honor. It would be 27 -- and I'll just give you the -- it will be 27-1 through 27-12.

THE COURT: All right. Are there any objections, Mr. Webster?

I take it the underlying data has been produced to the other side.

MR. DIMOCK: Yes, it has, Your Honor.

MR. WEBSTER: Yes, Your Honor. So long as she can just authenticate them, we don't have any problem.

THE COURT: All right. Well, go through them and then just move them in as a group.

MR. DIMOCK: Okay. I have one other series.

I don't know if you want to address that when I get to that part or if you want to do that now.

THE COURT: Well, let's stay with these.

MR. DIMOCK: Okay.

BY MR. DIMOCK:

Q All right. So starting with Exhibit 27-1 --

MR. DIMOCK: Your Honor, we have permission to publish these as we go along?

THE COURT: Yes.

BY MR. DIMOCK:

Q Ms. Oremland, do you have that exhibit in front of you?

A Yes.

Q Okay. Is this one of the summary exhibits that you created?

A Yes.

Q And it relates to Everock?

A Yes.

Q Could you explain what's summarized in this exhibit.

A This summarizes a transfer of Everock shares to several accounts and then the subsequent sale of those shares.

Q Okay. In the -- at the top in the title, it says first tranche. What does that relate to?

A It relates to the first -- a transferring of shares that we noticed in the activity with several accounts.

Q There's more than one tranche?

A Yes. There's four of them.

Q Why don't you then walk us -- just to be clear on this one, the underlying data being summarized comes from transfer agent records, correct?

A Yes.

Q And is it also the Blue Sheet data?

A Yes.

Q Okay. If you could, then please explain this exhibit to us.

A Sure. On March 24, 2009, there's a letter from Frank Zangara instructing a transfer of over 18,000,000 Everock shares from Grossman Trading account, titled Glenwood Marketing, to two entities. Over 17,000,000 goes to Bastille Advisors for further credit to Digital Edge Marketing, care of Mark Dresner, and 700,000 shares go to a Wachovia account in the name of Infusion Capital Management.

On the 26th of March, 2009, there's a letter from Moeller to the Continental transfer agent requesting the transfer of those over 18,000,000 shares from the Grossman account to two entities, over 17,000,000 to

Bastille Advisors for further credit to Mark Dresner and 700,000 shares to Infusion Capital Management.

On April 1, 2009, Continental transfer agent transfers the 700,000 shares from the Grossman/Glenwood Marketing account to the Infusion Capital account.

On April 3, 2009, Infusion Capital sells 700,000 shares into the market.

On the 6th of April, Continental transfer agent transfers over 17,000,000 shares from the Glenwood Marketing account to the Sandias account at Penson.

From the period of May 26, 2009, through July 31, 2009, the Sandias account sells over 17,000,000 shares.

Q Okay. I just want to clarify one thing on this. On the 4-6-2009 entry, in the bracket, it says Track Data/PFSI. Can you explain what that is?

A Track Data is the introducing firm, and PFSI is a code for Penson, which is the clearing firm.

Q Okay. Thank you.

I'd like to move now to the next exhibit in the series, which would be 27-2. Ms. Oremland, are you familiar with this document?

A Yes.

Q What is this?

A This is a summary of the trading activity -- select trading activity in Everock from January 2009

through July 2009.

Q Okay. And could you just sort of walk us through the chart, the axises, and what it's depicting.

A Sure. On the left, that corresponds with the share volume, the volume of shares that are traded on a particular day in the market. The right -- that is shown in the columns. There are blue columns, and there are green columns. The blue columns show the total market volume, and the green columns represent the amount of shares that's attributed to the group. In this instance, the group is the Sandias account and the Infusion Capital Management account which was summarized in the exhibit that we just discussed.

On the right axis, it corresponds to the share price. Really, that's the daily closing price, and that is shown with the red line on the chart.

Q Okay. And what are we seeing happening here with regard to price over this period?

A There is an increase in price, really, after the group activity starts, after you see some of the selling activity from these accounts. There's an increase in price from -- that's seen starting around the end of April, May to the beginning of July where the price reaches almost 15 cents. But at the end of the period, the price falls down to around 4 cents.

Q Okay. In the yellow box in the top right, what information is contained there?

A That states that there were nine press releases regarding Everock issued from July 1, 2009, through the end of July 2009.

Q Okay. I'd like to move now to the next exhibit in the series. This would be 27-3. Is this another chart that you prepared --

A Yes.

Q -- in connection with Everock?

A Yes.

Q Okay. Could you just explain to us the information that's summarized here.

A Sure. This is what -- the background for the second tranche or transfer of shares that we noted. August 20, 2009, the Continental transfer agent transferred 70,000,000 Everock shares from Moeller to Bastille Advisors' account. R.M. Stark, the clearing firm, is purging.

September 10, 2009, the Bastille Advisors' R.M. Stark account transfer 70,000,000 shares to a Bastille Advisors' account at Penson.

And from the period of September 11, 2009, through November 25, 2009, the Bastille Advisors' account at Penson sells those 70,000,000 shares into the market.

Q Okay. And do you have another chart that corresponds to this time period?

A Yes.

Q Okay. If we could move then to Government Exhibit 27-4.

THE COURT: The Penson account is in the nature of a transfer agency account?

THE WITNESS: That's the clearing firm.

THE COURT: Right. Then their function in this context is what?

THE WITNESS: To really execute the trades.

THE COURT: Right. Right. So it's sent to them for the purposes of having a trade or transfer to someone else?

THE WITNESS: The shares were sent to the Bastille account, and then when Bastille wanted to sell those shares, the clearing firm was responsible for selling those shares into the market.

THE COURT: All right. Did those shares go directly to the Penson account, or did they go through another brokerage first?

THE WITNESS: I believe, Your Honor, that the -- well, it went to R.M. Stark, and then it was transferred to Penson. I don't know if -- I'm not sure if there was an introducing firm with this because

Penson is a large clearing firm.

THE COURT: All right. But the R.M. Stark firm is a brokerage firm?

THE WITNESS: Right.

THE COURT: All right. So it went from Bastille to Stark to the Penson account?

THE WITNESS: Yeah. It went from the transfer agent to the Bastille account at Stark to -- which it then --

THE COURT: Oh, I see.

THE WITNESS: Then the Stark account transferred to the Penson account.

THE COURT: I'm just trying to figure out where in the process here. So the 9-10 begins with the account at Stark, not at Bastille?

THE WITNESS: Yes, Your Honor.

THE COURT: All right.

THE WITNESS: Bastille is the name on the account.

THE COURT: At Stark?

THE WITNESS: At Stark.

THE COURT: All right. I'm with you. All right.

MR. DIMOCK: Thank you, Your Honor.

BY MR. DIMOCK:

Q I think we're next -- we'll move on to 27-4. And if you could just -- initially, is this another chart, summary chart that you created?
A Yes.
Q Okay. And could you just sort of walk us through this one like you did with the other one.
A Yes. This chart is similar to the one we reviewed previously. It walks through the activity that was just discussed in the background of the second tranche from the period of September 2009 through November 2009. And again, it shows the total market volume as compared to what the Bastille account's activity in the market. The total market volume is the blue column, and the green column represents the Bastille account's activity. The red line shows the price.
Q So what's generally occurring with the price over this three-month period?
A The price does increase around the end of September to a little bit more than 3 cents, but by the end of the period, after all of the shares have been sold, the price falls to about -- a little over 1 cent.
Q And does this chart also indicate there was press activity during this time period?
A Yes. There were 13 press releases issued from September 1 through November 30.

Q Okay. And if we could now move to the next exhibit in the series, this would be 27-5. Is this another summary chart that you put together in anticipation of your testimony?
A Yes.
Q Okay. Could you walk us through the information on -- well, first off, this one says third tranche on it?
A Yes.
Q So this relates to a third sort of chunk, for lack of a better phrase, of shares during this time period; is that accurate?
A Yes.
Q Could you walk through this chart for us.
A Sure. On March 12, 2010, the Continental transfer agent transfers 45,000,000 shares from Moeller to BHI Group account at Scottsdale Capital Advisors.
Then on March 22, 2010, the Continental transfer agent transfers 25,000,000 shares from Moeller to AKAT Global at an account at Scottsdale Capital Advisors.
Then from the period of March 23, 2010, through April 9, 2010, AKAT Global sells 25,000,000 shares that it received.
Then on May 18, 2010, the Continental transfer agent transfers 45,000,000 shares from Moeller to BHI

Group at Scottsdale Capital.

June 1, 2010, Continental transfer agent transfers 25,000,000 shares from Moeller to the BHI Group.

On July 13, 2010, Continental transfer agent transfers 47,000,000 shares from BHI Group/Zangara account at Scottsdale Capital to the BHI Group/Gibraltar Global Securities account at Penson.

August 25, 2010, the Continental transfer agent transfers 25,000,000 Everock shares from Gibraltar Global at Penson to the BHI Group account at Scottsdale Capital Advisors.

From the period of March 23, 2010, through September 15, 2010, the BHI Group sells almost 80,000,000 shares.

Q Okay. Thank you very much.

And did you also create a summary chart that covers the trading activity during this time period?

A Yes.

Q If we could have the Government Exhibit 27-6, please.

And is this another chart that you prepared?

A Yes.

Q Okay. And this one is also related to Everock?

A Yes. This shows the activity that was just described in the background.

Q Okay. All right. And if you could, just very generally explain what's going on in the chart.
A So from March 2010 through September 2010, you can see the volume that the group represented as compared to the total market volume and -- as well, you can see that the price decreased over this period after all of the shares were sold into the market by these groups --
Q Okay.
A -- these accounts.
Q And this period in 2010 from March to September, was there also activity relating to press releases?
A Yes. There were 31 press releases issued from March 1, 2010, through September 30, 2010.

THE COURT: Mr. Dimock, we're going to stop for today.

But I have one question for you.

THE WITNESS: Yes, Your Honor.

THE COURT: The first tranche is 7-1 to 7-31-09. Was there trading activity from August 1 through August 31? And if so, did you track that?

MR. DIMOCK: Your Honor, I might be able to -- we actually have another chart that, I think, is going to answer your question.

THE COURT: All right. Well, I won't try to do your job for you.

MR. DIMOCK: Actually, I appreciate it when you do sometimes.

THE COURT: All right. We'll recess for today. We'll resume tomorrow morning at 9:00.

All right. Ms. Oremland, don't discuss your testimony during the evening recess.

THE WITNESS: Okay. Yes, sir.

THE COURT: Thank you. The Court will stand in recess.

MR. DIMOCK: Thank you, Your Honor.

MR. STOJILKOVIC: Excuse me, Your Honor. I apologize. When do you want us here tomorrow?

THE COURT: We'll begin at 9:00.

MR. STOJILKOVIC: Do you want us to have these in binders by tomorrow?

THE COURT: If you would.

MR. STOJILKOVIC: Yes.

THE COURT: All right. Thank you.

----------------------------------

Time: 5:59 p.m.

I certify that the foregoing is a true and accurate transcription of my stenographic notes.

/s/

Rhonda F. Montgomery, CCR, RPR